Steven J. Nataupsky (State Bar No. 155,913)
snataupsky@kmob.com
Boris Zelkind (State Bar No. 214,014)
boris.zelkind@kmob.com
Ali S. Razai (State Bar No. 246,922)
ali.razai@kmob.com
KNOBBE, MARTENS, OLSON & BEAR, LLP
550 West C Street, Suite 1200
San Diego, CA 92101
Telephone: (619) 235-8550
Facsimile:  (619) 235-0176

Attorneys for Plaintiff and Counter-Defendant
I-FLOW CORPORATION

## IN THE UNITED STATES DISTRICT COURT

## FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I-FLOW CORPORATION, a Delaware corporation,<br><br>Plaintiff/Counter-Defendant.<br><br>v.<br><br>APEX MEDICAL TECHNOLOGIES, INC., a California corporation, MARK MCGLOTHLIN, an Individual,<br><br>Defendants/Counter-Claimants.<br><br>I-FLOW CORPORATION, a Delaware corporation,<br><br>Plaintiff/Counter-Defendant<br><br>v.<br><br>ZONE MEDICAL LLC, a California limited liability company,<br><br>Defendant/Counter-Claimant. | Case No. 07-cv-1200 DMS (NLS)<br><br>**PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW**<br><br>Trial Date:  August 24, 2009<br>Time:          9:00 A.M.<br>Courtroom 10, 2nd Floor<br><br>Honorable Dana M. Sabraw |

## CONTAINS CONFIDENTIAL INFORMATION – FILED UNDER SEAL

# TABLE OF CONTENTS

**Page No.**

I.      SUMMARY OF THE CASE ................................................................ 1

II.     FACTUAL CONTENTIONS (L.R. 16.1 (f)(3)(e)(1)) ............................... 2

    A.     The '481 Patent ................................................................ 2

    B.     Claim Construction........................................................... 3

    C.     Reexamination of the '481 Patent ........................................ 3

III.    FACTUAL CONTENTIONS (L.R. 16.1 (f)(3)(e)(2)) .............................. 4

    A.     The Accused Solace Pump Infringes Claims 1, 2 and 15 of the '481 Patent ........................................................................... 4

        1.     The Accused Solace Pump Infringes Claim 1 ............................ 4

            a.     The Accused Solace Pump Includes an Elongated Generally Cylindrical Support Member ......................... 5

            b.     The Accused Solace Pump Includes an Elongated Elastic Sleeve Means Mounted and Sealingly Secured at Fixed Spaced Longitudinal Positions on Said Support Member For Defining a Substantially Zero Non-Pressurized Volume Pressure Reservoir for Holding a Liquid in a Pressurized State for Dispensing Therefrom.................................. 6

            c.     The Accused Solace Pump Includes Housing Means Comprising Collapsible Non-Stretchable Housing Means for Containing Said Support Member and Said Pressure Reservoir for Enabling Said Pressure Reservoir to Expand Naturally and For Confining Said Reservoir to Fill Concentrically About Said Support Member, Said Collapsible Non-Stretchable Housing Means Loosely Positioned Around Said Sleeve Means and Defining a Chamber Between Said Sleeve Means and Said Collapsible Non-Stretchable Housing Means ................................. 8

            d.     The Accused Solace Pump Includes an Inlet Means for Introducing a Liquid Into Said Elastic Pressure Reservoir .......... 10

            e.     The Accused Solace Pump Includes Outlet Means for Dispensing Liquid From Said Pressure Reservoir to a Selected Site .................................................... 10

        2.     The Accused Solace Pump Infringes Claim 2........................... 10

        3.     The Accused Solace Pump Infringes Claim 15........................ 11

**TABLE OF CONTENTS**
*(cont'd)*

Page No.

  a. The Accused Solace Pump Includes an Elongated Generally Cylindrical Support Member Having Inlet Means Including an Inlet Port in One End of Said Member, and Outlet Means Including An Outlet Port in the Other End of Said Member.........................................12

  b. The Accused Solace Pump Includes an Elongated Elastic Sleeve Means Mounted in Non-Stretched Surface Contact and Sealingly Secured at Fixed Spaced Longitudinal Positions on Said Support Member for Defining a Substantially Zero Non-Pressurized Volume Pressure Reservoir for Holding a Liquid in a Pressurized State for Dispensing Therefrom.........................................13

  c. The Accused Solace Pump Includes First Housing Means Including a Collapsible Shell Enclosing Said Support Member and Said Pressure Reservoir, Said Housing Means Having a Size and Shape for Enabling Said Pressure Reservoir to Expand Naturally and For Confining Said Reservoir to Fill Concentrically About Said Support Member, Said Collapsible Shell Loosely Positioned Around Said Sleeve Means and Defining a Chamber Between Said Sleeve Means and Said Collapsible Shell.........................................13

  d. The Accused Solace Pump Includes an Inlet Means in One End of Said Support Member for Introducing a Liquid into Said Elastic Pressure Reservoir.........................................14

  e. The Accused Solace Pump Includes an Outlet Means in the Other End of Said Support Member for Dispensing Liquid from Said Pressure Reservoir to a Selected Site.........................................14

 4. The Accused Solace Pump Infringes Claims 1, 2 and 15 Under the Doctrine of Equivalents.........................................14

 5. Defendants are Not Entitled to Intervening Rights.........................................15

  a. Defendants are Not Entitled to Absolute Intervening Rights.........................................15

  b. Defendants are Not Entitled to Equitable Intervening Rights.........................................16

B. The '481 Patent Is Valid.........................................16

 1. Defendants' Invalidity Arguments.........................................17

**TABLE OF CONTENTS**
*(cont'd)*

Page No.

a. Allegedly Anticipatory References ............................... 17

    i. The EPO Publication ...................................... 17

    ii. United States Patent No. 5,105, 983 ("the '983 Patent") ................................................................ 18

b. Obviousness References ................................................ 19

    i. The Scope and Content of Prior Art Taught Away From the Claimed Invention................................. 19

    ii. The Asserted Combinations Do Not Disclose or Suggest a Collapsible Housing............................ 20

c. Objective Indicia of Nonobviousness Demonstrate Claims 1, 2 and 15 Are Not Obvious........................................ 21

    i. The Infusion Pump With A Collapsible Shell Achieved Unexpected Results............................. 21

    ii. The Commercial Success Enjoyed By Soft-Shell Pumps Support Nonobviousness ....................... 22

    iii. Customer Complaints About Prior Pumps Demonstrates A Long-Felt Unmet Need In The Market Place For The Claimed Invention ....................... 22

d. Indefiniteness Arguments............................................... 23

e. Written Description and Enablement Arguments ........................ 23

C. The '481 Patent is Enforceable ............................................................. 23

  1. Allegations Regarding the Sancoff Patents and the EPO Publication............................................................................. 23

    a. Materiality ..................................................................... 23

    b. Intent............................................................................. 25

  2. Allegations Regarding the Hessel and the Liebensohn Patents ............... 25

    a. Materiality ..................................................................... 25

    b. Intent............................................................................. 25

D. I-Flow Has Not Committed Patent Misuse ......................................... 25

# TABLE OF CONTENTS
### *(cont'd)*

**Page No.**

E.    I-Flow's Claims are Not Barred by Waiver, Estoppel, or Laches.........................26

F.    I-Flow's Claims are Not Barred by Collateral Estoppel .......................................26

G.    I-Flow's Claims are Not Barred by Unclean Hands...............................................26

H.    I-Flow's Claims are Not Barred by Res Judicata .................................................26

I.    I-Flow's Claims are Not Barred by Preemption....................................................27

J.    I-Flow is Entitled to Damages of At Least $465,887 For Its Lost Profits on the Infringing Sales ........................................................................................27

K.    Alternatively, I-Flow is Entitled to a Reasonable Royalty for Defendants' Infringement of the '481 Patent ...................................................28

L.    Defendants' Infringement Was Willful..................................................................29

M.    Defendants Should be Permanently Enjoined From Continuing to Infringe the '481 Patent .........................................................................................29

IV.    FACTUAL CONTENTIONS (L.R. 16.1 (f)(2)(a)).................................................31

    A.    Defendants are Liable for Trade Secret Misappropriation ....................................31

        1.    I-Flow Owns Protectable Trade Secrets....................................................31

            a.    I-Flow's Protectable Business Trade Secrets ................................31

            b.    I-Flow's Technical Trade Secrets..................................................31

            c.    I-Flow Takes Reasonable Measures To Protect Its Trade Secrets .........................................................................................32

            d.    I-Flow's Trade Secrets Have Independent Economic Value Because They Are Not Generally Known .........................33

        2.    Defendants Misappropriated I-Flow's Protectable Trade Secrets............33

            a.    Misappropriation of I-Flow's Business Trade Secrets by Improper Acquisition ....................................................................34

            b.    Misappropriation of I-Flow's Business Trade Secrets by Improper Use....................................................................................34

            c.    Misappropriation of I-Flow's Technical Trade Secrets by Improper Acquisition ....................................................................35

**TABLE OF CONTENTS**
*(cont'd)*

Page No.

d.    Misappropriation of I-Flow's Technical Trade Secrets by Improper Use ........................................................................ 35

3.    I-Flow Has Been Damaged by Defendants' Misappropriation of I-Flow's Protectable Trade Secrets ........................................... 36

B.    Defendants Should be Permanently Enjoined From Continuing to Use I-Flow's Protectable Trade Secrets ........................................... 38

C.    Defendants are Liable for Breach of Confidence .................................... 39

D.    I-Flow is Entitled to Damages for Defendants' Breach of Confidence ............... 40

E.    Defendants are Liable for Unfair Competition Under California Common Law ............................................................................ 40

F.    I-Flow is Entitled to Damages and a Permanent Injunction for Defendants' Unfair Competition Under California Common Law ............ 41

G.    Defendants are Liable for Unfair Competition Under California Business and Professions Code §17200, et seq. ................................... 41

H.    Defendants' Alleged Affirmative Defenses to Trade Secret Misappropriation, Breach of Confidence, and Unfair Competition ............ 41

I.    I-Flow Has Not Engaged In Unfair Competition Under Section 43 Of The Lanham Act ......................................................................... 42

J.    I-Flow Has Not Engaged In Statutory or Common Law Unfair Competition .............................................................................. 43

V.    ISSUES OF LAW ........................................................................... 44

A.    Claim Construction ...................................................................... 44

B.    Infringement ............................................................................... 44

1.    Literal Infringement .............................................................. 44

2.    Infringement Under the Doctrine of Equivalents ...................... 45

3.    Willful Infringement .............................................................. 45

C.    Damages ..................................................................................... 46

1.    Lost Profits .......................................................................... 46

2.    Reasonable Royalty .............................................................. 46

# TABLE OF CONTENTS
### (cont'd)

Page No.

3.  Treble Damages ........................................................................ 48

D.  Injunctive Relief .................................................................................. 48

E.  Intervening Rights ............................................................................... 49

F.  Patent Validity ..................................................................................... 50

1.  Anticipation .............................................................................. 50

a.  Printed Publication ....................................................... 51

2.  Obviousness .............................................................................. 51

G.  Inequitable Conduct ............................................................................ 52

H.  Patent Misuse ...................................................................................... 53

I.  Waiver .................................................................................................. 53

J.  Equitable Estoppel ............................................................................... 53

K.  Laches .................................................................................................. 53

L.  Collateral Estoppel .............................................................................. 54

M.  Unclean Hands ..................................................................................... 54

N.  Res Judicata ......................................................................................... 54

O.  Preemption as a Defense to a State Law Unfair Competition Claim ... 55

P.  Trade Secret Misappropriation ........................................................... 55

Q.  Breach of Confidence .......................................................................... 57

R.  Unfair Competition Under California Common Law .......................... 57

S.  Unfair Competition Under Cal. Bus. And Prof. Code 17200, et seq. ... 57

T.  False Advertising Under the Lanham Act 43(a)(1)(B) ....................... 58

U.  Preemption as a Defense to Fraud-on-the-FDA Claims ...................... 59

V.  Lack of Standing to Assert a Private Right of Action under the Food, Drug, and Cosmetic Act ....................................................................... 59

VI.  ATTORNEYS' FEES ..................................................................................... 60

-vi-

# TABLE OF AUTHORITIES

**Page Nos.**

*A&M Records v. Napster, Inc.*,
    239 F.3d 1004 (9th Cir. 2001) .................................................................... 53

*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*,
    960 F.2d 1020 (Fed. Cir. 1992) .................................................................. 52

*Acumed, LLC v. Stryker Corp.*,
    525 F.3d 1319 (Fed. Cir. 2008) .................................................................. 53

*Ajaxo Inc. v. E*Trade Group, Inc.*,
    135 Cal. App. 4th 21 (Ct. App. 2005) ........................................................ 55

*Allied Tube & Conduit Corp. v. John Maneely Co.*,
    125 F. Supp. 2d 987 (D. Ariz. 2000) .......................................................... 50

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
    435 F.3d 1356 (Fed. Cir. 2006) .................................................................. 54

*Bank of the West v. Superior Court*,
    2 Cal. 4th 1254 (Cal. 1992) ....................................................................... 56

*Beatrice Foods Co. v. New England Printing & Lithographing Co.*,
    923 F.2d 1576 (Fed. Cir. 1991) .................................................................. 48

*Bloom Eng'g Co. v. North American Mfg. Co.*,
    129 F.3d 1247 (Fed. Cir. 1997) .................................................................. 49

*Buckman Co. v. Plaintiffs' Legal Committee*,
    531 U.S. 341 (2001) .................................................................................... 58

*City Solutions Inc. v. Clear Channel Commc'ns, Inc.*,
    365 F.3d 835 (9th Cir. 2004) ...................................................................... 56

*Consolidated Aluminum Corp. v. Foseco Int'l, Ltd.*,
    910 F.2d 804 (Fed. Cir. 1990) .................................................................... 53

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*,
    868 F.2d 1251 (Fed. Cir. 1989) .................................................................. 45

*Davies v. Krasna*,
    14 Cal. 3d 502 (Cal. 1975) ......................................................................... 56

*Digital Control Inc. v. Charles Mach. Works*,
    437 F.3d 1309 (Fed. Cir. 2006) .................................................................. 51

*Duncan v. Stuetzle*,
    76 F.3d 1480 (9th Cir. 1996) ...................................................................... 56

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ................................. 48, 49

1

**<u>TABLE OF AUTHORITIES</u>**
*(cont'd)*

2

3

**Page Nos.**

4

*Elan Pharms., Inc. v. Mayo Found.*,
    346 F.3d 1051 (Fed. Cir. 2003) ................................................. 50

5

*Engineered Data Products v. GBS Corp.*,
    506 F. Supp. 2d 461 (D.Colo. 2007) ...................................... 49

6

7

*Faris v. Enberg*,
    97 Cal. App. 3d 309 (Ct. App. 1979) ..................................... 56

8

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970) ................................ 27, 46

9

10

*Gile v. Optical Radiation Corp.*,
    22 F.3d 540 (3rd Cir. 1994), <u>cert. denied</u>, 513 U.S. 965 (1994) ...... 58

11

*Studiengesellschaft Kohlem. H. v. Dart Indus., Inc.*,
    726 F.2d 724 (Fed. Cir. 1984) .................................................. 50

12

13

*Harper House, Inc. v. Thomas Nelson, Inc.*,
    889 F.2d 197 (9th Cir. 1989) .................................................... 57

14

*Healthport Corp. v. Tanita Corp. of Am.*,
    563 F. Supp. 2d 1169 (D. Or. 2008) ....................................... 57

15

16

*Hebert v. Lisle Corp.*,
    99 F.3d 1109 (Fed. Cir. 1996) .................................................. 51

17

*Hilderman v. Enea Teksci, Inc.*,
    551 F. Supp. 2d 1183 (S.D. Cal. 2008) .................................. 54

18

19

*Hoechst Celanese Corp. v. BP Chems. Ltd.*,
    78 F.3d 1575 (Fed. Cir. 1996) .................................................. 48

20

*Impax Labs, Inc. v. Aventis Pharms., Inc.*,
    468 F.3d 1366 (Fed. Cir. 2006) ............................................... 51

21

22

*In re Seagate Tech., LLC*,
    497 F.3d 1360 (Fed. Cir. 2007) ............................................... 45

23

*Johnson Worldwide Assocs. v. Zebco Corp.*,
    175 F.3d 985 (Fed. Cir. 1999) .................................................. 44

24

25

*Kaufman Co. v. Lantech, Inc.*,
    807 F.2d 970 (Fed. Cir. 1986) .................................................. 48

26

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (Cal. 2003) ............................................. 56, 57

27

28

# TABLE OF AUTHORITIES
## *(cont'd)*

**Page Nos.**

*Kraft Foods, Inc. v. Int'l Trading Co.,*
    203 F.3d 1362 (Fed. Cir. 2000) ...................................................... 44

*KSR Int'l Co. v. Teleflex Inc.,*
    550 U.S. 398 (2007) .............................................................. 50, 51

*Laitram Corp. v. NEC Corp.,*
    952 F.2d 1357 (Fed. Cir. 1991) ...................................................... 48

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.,*
    285 F.3d 1353 (Fed. Cir. 2002) ...................................................... 44

*Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.,*
    895 F.2d 1403 (Fed. Cir. 1990) ...................................................... 45

*Liquid Dynamics Corp. v. Vaughan Co.,*
    449 F.3d 1209 (Fed. Cir. 2006) .................................................. 44, 47

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.,*
    439 F.3d 1335 (Fed Cir. 2006) ...................................................... 51

*MAI Systems Corp. v. UIPS,*
    856 F. Supp. 538 (N.D. Cal. 1994) .................................................. 57

*Markman v. Westview Instruments,*
    116 S. Ct. 1384 (1996) ............................................................. 43

*McNeil-PPC, Inc. v. L. Perrigo Co.,*
    337 F.3d 1362 (Fed. Cir. 2003) ...................................................... 50

*Micro Chemical, Inc. v. Lextron, Inc.,*
    318 F.3d 1119 (Fed. Cir. 2003) ...................................................... 45

*Mine Safety Appliances Co. v. Dickinson & Co.,*
    744 F. Supp. 578 (S.D.N.Y. 1990) .................................................. 49

*Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.,*
    267 F. Supp. 726 (S.D. Cal. 1966) .................................................. 56

*Monsanto Co. v. Ralph,*
    382 F.3d 1374 (Fed. Cir. 2004) ...................................................... 46

*Pacific Trading Co. v. Wilson & Co.,*
    547 F.2d 367 (7th Cir. 1976) ........................................................ 58

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,*
    575 F.2d 1152 (6th Cir. 1978) .................................................. 27, 45

**TABLE OF AUTHORITIES**
*(cont'd)*

**Page Nos.**

*Perricone v. Medicis Pharm. Corp.*,
    432 F.3d 1368 (Fed. Cir. 2005) ......................................................... 50

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ......................................................... 43

*Plastic Container Corp. v. Cont'l Plastics of Oklahoma, Inc.*,
    607 F.2d 855 (10th Cir. 1979) ......................................................... 49

*Precision Inst. Mfr. Co. v. Automotive Maintenance Machinery Co.*,
    324 U.S. 806 (1945) ......................................................................... 53

*Purdue Pharma L.P. v. Endo Pharms., Inc.*,
    438 F.3d 1123 (Fed. Cir. 2006) ......................................................... 51

*Read Corp. v. Portec, Inc.*,
    970 F.2d 816 (Fed. Cir. 1992) ......................................................... 47

*Regents of the Univ. of California v. Eli Lilly & Co.*,
    119 F.3d 1559 (Fed. Cir. 1997) ......................................................... 53

*San Jose Construction, Inc. v. S.B.C.C., Inc.*,
    155 Cal. App. 4th 1528 (Ct. App. 2007) ......................................... 55

*Sargent Fletcher, Inc. v. Able Corp.*,
    110 Cal. App. 4th 1658 (Ct. App. 2003) ......................................... 54

*Schumer v. Lab Computer Sys. Inc.*,
    308 F.3d 1304 (Fed. Cir. 2002) ......................................................... 49

*Seattle Box Co. v. Indus. Crating & Packing, Inc.*,
    731 F.2d 818 (Fed. Cir. 1984) ......................................................... 49

*Shockley v. Arcan, Inc.*,
    248 F.3d 1349 (Fed. Cir. 2001) ......................................................... 49

*Southland Sod Farms v. Stover Seed Co.*,
    108 F.3d 1134 (9th Cir. 1997) ......................................................... 57

*SRI Int'l v. Matsushita Elec. Corp. of Am.*,
    775 F.2d 1107 (Fed. Cir. 1985) ......................................................... 49

*Stratoflex, Inc. v. Aeroquip Corp.*,
    713 F.2d 1530 (Fed. Cir. 1983) ......................................................... 51

*Takeda Chem. Indus. v. Alphapharm Pty., Ltd.*,
    No. 06-1329, 2007 U.S. App. LEXIS 15349 (Fed. Cir. June 28, 2007) ...... 50

1

## TABLE OF AUTHORITIES
### *(cont'd)*

2

3

**Page Nos.**

4  *Tate Access Floors, Inc. v. Maxcess Techs.,*
    222 F.3d 958 (Fed. Cir. 2000) ................................................................. 59

5

6  *TechSearch, L.L.C. v. Intel Corp.,*
    286 F.3d 1360 (Fed. Cir. 2002) ............................................................... 43

7  *Teleflex, Inc. v. Ficosa N Am. Corp.,*
    299 F.3d 1313 (Fed. Cir. 2002) ............................................................... 50

8

9  *Thomas & Betts Corp. v. Litton Sys., Inc.,*
    720 F.2d 1572 (Fed. Cir. 1983) ............................................................... 44

10  *Typeright Keyboard Corp. v. Microsoft Corp.,*
    374 F.3d 1151 (Fed. Cir. 2004) ............................................................... 49

11

12  *Ultra-Precision Mfg., LTD v. Ford Motor Co.,*
    411 F.3d 1369 (Fed. Cir. 2005) ............................................................... 53

13  *United States v. King Features Entm't, Inc.,*
    843 F.2d 394 (9th Cir. 1988) ................................................................... 52

14

15  *Vess v.  Ciba-Geigy Corp.,*
    317 F.3d 1097 (9th Cir. 2003) ................................................................. 56

16  *Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996) ................................................................. 43

17

18  *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.,*
    520 U.S. 17 (1997) .................................................................................. 44

19  *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.,*
    239 F.3d 1225 (Fed. Cir. 2001) ............................................................... 43

20

21  **OTHER AUTHORITIES**

22

23  21 C.F.R. § 801.437 ................................................................................... 42, 43

24  21 U.S.C. § 337 .............................................................................................. 66

25  21 U.S.C. § 301 .............................................................................................. 42

26  35 U.S.C. § 102 .............................................................................. 18, 23, 24, 53

27  35 U.S.C. § 103 ........................................................................................ 23, 24

28  35 U.S.C. § 252 ........................................................................................ 50, 52

**TABLE OF AUTHORITIES**
*(cont'd)*

**Page Nos.**

35 U.S.C. § 271 ................................................................................................ 57

35 U.S.C. § 282 ......................................................................................... 16, 53

35 U.S.C. § 284 ............................................................................... 2, 28, 46, 49

35 U.S.C. § 285 ....................................................................................... 2, 28, 67

35 U.S.C. §307 ................................................................................................ 50

Cal. Bus. & Prof. Code § 17200 ..................................................................... 63

Cal. Bus. & Prof. Code § 17203 ..................................................................... 64

Cal. Civ. Code § 3294 .................................................................... 60, 61,. 62, 63

Cal. Civ. Code § 3426.3 .................................................................................. 62

1       Pursuant to Civil L.R. 16.1(f), Plaintiff I-Flow Corporation, Inc. ("I-Flow") submits the

2   following Memorandum of Contentions of Fact and Law.  I-Flow reserves the right to amend

3   or supplement this memorandum.

4                       **I.  SUMMARY OF THE CASE**

5       I-Flow designs, develops, manufactures and markets technically advanced, low-cost

6   ambulatory drug delivery systems that provide quality of life enhancing solutions for pain

7   management and infusion therapy.  In 1996, I-Flow acquired the rights to U.S. Patent No.

8   5,284,481 ("the '481 Patent"), the patent in suit.  The '481 Patent is directed to an improved

9   compact collapsible infusion pump.  I-Flow currently manufactures a line of compact, portable

10  infusion pumps, catheters and pain kits that administer medication directly to a wound site, as

11  well as administer local anesthetics, chemotherapies, antibiotics, diagnostic agents, nutritional

12  supplements and other medications.

13      Defendants Apex Medical Technologies, Inc. ("Apex"), Zone Medical, LLC ("Zone"),

14  and Mark McGlothlin ("McGlothlin") (collectively "Defendants") manufacture, market, and

15  sell the Solace™ Post-Operative Pain Relief Infusion System ("Accused Solace Pump").  On

16  June 29, 2007, I-Flow filed the instant lawsuit claiming that Defendants willfully infringe

17  Claims 1, 2 and 15 of the '481 Patent by using, selling, and offering for sale the Accused

18  Solace Pump.  At Defendants' request, the United States Patent and Trademark Office ("PTO")

19  reexamined the claims of the '481 Patent.  The PTO is shortly expected to issue a

20  reexamination certificate validating amended claims that are substantially identical to the

21  original claims of the '481 Patent.  I-Flow also alleges that Defendants are liable for

22  misappropriation of I-Flow's valuable and protectable trade secrets, breach of confidence, and

23  unfair competition under California common law and California Business and Professions

24  Code §17200, et seq.

25      As a result of Defendants' infringement, I-Flow is entitled to damages in the amount of

26  profits I-Flow has lost due to Defendants' infringement.  If lost profits are not awarded, I-Flow

27  is entitled to damages in the amount of no less than a reasonable royalty.  I-Flow is also entitled

28  to a permanent injunction to prevent further infringement.  Because Defendants' infringement

1  was and continues to be willful, the Court may award I-Flow up to three times the damages

2  awarded at trial, as well as I-Flow's reasonable attorneys' fees.  35 U.S.C. §§ 284, 285.  I-Flow

3  is also entitled to actual and punitive damages for Defendants' trade secret misappropriation,

4  breach of confidence, and unfair competition, and a permanent injunction enjoining

5  Defendants' continued use of I-Flow's confidential information.

6  ## II. FACTUAL CONTENTIONS (L.R. 16.1 (f)(3)(e)(1))

7  **A.   The '481 Patent**

8          The '481 Patent describes a novel elastomeric infusion pump that uses a collapsible

9  housing.   An elastomeric infusion pump is a medical device for delivering a fluid into a

10  patient's body using an elastomeric bladder to drive the fluid into the patient.   The first

11  generation of elastomeric infusion pumps covered the elastomeric bladders with a hard shell.

12  The widely-held belief by persons of skill in the art was that a hard rigid shell was required to

13  provide sufficient protection for the elastic inflatable bladder contained therein. The prior art

14  also taught that the absence of a hard rigid shell would leave the pump vulnerable to

15  overfilling, external pressure, and flow rate variability.   A major drawback to the early

16  generation pumps, however, was that rigid housings were bulky and uncomfortable.   The hard

17  shell also increased the costs of manufacture, packaging, storage, and shipment.

18          The '481 Patent discloses and claims an improved infusion pump that replaces the rigid

19  hard-shell housing of predecessor pumps with a non-rigid "collapsible" housing, despite prior

20  art references teaching away from such a design.  Claims 1 and 2 recite an infusion pump with

21  a "collapsible non-stretchable housing means," and Claim 15 recites an infusion pump with "a

22  collapsible shell."   Contrary to expectations and teachings in the art, commercial embodiments

23  of the '481 Patent soft-shell pump provide adequate protection against bursting and accidental

24  puncture, are not prone to being overfilled, and do not experience flow rate problems due to

25  external pressure.   The infusion pump market's recognition of these drastic improvements is

26  evidenced by the commercial success of I-Flow's collapsible soft-shell pump.

27  / / /

28  / / /

**B.      Claim Construction**

On July 25, 2008, the Court construed Claims 1, 2 and 15 of the '481 Patent.  The Court construed the term "elongated" to mean "extended" or "drawn out."  The phrase "elongated elastic sleeve means" was construed to mean an "extended elastic membrane or bladder."  The Court interpreted the term "secured at fixed spaced longitudinal positions" to mean "secured at positions along the longitudinal axis of the support member with space there between."  The Court construed the term "defining a substantially zero non-pressurized volume pressure reservoir" to mean "defining a pressure chamber having a substantially zero fill volume when not pressurized."  The Court also construed the term "a collapsible non-stretchable housing means" to mean "a shell or cover that is not rigid and cannot be permanently stretched, including elastic or semi-elastic materials."  The phrase "fill concentrically about said support member" was construed to mean "to fill evenly in a spherical manner from the support member."  The Court interpreted the term "inlet means" to mean "inlet port," and construed the term "outlet means" to mean "outlet port."

In addition to the claim terms discussed above, the Court interpreted the term "inlet means including an inlet port in one end of said member" to mean "inlet port in one end of said member."  The term "outlet means including an outlet port in the other end of said member" was construed to mean "outlet port in the other end of said member."  The Court also construed the term "enclosing said support member and said pressure reservoir" to mean "substantially surrounding the support member and pressure chamber."

**C.      Reexamination of the '481 Patent**

On January 16, 2008, the PTO granted Defendants' request to reexamine the '481 Patent.  During reexamination, I-Flow amended Claims 1, 2 and 15 to clarify and make definite a feature, already inherent in the claims as originally issued, that the housing means be loosely fitting over the bladder assembly, defining a chamber therebetween.  As recited in the original claims and described in the specification, the housing means is a structure that is separate and distinct from the bladder assembly.  The original claims also recite that the housing means contains the bladder assembly and enables it to expand naturally.  These original claim

1  limitations as used in the specification inherently required the housing means to be loosely

2  fitting to create a chamber between the housing means and the bladder assembly.  Thus, the

3  claims did not change in scope during the reexamination.  The PTO has indicated the amended

4  claims are patentable in a Notice of Intent to Issue *Ex Parte* Reexamination Certificate dated

5  April 22, 2009, and is expected to issue a reexamination certificate validating the amended,

6  substantially identical claims.

7  ### III.  FACTUAL CONTENTIONS (L.R. 16.1 (f)(3)(e)(2))

8  **A.      The Accused Solace Pump Infringes Claims 1, 2 and 15 of the '481 Patent**

9        I-Flow alleges that the Accused Solace Pump, a compact, portable, collapsible shell

10  infusion pump manufactured and sold by Defendants, infringes Claims 1, 2 and 15 of the '481

11  Patent.[1]

12        **1.      The Accused Solace Pump Infringes Claim 1**

13        Claim 1, as amended during the reexamination of the '481 Patent,[2] recites:

14        A compact portable apparatus for dispensing a liquid under pressure
       at a substantially constant flow rate over a period of time comprising:

15        an elongated generally cylindrical support member;

16        elongated elastic sleeve means mounted and sealingly secured at
       fixed spaced longitudinal positions on said support member for
17       defining a substantially zero non-pressurized volume pressure
       reservoir for holding a liquid in a pressurized state for
18       dispensing therefrom;

19        housing means comprising collapsible non-stretchable housing
       means for containing said support member and said pressure
20       reservoir for enabling said pressure reservoir to expand naturally
       and for confining said reservoir to fill concentrically about said
21       support member, said collapsible non-stretchable housing means
       loosely positioned around said sleeve means and defining a
22

23

24        [1] I-Flow has set forth its arguments relating to Defendants' infringement of the '481
25  Patent in several documents filed previously with the Court in this case, each of which is
   hereby incorporated by reference.   Those documents include Plaintiff's Preliminary
26  Infringement Contentions filed December 13, 2007 and Plaintiff's Opposition to Defendants'
   Motion for Summary Judgment of Non-Infringement filed June 12, 2009.

27        [2] All references to claims of the '481 Patent are to Claims 1, 2 and 15 as amended
28  during reexamination.

chamber between said sleeve means and said collapsible non-stretchable housing means;

inlet means for introducing a liquid into said elastic pressure reservoir; and

outlet means for dispensing liquid from said pressure reservoir to a selected site.

The Accused Solace Pump is a compact and portable device intended for continuous infusion of medications directly into an intraoperative site for post-operative pain relief, consistent with the preamble of Claim 1 of the '481 Patent. The Accused Solace Pump includes each of the limitations set forth in Claim 1.

       a.      **The Accused Solace Pump Includes an Elongated Generally Cylindrical Support Member**

The Court construed the term "elongated" to mean "extended" or "drawn out." The support member of the Solace Pump includes a barbed body and a one-way valve. The barbed body is an elongated generally cylindrical mandrel. The support member of the Accused Solace Pump includes the one-way valve and an inlet port mounted on the body, further extending the length of the generally cylindrical member to 1.868 inches. The support member embodied in the Accused Solace Pump is thus an elongated or drawn out generally cylindrical support member.



/ / /

/ / /

/ / /

b.   **The Accused Solace Pump Includes an Elongated Elastic Sleeve Means Mounted and Sealingly Secured at Fixed Spaced Longitudinal Positions on Said Support Member For Defining a Substantially Zero Non-Pressurized Volume Pressure Reservoir for Holding a Liquid in a Pressurized State for Dispensing Therefrom**

The Court construed the phrase "elongated elastic sleeve means" as an "extended elastic membrane or bladder."  The Accused Solace Pump contains a balloon or bladder, made of an elastic polymer.  This elastomeric balloon expands as fluid is introduced into the Accused Solace Pump and provides the elastomeric force to deliver the medicine into the body.  This balloon or bladder extends from the distal portion of the infusion pump to the edge of the support member.   Accordingly, the Accused Solace Pump includes an extended elastic membrane or bladder.



Elongated Elastic
Sleeve Means

The Court construed the phrase "secured at fixed spaced longitudinal positions" to mean "secured at positions along the longitudinal axis of the support member with space therebetween."  I-Flow's experts have examined the Accused Solace Pump and explain that the extended elastic membrane or bladder is mounted on the support member by mounting the neck of the elastic balloon over the barbed body of the Solace Pump.  The neck of the balloon is then secured to the barbed body with thread.  One continuous thread is wrapped five times around each of the three barbs of the infuser body.  The three barbs, which are evenly spaced 0.185

1  inches apart along the length of the body, represent the points at which the elastic membrane or

2  bladder is secured to the support member.  When the elastic sleeve means is mounted and

3  sealingly secured on the support member of the Accused Solace Pump, a fluid-tight seal is

4  created.  This fluid-tight seal allows the chamber to hold liquid introduced into the chamber.

5  Accordingly, the Accused Solace Pump contains an extended elastic membrane or bladder

6  mounted and sealingly secured at positions along the longitudinal axis of the support member

7  with space therebetween.



19        The Court construed the term "defining a substantially zero non-pressurized volume

20  pressure reservoir" to mean "defining a pressure chamber having a substantially zero fill

21  volume when not pressurized."  A filler ball is disposed within the elastic bladder and occupies

22  the volume of the unfilled bladder.  Accordingly, the bladder has a substantially zero fill

23  volume when in a deflated state.

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /



Pressure Reservoir
Has Substantially Zero Volume
When Not Pressurized ( Pre-Fill )

        **c.**     **<u>The Accused Solace Pump Includes Housing Means Comprising</u>**

                 **<u>Collapsible Non-Stretchable Housing Means for Containing Said</u>**

                 **<u>Support Member and Said Pressure Reservoir for Enabling Said</u>**

                 **<u>Pressure Reservoir to Expand Naturally and For Confining Said</u>**

                 **<u>Reservoir to Fill Concentrically About Said Support Member, Said</u>**

                 **<u>Collapsible Non-Stretchable Housing Means Loosely Positioned</u>**

                 **<u>Around Said Sleeve Means and Defining a Chamber Between Said</u>**

                 **<u>Sleeve Means and Said Collapsible Non-Stretchable Housing Means</u>**

The Court construed the term "a collapsible non-stretchable housing means" to mean a housing means comprising "a shell or cover that is not rigid and cannot be permanently stretched, including elastic or semi-elastic materials."  The Accused Solace Pump contains a cover made of polyurethane with a thickness between 0.006 inches and 0.01 inches.  I-Flow's experts analyzed the Accused Solace Pump and confirm that its cover is not rigid.  Defendants have admitted that during normal operation of the Solace Pump, the cover retains its elastic or semi-elastic properties.  Accordingly, the cover of the Solace Pump is a non-rigid, elastic or semi-elastic shell or cover that cannot be permanently stretched.

The Court construed the term "fill concentrically about said support member" to mean "to fill evenly in a spherical manner from the support member."  Thus, according to the Court's

1   claim construction and the parties' agreed construction, the term "containing said support

2   member and said pressure reservoir for enabling said pressure reservoir to expand naturally and

3   for confining said reservoir to fill concentrically about said support member" means that the

4   cover has the properties of: having within it said support member and said pressure reservoir,

5   enabling said pressure reservoir to expand naturally, and keeping the chamber within the

6   boundaries defined by the housing to fill evenly in a spherical manner from the support

7   member.   The support member and the pressure reservoir of the Accused Solace Pump are

8   within the cover.   As explained in Defendants' deposition testimony and depicted in

9   Defendants' technical drawings, the cover is large enough to accommodate the expanding

10  bladder.   As such, the cover exerts no force on the bladder to hinder its natural expansion.

11  Accordingly, the cover enables the pressure reservoir to expand naturally.

12       I-Flow's experts and Defendants' technical drawings confirm that the unfilled chamber

13  is in a spherical configuration.   As fluid is injected through the one-way valve in the support

14  member and into the chamber, the chamber fills and continues its natural expansion.   The

15  chamber retains its spherical shape when filled to its rated volume.   Accordingly, the cover of

16  the Accused Solace Pump has the properties of: having within it said support member and said

17  pressure reservoir, enabling said pressure reservoir to expand naturally, and keeping the

18  chamber within the boundaries defined by the housing to fill evenly in a spherical manner from

19  the support member.

20       As can be seen from the figure below and as Defendants' expert has confirmed, the

21  cover of the Accused Solace Pump is loosely positioned around the elastic bladder, and defines

22  a chamber between the cover and the elastic bladder.

23  / / /

24  / / /

25  / / /

26  / / /

27  / / /

28  / / /

Collapsible non-stretchable housing means loosely positioned and defining a chamber

Fill concentrically about the support member

**d.** **The Accused Solace Pump Includes an Inlet Means for Introducing a Liquid Into Said Elastic Pressure Reservoir**

The Court construed the term "inlet means" to mean "inlet port."  Thus, the "inlet means for introducing a liquid into said elastic pressure reservoir" requires an inlet port for introducing a liquid into an elastic pressure reservoir.  The Accused Solace pump contains an inlet port in its one way valve for introducing liquid to the pressure reservoir.

**e.** **The Accused Solace Pump Includes Outlet Means for Dispensing Liquid From Said Pressure Reservoir to a Selected Site**

The Court construed the term "outlet means" to mean "outlet port."  Thus, the "outlet means for dispensing liquid from said pressure reservoir to a selected site" requires an outlet port through which fluid travels out of the pressure reservoir.  The Accused Solace Pump contains an outlet port for dispensing liquid from the pressure reservoir to a selected site, the selected site usually being a surgical wound on a patient to which the fluid is being administered.

**2.** **The Accused Solace Pump Infringes Claim 2**

Claim 2 depends from Claim 1.  Claim 2 additionally requires "said collapsible non-stretchable housing means comprises a substantially spherical housing."  The Accused Solace Pump satisfies this additional limitation.  The housing embodied by the unfilled Accused

Solace Pump is substantially spherical to accommodate the spherical bladder.  As the Solace Pump is filled, the cover or housing accommodates the natural spherical expansion of the bladder.  I-Flow's experts have confirmed that when the pump is filled to its rated volume, the cover or housing maintains a close fit around the spherical bladder.   Accordingly, the collapsible non-stretchable housing of the Accused Solace Pump comprises a substantially spherical housing.

3.      **The Accused Solace Pump Infringes Claim 15**

As amended during the reexamination of the '481 Patent, Claim 15 recites:

A compact collapsible infusion apparatus for dispensing a liquid under pressure at a predetermined substantially constant flow rate over a period of time comprising:

an elongated generally cylindrical support member having inlet means including an inlet port in one end of said member, and outlet means including an outlet port in the other end of said member;

elongated elastic sleeve means mounted in non-stretched surface contact and sealingly secured at fixed spaced longitudinal positions on said support member for defining a substantially zero non-pressurized volume pressure reservoir for holding a liquid in a pressurized state for dispensing therefrom;

first housing means including a collapsible shell enclosing said support member and said pressure reservoir, said housing having a size and shape for enabling said pressure reservoir to expand naturally and for confining said reservoir to fill concentrically about said support member, said collapsible shell loosely positioned around said sleeve means and defining a chamber between said sleeve means and said collapsible shell;

inlet means in one end of said support member for introducing a liquid into said elastic pressure reservoir; and

outlet means in the other end of said support member for dispensing liquid from said pressure reservoir to a selected site.

As described above, the Accused Solace Pump is a compact and collapsible device intended for continuous infusion of medications directly into an intraoperative site for post-operative pain relief, consistent with the preamble of Claim 15 of the '481 Patent.  The Accused Solace Pump includes each of the components set forth in Claim 15.

a.   **The Accused Solace Pump Includes an Elongated Generally**
**Cylindrical Support Member Having Inlet Means Including an Inlet**
**Port in One End of Said Member, and Outlet Means Including An**
**Outlet Port in the Other End of Said Member**

As described above, the Accused Solace Pump includes an extended or drawn out generally cylindrical support member.   The Court has construed the term "inlet means including an inlet port in one end of said member" to mean "an inlet port in one end of said member."  I-Flow's experts confirm that the Accused Solace pump contains an inlet port on one end of its support member for introducing liquid to the pressure reservoir or chamber.  The inlet port is used to introduce fluid from outside the pressure chamber through the support member and into the pressure chamber.   Accordingly, the Accused Solace pump includes an inlet port in one end of said member.

The Court has construed the term "outlet means including an outlet port in the other end of said member" to mean "outlet port in the other end of said member."  In the Accused Solace Pump, the outlet port begins on the inside of the pressure chamber and is used to expel liquid out through the support member to a selected site, the selected site usually being a patient to whom the fluid medication is administered.  The inlet port begins on the end of the support member opposite the outlet port.  Accordingly, the inlet port of the Accused Solace Pump is on one end of the support member whereas the outlet port is on the other end of the support member.



b.   **The Accused Solace Pump Includes an Elongated Elastic Sleeve Means Mounted in Non-Stretched Surface Contact and Sealingly Secured at Fixed Spaced Longitudinal Positions on Said Support Member for Defining a Substantially Zero Non-Pressurized Volume Pressure Reservoir for Holding a Liquid in a Pressurized State for Dispensing Therefrom**

As described above, the Accused Solace Pump contains an elongated elastic sleeve means mounted and sealingly secured at fixed spaced longitudinal positions on said support member for defining a substantially zero non-pressurized volume pressure reservoir for holding a liquid in a pressurized state for dispensing therefrom.

Further, the elastic sleeve means of the Accused Solace Pump is mounted in non-stretched surface contact with the support member.  The portion of the bladder that is mounted on the support member is in surface contact with the support member.  As fluid is introduced into the Accused Solace Pump, the reservoir of the elastic bladder stretches to accommodate this fluid.  The portion of the bladder that contacts the support member, however, does not stretch even upon introduction of the fluid into the Accused Solace Pump.  This portion remains in unstretched surface contact with the support member.

c.   **The Accused Solace Pump Includes First Housing Means Including a Collapsible Shell Enclosing Said Support Member and Said Pressure Reservoir, Said Housing Means Having a Size and Shape for Enabling Said Pressure Reservoir to Expand Naturally and For Confining Said Reservoir to Fill Concentrically About Said Support Member, Said Collapsible Shell Loosely Positioned Around Said Sleeve Means and Defining a Chamber Between Said Sleeve Means and Said Collapsible Shell**

As described above, the Accused Solace Pump includes a shell or cover that is not rigid, and thus meets the limitation "first housing means including a collapsible shell."

/ / /

The Court has construed the term "enclosing said support member and said pressure reservoir" to mean "substantially surrounding the support member and pressure chamber."  I-Flow's experts have analyzed the Accused Solace Pump and confirm that the cover or housing of the pump substantially surrounds the support member as well as the pressure chamber.

As described above, the Accused Solace Pump fulfills the limitation: "said housing having a size and shape for enabling said pressure reservoir to expand naturally and for confining said reservoir to fill concentrically about said support member."

As discussed above, the cover of the Accused Solace Pump is loosely positioned around the elastic bladder, and defines a chamber between the cover and the elastic bladder.

> **d.**    **The Accused Solace Pump Includes an Inlet Means in One End of Said Support Member for Introducing a Liquid into Said Elastic Pressure Reservoir**

As described above, the Accused Solace Pump includes an inlet means in one end of the support member for introducing a liquid into the elastic pressure reservoir.

> **e.**    **The Accused Solace Pump Includes an Outlet Means in the Other End of Said Support Member for Dispensing Liquid from Said Pressure Reservoir to a Selected Site**

As described above, the Accused Solace Pump includes an outlet means in the other end of the support member for dispensing liquid from the pressure reservoir to a selected site.

> **4.**    **The Accused Solace Pump Infringes Claims 1, 2 and 15 Under the Doctrine of Equivalents**

To the extent that the Accused Solace Pump is found not to literally contain any element of Claims 1, 2 or 15, the Accused Solace Pump contains structures that are equivalent to each missing element recited in the claims.   These structures are known to be interchangeable with the corresponding elements in the claims.   Further, these structures perform substantially the same function, in substantially the same way, and achieve substantially the same result as the corresponding limitations in Claims 1, 2 and 15 of the '481 Patent.

5.      **Defendants are Not Entitled to Intervening Rights**

Defendants allege that they are entitled to intervening rights as a result of clarifying claim amendments made during the ongoing Reexamination of the '481 Patent.   However, Defendants are not entitled to either absolute or equitable intervening rights because Defendants cannot meet their burden of establishing that Claims 1, 2 and 15 of the '481 Patent, after reexamination, are substantively different from the claims as originally issued.

a.      **Defendants are Not Entitled to Absolute Intervening Rights**

On September 29, 2008, the PTO issued an Office Action in the '481 Patent reexamination proceeding.   The Action rejected the claims over European Application No. 90311152.4 ("the EPO Publication"), erroneously referring to the outer layer of the bladder assembly of the pump in the EPO Publication as the housing of the pump.   To overcome the Examiner's rejection, I-Flow clarified a feature, already inherent in Claims 1, 2 and 15 as originally issued, that the housing means recited in the claims and described in the specification is a structure that is separate and distinct from the bladder assembly.   Thus, the scope of Claims 1 and 15 did not change when I-Flow amended the claims to recite "said collapsible non-stretchable housing means loosely positioned around said sleeve means and defining a chamber between said sleeve means and said collapsible non-stretchable housing means."

The amendments made during reexamination are not substantive for several reasons. The bladder assembly defines the reservoir that holds the fluid medication to be delivered to a patient and provides the elastomeric force that drives the medication out of the pump as the bladder assembly deflates.   The collapsible housing is a structure separate from the bladder assembly and is designed to protect the bladder assembly.   The housing contains the bladder assembly and support member, helps to confine the expanding bladder, and enables the natural expansion of the bladder.   If the elastic or semi-elastic housing were tight fitting around the sleeve means, it would merely comprise another layer or sleeve defining the bladder assembly and would not constitute a separate and distinct structure therefrom.   It is, thus, inherent in the claims as originally issued that the collapsible housing is loose fitting around the sleeve means, defining a gap between the sleeve means and the housing.   Further, in order to confine the

expanding bladder while enabling its natural expansion as recited by the claims and described in the disclosure, the collapsible housing recited in the claims as originally issued must be loosely fitted around the sleeve means, creating a chamber between the empty reservoir and the housing.

Defendants allege that the doctrine of absolute intervening rights relieves them of infringement liability during the period before Claims 1, 2 and 15 are validated.   Defendants are not entitled to such rights, however, because Claims 1, 2 and 15 were not amended to introduce a substantive change.   Claim amendments that merely make specific what was already implicit or inherent in the claim, or make the claim more definite without affecting its scope, are not substantive.

### b.   Defendants are Not Entitled to Equitable Intervening Rights

Defendants are not entitled to equitable intervening rights for the same reason they are not entitled to absolute intervening rights: Claims 1, 2 and 15 of the '481 Patent, after reexamination, are not substantively different from Claims 1, 2 and 15 as issued.   Further, Defendants did not innocently act in good faith when they developed and manufactured the Accused Solace Pump.   Rather, as set forth in more detail below, Defendants had full knowledge of the '481 Patent; Defendants deliberately copied I-Flow's patented device; Defendants did not obtain an independent, written opinion of counsel until approximately a year after receiving I-Flow's cease and desist letter; and Defendants secretly developed and then marketed their infringing device using misappropriated confidential and trade secret information.   Additionally, Defendants have presented no evidence regarding stockpiles of raw materials, existing orders, or the reasonable cost of converting their equipment to produce noninfringing goods.

### B.   The '481 Patent Is Valid

The '481 Patent was properly issued, is presumed valid under 35 U.S.C. §§ 282, and meets the statutory requirements for patent validity.

/ / /

/ / /

1    **1.    Defendants' Invalidity Arguments**

2    Defendants served Preliminary Invalidity Contentions in February 2008 and Final

3    Invalidity Contentions in September 2008. Defendants served Amended Final Invalidity

4    Contentions in November 2008, which became their Final Invalidity Contentions for this case.

5    These contentions identified two references alleged to anticipate Claims 1, 2 and 15 of the '481

6    Patent, and 10 references alleged by Defendants to support their obviousness defense.   On

7    January 8, 2009, Defendants moved for summary judgment of anticipation and obviousness of

8    Claims 1, 2 and 15 of the '481 Patent on the basis of the same references.

9    None of the identified references relied upon by Defendants teaches every limitation of

10   Claims 1, 2 and 15 of the '481 Patent or render these claims obvious.

11   **a.    Allegedly Anticipatory References**

12   Neither of the two references identified by Defendants fully disclose or enable Claims

13   1, 2 or 15 of the '481 Patent.

14   **i.    The EPO Publication**

15   Claims 1, 2 and 15 of the '481 Patent are not anticipated by the EPO Publication

16   because the reference does not disclose at least the "collapsible non-stretchable housing" of

17   Claims 1 and 2, nor the "collapsible shell" of Claim 15.   Defendants argue that the outer

18   elongated latex rubber elastic sleeves **24** and **26** disclosed in the EPO Publication constitute the

19   "collapsible non-stretchable housing" of Claims 1 and 2 and the "collapsible shell" of Claim

20   15.   On the contrary, the EPO Publication discloses an elastomeric infusion pump **10** with an

21   inflatable multi-layer bladder assembly mounted inside a rigid spherical housing **12**.

22   Specifically, the multi-layer bladder assembly within the rigid housing **12** includes an inner

23   elongated semi-elastic sleeve **22**, and a pair of outer elongated latex rubber elastic sleeves **24**

24   and **26**.   Thus, the bladder assembly of the EPO Publication, including elastic sleeves **22**, **24**,

25   and **26**, is separate and distinct from the rigid spherical housing **12**, within which it is

26   contained.   The '481 Patent also describes a multi-layer bladder assembly, but, unlike the prior

27   art, it is mounted inside a collapsible housing.

28   / / /

1    As the inflatable bladder and the housing are separate and distinct components of the

2  infusion pump, the structures that comprise the inflatable bladder assembly and define the

3  pressure reservoir cannot constitute the housing.  Therefore, the only housing disclosed in the

4  EPO Publication is the *rigid* spherical housing **12**.  In contrast, Claims 1, 2 and 15 of the '481

5  Patent recite an elongated sleeve means that defines a pressure reservoir for holding a liquid

6  (the bladder assembly **20**) and a separate *collapsible* housing structure for containing the

7  pressure reservoir (housing **12**).  Therefore, the EPO Publication does not anticipate Claims 1,

8  2 or 15 of the '481 Patent because it lacks at least a collapsible housing and shell as claimed in

9  the '481 Patent, including all of its express and inherent limitations as clarified by I-Flow's

10  amendment during reexamination.

11    The prosecution history of the '481 Patent also demonstrates Claims 1, 2 and 15 are not

12  anticipated by the EPO Publication.  The EPO Publication has the same disclosure as U.S.

13  Patent No. 5,080,652 ("the '652 Patent").  In its examination of the patent application, which

14  eventually issued as the '481 Patent, the PTO considered the '652 Patent (with the identical

15  disclosure of the EPO Publication), and allowed the application to issue upon determining the

16  claimed invention distinguished patentably over the '652 Patent.

17    Defendants also argue Claims 1, 2 and 15 are anticipated by the EPO Publication in

18  view of findings in an Office Action in the ongoing reexamination proceedings of the '481

19  Patent.  However, the PTO's statements were erroneous and issued nearly 16 years after the

20  filing date of the '481 Patent and do not constitute prior art under 35 U.S.C. §102(b) or any

21  other relevant section of the law.

22    ii.    United States Patent No. 5,105, 983 ("the '983 Patent")

23    Claims 1, 2 and 15 of the '481 Patent are not anticipated by United States Patent No.

24  5,105,983 ("the '983 Patent") because the '983 Patent does not disclose at least the "collapsible

25  non-stretchable housing" nor the "collapsible shell" as claimed in the '481 Patent, including all

26  of its express and inherent limitations as clarified by I-Flow's amendment during

27  reexamination.

28  / / /

**b.**   <u>**Obviousness References**</u>

In their Motion for Summary Judgment of Invalidity, Defendants argue Claims 1, 2 and 15 are obvious over the EPO Publication in view of seven intravenous bag technology patents ("the IV bag patents").  In their Amended Final Invalidity Contentions, Defendants also allege that Claims 1, 2 and 15 are obvious over the '983 Patent in view of the IV bag patents, and obvious over the '652 Patent in view of the IV bag patents.

Claims 1, 2 and 15 are not rendered obvious by any of these combinations of references.

**i.**   <u>**The Scope and Content of Prior Art Taught Away From the Claimed Invention**</u>

At the time of invention, the prior art taught away from replacing the rigid cover of the hard-shell infusion pump with a "collapsible shell" or "collapsible non-stretchable housing." Infusion pumps, such as those disclosed in the EPO publication and the '983 patent, teach a rigid housing that contains an elastic bladder or reservoir.  Without a hard shell or cover, it was feared that the elastic bladder was vulnerable and exposed to the outside elements.  The widely held belief by persons of skill in the art was that the hard shell was required to protect the elastic bladder assembly from bursting and accidental puncture.

The prior art also taught that the absence of a hard shell would leave the pump vulnerable to overfilling, external pressure, and flow rate variability.  The hard shell was thought to prevent overfilling of the bladder because it would prevent expansion of the bladder beyond a certain limit.  Overfilling the elastic bladder beyond a prescribed limit causes variability in the elastomeric pressure exerted by the elastic bladder.  The variability in elastomeric pressure could result in a variable flow rate of the medicine from the bladder to the patient, affecting the dosage of medication to be infused to the patient.

The hard shell was also considered necessary to prevent undue external pressure from being placed on the bladder by patients sitting or laying on the pump.  The concern was that such external pressure would cause a dramatic increase in the flow rate at which the drug was delivered to the patient.  Thus, the common understanding in the infusion device industry in the

/ / /

1   late 1980's and early 1990's was that the hard shell housing was required to maintain a

2   constant flow rate of the medication.

3   　　　The conception of the non-rigid "collapsible" housing, as recited in Claims 1, 2 and 15

4   of the '481 Patent, was therefore contrary to the strongly held understanding of those skilled in

5   the art.  Successfully replacing the rigid hard-shell housing of predecessor pumps with a non-

6   rigid "collapsible" housing, despite prior art teachings, demonstrates Claims 1, 2 and 15 are not

7   obvious.

8   　　　　　　　　ii.　　**The Asserted Combinations Do Not Disclose or Suggest a**

9   　　　　　　　　　　**Collapsible Housing**

10   　　　In addition, the IV bag patents do not cure the deficient disclosure of the EPO

11   Publication, the '983 Patent, or any other reference disclosing a pump with a hard-shell

12   housing.  The combination of a hard-shell housing reference and the IV bag patents fails to

13   teach or suggest a "collapsible non-stretchable housing," as recited in Claims 1 and 2 and a

14   "collapsible shell" of Claim 15 of the '481 Patent.  As the prior art fails to teach all limitations

15   of Claims 1, 2 and 15, they are not obvious.

16   　　　As discussed above, the EPO publication fails to teach a "collapsible non-stretchable

17   housing" or a "collapsible shell."  One of the functions of the housing in an elastomeric

18   infusion device is to constrain the bladder or reservoir in order to maintain a constant flow rate.

19   The housing also serves to protect the bladder from bursting or accidental puncture.  The

20   housing does not define the reservoir for holding a fluid.  Defendants attempt to cure the

21   deficiency in the EPO Publication and the '983 Patent by citing art that discloses IV bag

22   technology.  However, such art does not teach, disclose, or even mention a housing.  The

23   references merely disclose IV bags used to infuse medication to a patient.  The references fail

24   to disclose to a person skilled in the art any property of the IV bag material that would serve to

25   function as a housing or shell, i.e., to constrain the bladder or reservoir of an infusion pump or

26   to protect an infusion pump from bursting or puncture.

27   　　　Following I-Flow's clarifying amendments during reexamination of the '481 Patent, the

28   Examiner confirmed Defendants' asserted combinations do not disclose or suggest a collapsible

housing.  The Examiner stated: "Clearly, Sancoff '983 and '652 [with the same disclosure as the EPO Publication] alone do not teach the collapsible housing and it would not have been obvious by one skilled in the art to substitute the material as taught by any one of [the IV bag patents] to make the rigid housing of either Sancoff '983 or Sancoff '652 collapsible."  The combinations are not obvious "based on predictable results because the structures are not analogous and there is no reasonable line of rationale to make the substitution."

Thus, Defendants have failed to establish by clear and convincing evidence that the combination of the prior art teaches every element of Claims 1, 2 and 15 of the '481 Patent.

        **c.**    **Objective Indicia of Nonobviousness Demonstrate Claims 1, 2 and 15 Are Not Obvious**

Moreover, there is substantial evidence of objective indicia of nonobviousness that demonstrate that the claimed invention is not obvious.

        **i.**    **The Infusion Pump With A Collapsible Shell Achieved Unexpected Results**

The unexpected results demonstrated by the commercial embodiment of the claimed invention of the '481 Patent evidences the nonobviousness of Claims 1, 2 and 15.  Block Medical, I-Flow's predecessor in interest, introduced the Homepump Eclipse® ("Eclipse") in 1993, which incorporated the invention of the '481 Patent.  The Eclipse used a soft, collapsible shell rather than a hard plastic shell.  Contrary to expectations, the Eclipse and other soft-shell elastomeric infusion pumps in I-Flow's family of soft-shell pumps proved to be more durable and dependable than hard shell infusion pumps.  Upon testing, the soft collapsible PVC shell proved to provide adequate protection against bursting and accidental puncture of the bladder assembly.

Contrary to expectations, soft-shell pumps did not experience the anticipated flow rate problems caused by patients' squeezing, sitting, laying or otherwise putting additional external pressure on the pumps.  Also contrary to expectations, I-Flow's soft-shell pumps were not prone to being overfilled.  Thus, the unexpected results achieved by commercial embodiments of the claimed invention establish the nonobviousness of Claims 1, 2 and 15 of the '481 Patent.

1            ii.      **The Commercial Success Enjoyed By Soft-Shell Pumps**

2                        **Support Nonobviousness**

3       Commercial embodiments of the claimed invention enjoyed, and continue to enjoy,

4  unparalleled success in the marketplace.  The soft-shell Eclipse pump was first introduced in

5  the third quarter of 1993.  By 1998, millions of Eclipse pumps had been manufactured and sold.

6  To date, Block Medical and I-Flow have sold over 30 million soft-shell pumps.  I-Flow's

7  collapsible shell pump is the number one elastomeric infusion product sold today.

8       The success of I-Flow's soft-shell pumps is directly attributable to the development of

9  the collapsible shell.  The commercial success enjoyed by infusion pumps containing a non-

10  rigid "collapsible" housing constitutes further evidence of the nonobviousness of Claims 1, 2

11  and 15 of the '481 Patent.

12            iii.     **Customer Complaints About Prior Pumps Demonstrates A**

13                        **Long-Felt Unmet Need In The Market Place For The**

14                        **Claimed Invention**

15       I-Flow's collapsible shell pump satisfied a long-felt unmet need in the market place,

16  further demonstrating the nonobviousness of Claims 1, 2 and 15.  Defendants concede that

17  there were customer complaints by pharmacies regarding the amount of space occupied by

18  earlier infusion pumps.  These complaints evidence the long-felt need in the market.

19  Additionally, the increased cost associated with sterilization of the rigid housing presented yet

20  another drawback to the hard-shell pumps.  Although the need for a space-saving infusion

21  pump may have been apparent, it was the solution that eluded manufacturers.  The widely-held

22  belief in the field that a rigid housing was essential to the proper function of the infusion pump

23  did not allow manufacturers to meet this long-felt need.  The improvements introduced in the

24  '481 Patent, introducing a pump that required one-fourth the space occupied by its predecessor

25  pumps, finally placed a product on the market that would address these needs.  This evidence

26  of long-felt unmet need supports a finding of nonobviousness of Claims 1, 2 and 15.

27  / / /

28  / / /

d.     **Indefiniteness Arguments**

Defendants allege that Claims 1, 2 and 15 of the '481 Patent are invalid for indefiniteness in light of the Court's construction of the claim terms "elongated," "inlet means," "outlet means," "inlet means including an inlet portion in one end of said member," and "outlet means including an outlet port in the other end of said member." Defendants have provided no evidence to support this assertion. The terms are clear, definite, and properly supported in the '481 Patent. Therefore, Defendants cannot avoid liability on this basis.

e.     **Written Description and Enablement Arguments**

Defendants allege that Claims 1, 2 and 15 of the '481 Patent are invalid for lack of enablement in light of the Court's construction of the claim terms "elongated," "elongated elastic sleeve means," "secured at fixed spaced longitudinal positions," and "fill concentrically about said support member." Defendants also allege that Claims 1, 2 and 15 are invalid for lack of written description in light of the Court's construction of the claim term "fill concentrically about said support member." Defendants have provided no evidence to support these assertions. The terms are fully supported by the specification and drawings of the '481 Patent. Therefore, Defendants cannot avoid liability on these bases.

C.     **The '481 Patent is Enforceable**

Defendants also allege that the '481 Patent is unenforceable because of alleged inequitable conduct before the PTO. However, Defendants have not shown by clear and convincing evidence that any undisclosed information was material and withheld with intent to deceive the PTO.

1.     **Allegations Regarding the Sancoff Patents and the EPO Publication**

a.     **Materiality**

Applicants did not take inconsistent positions or withhold material information during prosecution of U.S. Patent Application Serial No. 07/984,899 ("the '899 Application"), which eventually issued as the '481 Patent. During prosecution of the '899 Application, the Examiner issued a rejection, asserting that the claims of the application were obvious in light of cited references, including the '652 Patent and the '983 Patent (collectively "the Sancoff patents").

1    In response to the Examiner's rejection, Applicants' attorney argued the Sancoff patents did not

2    qualify as prior art in an obviousness rejection based on 35 U.S.C. § 103(a), because the

3    Sancoff Patents and the '899 Application were co-owned.  As then worded, 35 U.S.C. § 103

4    provided that certain kinds of co-owned prior art, specifically prior art under 35 U.S.C.

5    § 102 (f) and (g), were disqualified under 35 U.S.C. § 103 so that obviousness-type rejections

6    could not be based on them.  The attorney apparently misunderstood the disqualification

7    paragraph of 35 U.S.C. § 103, thinking that it would also disqualify other types of commonly-

8    owned prior art.  In 1993, prior art under 35 U.S.C. § 102(e) was not disqualified, although

9    today it is included in the disqualification provisions of 35 U.S.C. § 103(c).

10          The Examiner did not accept the attorney's argument, and specifically pointed out in his

11   Notice of Allowability for the '899 Application that the attorney's statement was incorrect.

12   The Examiner clearly understood that the Sancoff patents, as prior art under 35 U.S.C. 102(e),

13   were not disqualified under the then-existing version of 35 U.S.C. § 103.  When the Examiner

14   allowed the claims of the '899 Application, the Examiner necessarily concluded that the claims

15   distinguished patentably over the Sancoff Patents as well as the other prior art on which he had

16   relied.  This other prior art included U.S. Patent No. 4,507,116 (the "Liebensohn Patent") and

17   U.S. Patent No. 4,915,693 (the "Hessel Patent").

18          Defendants contend that Applicants' failure to disclose the EPO Publication during

19   prosecution of the '899 Application constitutes inequitable conduct.  Defendants contend that

20   as the EPO Publication was published 19 months before the filing date of the '899 Application,

21   it constituted prior art and should have been disclosed to the Examiner.  As conceded by

22   Defendants in their Answer and Counterclaims, however, the disclosure of the EPO Publication

23   is the same as the disclosure of the Sancoff '652 Patent.  As the '652 Patent and the EPO

24   Publication provide the same teaching, they have the same prior art effect.  Thus, the EPO

25   Publication was cumulative to the information unquestionably before the Examiner and there

26   was no need or requirement under PTO Rule 56 for the EPO Publication to be cited to the

27   Examiner.  Under Rule 56, cumulative information is expressly excluded from the definition of

28   material information which is required to be submitted to the Examiner.

1    The attorney's mistaken argument that the Sancoff Patents did not constitute prior art

2 did not affect the Examiner's decision to issue the '481 Patent. This is made clear by the

3 Examiner's express statement in the Notice of Allowability.  Accordingly, Applicants did not

4 withhold material information from the PTO.

5                **b.**    **Intent**

6    There is nothing in the record to indicate that the attorney recognized that his argument

7 regarding the Sancoff Patents was incorrect.  The argument was the result of an honest mistake,

8 and not improper intent.  Accordingly, there is no proof of intent to mislead the PTO.

9         **2.    Allegations Regarding the Hessel and the Liebensohn Patents**

10               **a.    Materiality**

11    Defendants have additionally asserted that during the prosecution of the '899

12 Application, Applicants failed to cite various prior art references which were cited in the

13 prosecution of related applications.  Defendants specifically identify the Hessel Patent and the

14 Liebensohn Patent as prior art references not disclosed by Applicants during prosecution of the

15 '481 Patent.  However, as conceded by Defendants in their Answer, both the Hessel Patent and

16 the Liebensohn Patent were before the Examiner. The Examiner considered the Hessel Patent

17 and the Liebensohn Patent in his decisions on patentability. Thus, the Defendants have not

18 identified any information material to patentability that was not before the Examiner.

19               **b.    Intent**

20    Further, there is nothing in the record, and Defendants offer no evidence, to indicate

21 that Applicants or their attorneys intentionally withheld information material to patentability

22 from the PTO.  Accordingly, there is no proof of intent to mislead the PTO.

23 **D.    I-Flow Has Not Committed Patent Misuse**

24    Defendants allege in their Answer to Plaintiff's Second Amended Complaint that I-

25 Flow has committed acts, and continues to commit acts, constituting patent misuse for

26 knowingly attempting to enforce an invalid or unenforceable patent and for knowingly

27 attempting to enforce a patent beyond its legal scope.  I-Flow has simply asserted its rights in

28 the validly issued '481 Patent.  There is no evidence that I-Flow has committed patent misuse.

**E.   I-Flow's Claims are Not Barred by Waiver, Estoppel, or Laches**

Defendants further assert the defenses of waiver, estoppel, and laches.  Defendants have provided no evidence that I-Flow intentionally relinquished a known right with knowledge of its existence and the intent to relinquish it.  Further, Defendants have provided no evidence to support the assertion that I-Flow's conduct led Defendants to reasonably infer that I-Flow did not intend to enforce the '481 Patent, that Defendants relied on such conduct, and that Defendants would be materially prejudiced as a result of such reliance.  With regard to laches, Defendants have established no evidence to support the allegation that I-Flow unreasonably and inexcusably delayed in bringing suit, and further, that I-Flow's delay caused Defendants to suffer material prejudice.  Therefore, Defendants do not have any support for these affirmative defenses.

**F.   I-Flow's Claims are Not Barred by Collateral Estoppel**

Defendants have alleged that I-Flow's claims for relief are barred in whole or in part by the doctrine of collateral estoppel.  Defendants have provided no evidence to support this assertion.  Therefore, Defendants cannot avoid liability based on this defense.

**G.   I-Flow's Claims are Not Barred by Unclean Hands**

Defendants have also alleged that I-Flow is barred from recovery under the doctrine of unclean hands.  However, Defendants have not asserted any facts to support an unclean hands defense.  To the extent Defendants base their unclean hands theory on the same facts as I-Flow's alleged inequitable conduct before the PTO, I-Flow has not engaged in inequitable conduct for the reasons discussed above.  I-Flow is therefore not precluded from seeking relief under the doctrine of unclean hands.

**H.   I-Flow's Claims are Not Barred by Res Judicata**

Defendants have alleged that I-Flow's claims for relief are barred in whole or in part by the doctrine of res judicata.  Defendants have provided no evidence to support this assertion.  Therefore, Defendants cannot avoid liability based on this defense.

/ / /

/ / /

**I.     I-Flow's Claims are Not Barred by Preemption**

Defendants have alleged that I-Flow's claims for relief are barred in whole or in part by the doctrine of preemption.  Defendants have provided no evidence to support this assertion. Therefore, Defendants cannot avoid liability based on this defense.

**J.     I-Flow is Entitled to Damages For Its Lost Profits on the Infringing Sales**

Defendants' infringement of the '481 Patent entitles I-Flow to damages adequate to compensate I-Flow for Defendants' infringement.   From the documents provided by Defendants, I-Flow understands that ▮▮▮▮▮ products have been sold by Defendants between 2007 and 2008.  Additionally, ▮▮▮▮▮▮ REDACTED ▮▮▮▮▮▮ between 2006 and 2007 in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  I-Flow is entitled to between ▮▮▮▮▮▮ in incremental profits for Defendants' infringement through 2008.   This conclusion is based upon a consideration of the factors established in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978), as described below, as well as evidence that Defendants specifically targeted I-Flow's customers.

Upon evaluation of the Panduit factors, I-Flow's expert, David Hanson, determined that I-Flow has a ▮▮ share of the market for regional pain control.  Based on this market share, I-Flow is entitled to receive ▮▮ of the Defendants' ▮▮▮▮ through 2008, totaling ▮▮ ▮▮  Mr. Hanson calculated that I-Flow is entitled to ▮▮▮ in incremental profits on a loss ▮▮▮.  Alternatively, I-Flow has 100% of the market share for pump systems with a collapsible shell.  Thus, I-Flow may be entitled to the incremental profits that it would have made on all of these sales on the basis that, but for Defendants' infringement of the '481 Patent, I-Flow would have captured all of these ▮▮ sales.  Mr. Hanson calculated that I-Flow is entitled to ▮▮▮ in incremental profits on a loss of ▮▮ sales.  Mr. Hanson's calculations are based upon sales information provided by Defendants in discovery as of the date of Mr. Hanson's report.  Defendants have not produced any documents regarding sales in 2009. Based on his projections of Defendants' sales through the end of August, I-Flow believes that Defendants will sell ▮▮ infringing products before an injunction can be entered in this case. Assuming a market share of ▮▮, Mr. Hanson has calculated that I-Flow is entitled to

1    █████████ in lost incremental profits.  Assuming a market share of 100%, Mr. Hanson has

2    calculated that I-Flow is entitled to ████████ in lost incremental profits.  Mr. Hanson will

3    update these calculations based upon additional sales information received from Defendants at

4    trial.

5    **K.**      **Alternatively, I-Flow is Entitled to a Reasonable Royalty for Defendants'**

6              **Infringement of the '481 Patent**

7        I-Flow is entitled to at least a reasonable royalty on the revenue generated by all of

8    Defendants' infringing sales occurring after February 8, 1994, the '481 Patent issue date.  The

9    reasonable royalty is determined based upon a hypothetical negotiation between a willing

10   licensor and a willing licensee which would have taken place between I-Flow and Defendants

11   on February 8, 1994, when the patent issued.

12       The evaluation of I-Flow's reasonable royalty is based on the guidelines established by

13   the court in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y.

14   1970).  A number of factors, including the competitive positions of the parties in the market,

15   the importance and commercial success of the invention, including the profits that would have

16   been made on the infringing sales, and the use of the invention by Defendants, tend to influence

17   the royalty rate.

18       Upon evaluation of the 15 factors outlined in *Georgia Pacific*, I-Flow's expert

19   determined the appropriate proxy royalty rate to be ████ of sales.  Based on pre-2009 sales

20   information, Defendants' sales are calculated to total ██████ in revenue.  Applying I-Flow's

21   reasonable royalty rate of ████ to Defendants' sales, the royalty amount payable by Defendants

22   to I-Flow is █████ assuming no lost profits.  Alternatively, if I-Flow is awarded lost profits

23   for a ████ market share, I-Flow should receive a █████ royalty on ████ of the ██████ in

24   revenue.  Thus, according to Mr. Hanson's calculations, I-Flow would be entitled to a royalty

25   payment ████████  Based on projections for 2009 sales outlined above, I-Flow would be

26   entitled to a reasonable royalty of █████ assuming no lost profits, or ██████, assuming lost

27   profits for a █████ market share.

28   / / /

**L.    Defendants' Infringement Was Willful**

Defendants' infringement of the '481 Patent has been willful.  A finding of willfulness authorizes the Court to award I-Flow up to three times its actual damages, and its reasonable attorneys' fees.  35 U.S.C. § 284, 285.

Defendants' infringement was willful because Defendants acted with reckless disregard of the claims of the '481 Patent, and Defendants knew of the unjustifiably high risk that their conduct infringed the claims of the '481 Patent.  Defendants had full knowledge of I-Flow and the '481 Patent as Defendants were secretly developing their product.  Defendants deliberately copied I-Flow's product, using misappropriated confidential information.  Defendants did not obtain a written opinion until well after receiving a cease and desist letter.  The opinion letter was not competent in that it ignored basic principles of patent law, and Defendants knew that it was not independent.  Under these circumstances, Defendants willfully infringed the '481 Patent.  Thus, the damages award should be trebled and I-Flow awarded ███████ (based on an award of lost profits including projected 2009 infringement and 100% market share).

**M.    Defendants Should be Permanently Enjoined From Continuing to Infringe the '481 Patent**

Defendants' infringement of I-Flow's '481 Patent has continued for the past several years and will continue if Defendants are not enjoined by the Court from infringing the '481 Patent.

I-Flow can demonstrate, (1) that it has suffered irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

Since at least 2006, I-Flow has lost the right of exclusivity that the '481 Patent was meant to bestow.  I-Flow has been forced to compete against Apex and Zone, I-Flow's competitors, without the benefit of that right, the only real benefit that is bestowed by a patent. The infringing Solace Pump is the only collapsible shell elastomeric infusion pump not made

1    by I-Flow.  The loss of the benefit and concomitant degradation of the worth of a valid patent is

2    irreparable harm suffered by I-Flow.

3         Any reasonable royalty awarded in this case is inadequate to compensate I-Flow for the

4    loss of the right to exclusively practice the patented technology.  If Defendants are permitted to

5    continue to infringe the patent in the future, only paying a royalty to I-Flow, I-Flow will

6    effectively have been coerced by Defendants' own wrongdoing into granting a license to its

7    competitor, something that I-Flow would never have contemplated.  Thus, by infringing the

8    '481 Patent, Defendants have gained an advantage through a compulsory license that they

9    would not have gotten if they had not infringed I-Flow's patent rights.  The mere payment of

10   royalties in the future is inadequate to compensate I-Flow for the loss of the legitimate

11   commercial advantage that would have come with the exclusive right to practice the patented

12   technology and for the forced sharing of that right with Defendants, I-Flow's competitor.

13        The balance of hardships also weighs in favor of I-Flow.  The only disadvantage to

14   Defendants is that they must cease manufacturing, selling, and using infringing products that

15   Defendants never had a right to manufacture, sell, or use in the first place.  Defendants are also

16   free to design around the '481 Patent to avoid infringing I-Flow's patent rights.  I-Flow, on the

17   other hand, if Defendants are not enjoined, will lose the benefit of having patented its

18   technology and will be forced to treat its competitors as its licensees, competing in the market

19   against its own patented technology.

20        There are no public interests in this case weighing against awarding I-Flow a permanent

21   injunction.  The public has an interest in honoring the exclusive patent rights bestowed on the

22   inventors in exchange for the inventors' disclosure of the '481 Patent invention to the public.

23   Allowing Defendants, competing infringers, to extract an involuntary license from I-Flow,

24   thereby allowing Defendants to continue infringement, undercuts the public interest principles

25   underlying the patent system.

26   / / /

27   / / /

28   / / /

## IV.  FACTUAL CONTENTIONS (L.R. 16.1 (f)(2)(a))

**A.      Defendants are Liable for Trade Secret Misappropriation**

Defendants are liable for trade secret misappropriation because they acquired, disclosed, and used, through a series of misrepresentations and under false pretenses, I-Flow's trade secret confidential business information ("Business Trade Secrets") and trade secret confidential technical information ("Technical Trade Secrets").

**1.      I-Flow Owns Protectable Trade Secrets**

Over nearly two decades of market participation and internal analysis, I-Flow has collected, developed, and synthesized vast amounts of proprietary information regarding the market for infusion pumps and their technical design.  I-Flow employs numerous methods to maintain the confidentiality of its Business and Technical Trade Secrets to ensure they are not publicly available and not generally known by I-Flow's competitors and others involved in the infusion pump industry.

**a.      I-Flow's Protectable Business Trade Secrets**

REDACTED

**b.      I-Flow's Technical Trade Secrets**

REDACTED

1     REDACTED

2

3

4

5

6

7

8

9

10

11         **c.**     **I-Flow Takes Reasonable Measures To Protect Its Trade Secrets**

12         I-Flow uses a variety of methods to maintain the confidentiality of its information. I-

13 Flow restricts access to its facilities through the use of electronic key entry as well as password

14 protected entry. Visitors are not allowed on I-Flow premises unless they sign-in at the front

15 desk, and they must wear visitor badges to prominently display while on premises and be

16 escorted by an authorized I-Flow employee. Certain areas of I-Flow's facilities are off-limits to

17 even I-Flow personnel, unless special authorization has been previously granted. I-Flow's

18 computer system is password protected, with access based on level of authorization. I-Flow

19 maintains confidentiality agreements for all I-Flow employees. I-Flow uses confidentiality

20 agreements to allow exchange of confidential information with third parties. Moreover,

21 purchase orders with vendors include confidentiality provisions, prohibiting the unauthorized

22 use or disclosure of I-Flow confidential information. Controlled documents are routinely

23 marked with confidentiality designations. I-Flow has strict document retention policies to

24 maintain controlled documents.

25         I-Flow's principal, Don Earhart, also took measures to maintain the confidentiality of I-

26 Flow's trade secrets during his participation in the Adaptive Business Leaders Organization.

27 Any person attending a confidential ABL meeting is required to undertake obligations of

28 confidentiality by either signing a Letter of Intent or a membership agreement, each of which

1   contains a confidentiality clause.   Information discussed during meetings is proprietary and

2   confidential.

3                    **d.      I-Flow's Trade Secrets Have Independent Economic Value Because**

4                             **They Are Not Generally Known**

5            I-Flow's Business and Technical Trade Secrets have great value to I-Flow because they

6   are not publicly available and not generally known by I-Flow's competitors and others involved

7   in the infusion pump industry.

8            I-Flow's Business Trade Secrets have great value because this knowledge helps I-Flow

9   focus its resources to maximize its profitability and competitiveness.   Knowledge of the prices

10  the elastomeric pump market will bear and the kinds of distribution models that that can be

11  employed to profitably pursue that market is critical because it gives I-Flow a tremendous

12  advantage over potential competitors.   I-Flow's Business Trade Secrets allow it to focus its

13  resources on profitable markets and effective distribution models, while competitors would

14  squander their resources through the process of trial and error in an attempt to become

15  profitable.

16           I-Flow's Technical Trade Secrets are valuable because I-Flow's technical specifications

17  are critical for establishing a design that is capable of safe operation while meeting customer

18  requirements.   I-Flow has years of experience in producing millions of elastomeric pumps.   I-

19  Flow's competitors do not know this information, and a potential competitor would be forced

20  to spend vast sums of money over many years to recreate this wealth of knowledge from

21  experience. The fact that I-Flow's Technical Trade Secrets are not known throughout the

22  industry gives I-Flow an invaluable competitive advantage.

23                    **2.     Defendants Misappropriated I-Flow's Protectable Trade Secrets**

24           Defendants improperly acquired, disclosed, and used I-Flow's Business and Technical

25  Trade Secrets in order to build its own infusion business.

26  / / /

27  / / /

28  / / /

a.   <u>**Misappropriation of I-Flow's Business Trade Secrets by Improper Acquisition**</u>

Defendants improperly acquired I-Flow's Business Trade Secrets in the course of Defendant McGlothlin's participation in ABL.  McGlothlin signed a Letter of Intent containing a confidentiality clause prior to attending his first ABL meeting as a guest.  McGlothlin also signed a membership agreement containing the same confidentiality clause when he became an ABL member.  Thus, McGlothlin agreed to maintain the confidentiality of all proprietary and confidential information disclosed at ABL.

During his participation, McGlothlin gained access to I-Flow's Business Trade Secrets regarding the infusion pump and drug delivery markets.   While at ABL, McGlothlin represented himself as a component supplier and materials expert; he never disclosed that he was secretly developing or manufacturing infusion pumps to compete with I-Flow.

REDACTED

his resignation from ABL one year later in January of 2004, McGlothlin continued to attend ABL meetings and obtain, through misrepresentation and false pretenses, I-Flow's confidential and trade secret business information regarding the infusion pump market.

b.   <u>**Misappropriation of I-Flow's Business Trade Secrets by Improper Use**</u>

After improperly acquiring I-Flow's Business Trade Secrets under obligations of confidentiality, Defendants used this information to enter the pain management market at a significant advantage.   Defendants' penetration of the infusion pump market has been significantly facilitated by knowing what has and has not worked over the course of many years of market experience.   Defendants have tailored their marketing and sales strategy to take advantage of I-Flow's proprietary sales methods learned from I-Flow.   REDACTED

Defendants have used I-Flow trade

1  secret pricing strategies to undercut I-Flow and offer their pump below the cost of I-Flow's

2  products.  Thus, Defendants used I-Flow Business Trade Secrets.

3      **c.      Misappropriation of I-Flow's Technical Trade Secrets by Improper**

4              **Acquisition**

5       Defendants improperly acquired I-Flow's Technical Trade Secrets through a series of

6  misrepresentations and under false pretenses.  From approximately May 2005 until December

7  2005, I-Flow retained Apex to help develop an improved infusion pump system.  At that time,

8  Defendants represented themselves as a component supplier and contract manufacturer, and

9  never disclosed that they were developing their own product to compete with I-Flow.The

10 parties discussed confidentiality and the confidential nature of the information provided by I-

11 Flow to facilitate Defendants' work on I-Flow's behalf.   I-Flow provided Defendants

12 confidential drawings and design specifications, which were marked with confidentiality

13 designations.  I-Flow's work orders to Defendants included express confidentiality provisions.

14 Moreover, Defendants received admonishments about the obligations of confidentiality they

15 had undertaken.  Thus, Defendants acquired I-Flow's Technical Trade Secrets through improper

16 means.

17      **d.      Misappropriation of I-Flow's Technical Trade Secrets by Improper**

18              **Use**

19       Defendants improperly used I-Flow's Technical Trade Secrets despite their obligations

20 of confidentiality.  Defendants' access to I-Flow's proven design criteria enabled Defendants to

21 quickly verify their product design and avoid pitfalls in their own product development effort.

22 Defendants' pump also incorporates I-Flow's Technical Trade Secrets.  REDACTED

23 ████████████████████████████████████████

24 ████████████████████████████████████████

25 ████████████████████████████████████████

26 ████████████████████████████████████████

27 ████████████████████

28 / / /

1       Additionally, Defendants adopted the proprietary dip molding process that it developed

2 for I-Flow.  I-Flow paid for Defendants to develop a unique dip molding process for I-Flow.

3 Defendants then incorporated this process for the production of their pump bladder.  Prior to

4 developing I-Flow's dip molding process, Apex employed a significantly different dip molding

5 process for its own infuser balloon.

6       Defendants also used I-Flow's Technical Trade Secrets to select bladder materials for

7 their infusion pump.  Prior to working for I-Flow, Defendants used two polyisoprene materials.

8 As part of their work for I-Flow, Defendants identified specific polyisoprene materials that met

9 I-Flow's technical specifications for the infusion pump bladder.  Ultimately, Defendants did

10 not produce a cost-efficient polyisoprene bladder for I-Flow's infusion pump. However, this

11 did not stop Defendants from converting their bladder to virtually identical polyisoprene

12 materials that met I-Flow's technical specifications.  Thus, Defendants used I-Flow Business

13 Trade Secrets.

14     **3.**     <u>**I-Flow Has Been Damaged by Defendants' Misappropriation of I-Flow's**</u>

15             <u>**Protectable Trade Secrets**</u>

16       I-Flow has been damaged by, among other things, its lost sales resulting from

17 Defendants' misappropriation of I-Flow's Business and Technical Trade Secrets.  Damages to

18 I-Flow include at least lost profits on diverted sales, eroded prices, remedial costs, future lost

19 profits, and royalties.

20       From the documents provided by Defendants, I-Flow damages expert, David Hanson,

21 calculates that Defendants have sold ██████ products between 2007 and 2008 using I-Flow's

22 Business and Technical Trade Secrets.  Defendants also used I-Flow's Business and Technical

23 Trade Secrets when they ███████████████████ between 2006 and 2007 in early

24 marketing efforts.  I-Flow has ██████ of the market share for pump systems with a collapsible

25 shell.  Thus, I-Flow may be entitled to the incremental profits that it would have made on all of

26 these sales on the basis that, but for Defendants' misappropriation of I-Flow's Business and

27 Technical Trade Secrets, I-Flow would have captured all of these ██████ sales.  Mr. Hanson

28 calculated that I-Flow is entitled to ██████ in incremental profits on a loss of ██████ sales.

1   Alternatively, I-Flow has a ▐▐▐ share of the market for regional pain control.  Based on this

2   market share, I-Flow is entitled to receive ▐▐ of the Defendants' ▐▐▐ sales, totaling ▐▐▐

3   sales.  As a result, I-Flow is entitled to between ▐▐▐▐▐▐ in incremental profits as a

4   result of Defendants' misappropriation of I-Flow's Business and Technical Trade Secrets.

5        Mr. Hanson's calculations are based upon sales information provided by Defendants in

6   discovery as of the date of Mr. Hanson's report.  Defendants have not produced any documents

7   regarding sales in 2009.  Based on earnings projections, I-Flow believes that Defendants will

8   sell ▐▐▐ products using I-Flow's Business and Technical Trade Secrets before an injunction

9   can be entered in this case, resulting in lost incremental profits of ▐▐▐▐▐▐, as

10   set forth above.  Mr. Hanson will update these calculations based upon additional sales

11   information received from Defendants at trial.

12        Alternatively, I-Flow is entitled to at least a reasonable royalty on the revenue generated

13   by all of Defendants' sales which, but for Defendants' misappropriation of I-Flow's Business

14   and Technical Trade secrets, would not have occurred.  Mr. Hanson determined the appropriate

15   proxy royalty rate to be ▐▐▐ of sales.  Defendants' sales are calculated to total ▐▐▐▐ in

16   revenue.  Applying I-Flow's reasonable royalty rate of ▐▐▐ to Defendants' sales, the royalty

17   amount payable by Defendants to I-Flow is ▐▐▐ assuming no lost profits.  Alternatively, if

18   I-Flow is awarded lost profits for a ▐▐▐ market share, I-Flow should receive a ▐▐▐ royalty on

19   ▐▐▐▐▐ in revenue.  Thus, according to Mr. Hanson's calculations, I-Flow would

20   be entitled to a royalty payment of ▐▐▐ for activities through 2008.  For sales including

21   2009, Mr. Hanson calculated a reasonable royalty from ▐▐▐▐▐, as discussed

22   above.

23        I-Flow is also entitled to punitive damages for Defendants' willful and malicious

24   misappropriation of I-Flow's Business and Technical Trade Secrets.  With a willful and

25   conscious disregard for I-Flow's rights, Defendants intentionally copied as much of I-Flow's

26   product and business strategy as they could gather.  Defendants developed a product using I-

27   Flow's trade secrets and passed it off as their own technology so that they might gain

28   financially.  Courts have approved punitive damages in excess of 10 times actual damages.  In

1  light of Defendants' repeated outrageous willful and malicious conduct, punitive damages of at

2  least ████████ are well-justified.

3        In addition to I-Flow's lost sales, Defendants' have been unjustly enriched by acquiring,

4  disclosing, and using I-Flow's trade secrets both to develop their competing product and to

5  significantly reduce barriers to entry into the infusion pump market by capitalizing on I-Flow's

6  knowledge acquired through years of market participation and product development.  Access to

7  I-Flow's trade secrets has enabled Defendants to avoid having to spend the time and money

8  necessary to generate information internally.  Defendants' gain has resulted in I-Flow's loss of

9  customers, sales and, ultimately, profits.

10  **B.**       **Defendants Should be Permanently Enjoined From Continuing to Use I-Flow's**

11           **Protectable Trade Secrets**

12        Defendants' use of I-Flow's Business and Technical Trade Secrets has continued for the

13  past several years and will continue if Defendants are not enjoined by the Court from using I-

14  Flow's trade secrets.

15        I-Flow can demonstrate (1) that it has suffered irreparable injury; (2) that remedies

16  available at law, such as monetary damages, are inadequate to compensate for that injury; (3)

17  that, considering the balance of hardships between the plaintiff and defendant, a remedy in

18  equity is warranted; and (4) that the public interest would not be disserved by a permanent

19  injunction.

20        Since at least 2006, I-Flow has lost the invaluable competitive advantage that trade

21  secret protection was meant to bestow.  I-Flow has been forced to compete against Apex and

22  Zone, competitors who improperly used I-Flow's Business Trade Secrets to focus their

23  resources on profitable markets and effective distribution models.   Through Defendants'

24  improper acquisition of I-Flow's Technical Trade Secrets, Defendants avoided spending the

25  vast sums of money that would be necessary to recreate I-Flow's wealth of knowledge gained

26  from years of experience in producing millions of elastomeric pumps.   This loss of the benefits

27  of trade secret protection and concomitant degradation of the worth of those trade secrets is

28  irreparable harm suffered by I-Flow.

Defendants' have been unjustly enriched by acquiring, disclosing, and using I-Flow's Business and Technical Trade Secrets both to develop their competing product and to significantly reduce barriers to entry into the infusion pump market.  Any damages for lost profits awarded in this case are thus inadequate to compensate I-Flow for Defendants' continued misappropriation of its trade secrets.

The balance of hardships also weighs in favor of I-Flow.  The only disadvantage to Defendants is that they must cease manufacturing and using products that use I-Flow's Technical Trade Secrets, and cease selling such products using I-Flow's Business Trade Secrets.  Defendants are free to design and sell a new infusion pump without using I-Flow's Business and Technical Trade Secrets.  I-Flow, on the other hand, if Defendants are not enjoined, will lose the benefit of the advantage it acquired through years of market participation and product development.

There are no public interests in this case weighing against awarding I-Flow a permanent injunction.  The public has an interest in honoring reasonable efforts to maintain the confidentiality of valuable trade secrets.  Allowing Defendants to continue competing against I-Flow, using its own Business and Technical Trade Secrets against it, undercuts the public interest principles underlying trade secret protection.

**C.    Defendants are Liable for Breach of Confidence**

Defendants have committed an unlawful breach of confidence because I-Flow offered Business Trade Secrets, Technical Trade Secrets, and non-trade secret confidential information (collectively, "Confidential Information") to Defendants in confidence, with the understanding that it was not to be disclosed to others, and Defendants used that Confidential Information for purposes beyond the limits of the confidence without I-Flow's permission.

In addition to the Business and Technical Trade Secrets described above, I-Flow has compiled and developed vast amounts of non-trade secret business and technical proprietary information regarding the infusion pump market and infusion pumps ("Non-Trade Secret Confidential Information").    REDACTED

1   REDACTED

2

3

4   I-Flow's Non-Trade Secret Confidential Information is not publicly available and not

5   generally known by I-Flow's competitors and others involved in the infusion pump industry,

6   and thus has great value to the company.   As described above, Defendants acquired I-Flow's

7   Non-Trade Secret Confidential Information under confidentiality obligations and used such

8   information without I-Flow's permission.

9   Defendants are thus liable for breach of confidence for using I-Flow's Confidential

10  Information without I-Flow's permission and for purposes beyond the limits of I-Flow's

11  confidence.

12  **D.      I-Flow is Entitled to Damages for Defendants' Breach of Confidence**

13  I-Flow has been damaged by, among other things, its lost sales resulting from

14  Defendants' breach of confidence in using I-Flow's Confidential Information without

15  permission.  Damages to I-Flow include at least lost profits on diverted sales, eroded prices,

16  remedial costs, future lost profits, and royalties, as set forth above.  I-Flow may also be entitled

17  to punitive damages for Defendants' fraudulent and malicious breach of confidence.

18  I-Flow is therefore entitled to damages for Defendants' breach of confidence under

19  California common law.

20  **E.      Defendants are Liable for Unfair Competition Under California Common Law**

21  Defendants are liable for unfair competition under California common law because (1)

22  I-Flow invested substantial time, skill, and money in developing its Confidential Information;

23  (2) Defendants appropriated and used I-Flow's Confidential Information at little or no cost; (3)

24  Defendants' appropriation and use of I-Flow's Confidential Information was without

25  authorization or consent of I-Flow; and (4) I-Flow has established it has been injured by

26  Defendants' conduct.

27  / / /

28  / / /

**F.**     <u>I-Flow is Entitled to Damages and a Permanent Injunction for Defendants' Unfair Competition Under California Common Law</u>

I-Flow has been damaged by, among other things, its lost sales resulting from Defendants' acts constituting unfair competition under California common law. Damages to I-Flow include at least lost profits on diverted sales, eroded prices, remedial costs, future lost profits, and royalties, as set forth above. I-Flow is also entitled to punitive damages for Defendants' fraudulent and malicious unfair competition under California common law.

In addition to I-Flow's lost sales, Defendants' have been unjustly enriched by unfairly competing with I-Flow, both to develop their competing product and to significantly reduce barriers to entry into the infusion pump market by capitalizing on I-Flow's knowledge acquired through years of market participation and product development. Defendants' unfair competition has enabled Defendants to avoid having to spend the time and money necessary to generate information internally. Defendants' gain has resulted in I-Flow's loss of customers, sales and ultimately profits.

For the reasons discussed above, I-Flow is entitled to damages and injunctive relief for Defendants' past and continuing acts of unfair competition under California common law.

**G.**     <u>Defendants are Liable for Unfair Competition Under California Business and Professions Code §17200, et seq.</u>

Defendants are liable for unfair competition under California Business and Professions Code §17200, et seq. because Defendants' acquisition, disclosure, and use of I-Flow's Confidential Information, as described in detail above, constitutes an unlawful, unfair, and fraudulent business act or practice. I-Flow is entitled to a permanent injunction enjoining Defendants' conduct constituting unfair competition.

**H.**     <u>Defendants' Alleged Affirmative Defenses to Trade Secret Misappropriation, Breach of Confidence, and Unfair Competition</u>

In their Answer to Plaintiff's Second Amended Complaint, Defendants allege that I-Flow's claims for relief are barred on the basis of disclosure of alleged confidential information, failure to maintain efforts to maintain confidentiality, no duty of confidentiality,

1  independent acquisition of information, staleness of information, non-use of information, and

2  lack of value of information.  However, as discussed above, I-Flow owns protectable trade

3  secrets; Defendants misappropriated those trade secrets; and I-Flow has been damaged by

4  Defendants' misappropriation.    Defendants have also acquired I-Flow's Confidential

5  Information under confidentiality obligations and used such information without I-Flow's

6  permission.   Additionally, as discussed above, I-Flow invested substantial time, skill, and

7  money in developing its Confidential Information, and Defendants appropriated and used I-

8  Flow's Confidential Information at little or no cost, and without authorization or consent of I-

9  Flow. Accordingly, I-Flow's claims for relief are not barred on the basis of any of Defendants'

10  alleged affirmative defenses.

11  **I.**     **I-Flow Has Not Engaged In Unfair Competition Under Section 43 Of The Lanham**

12          **Act**

13          Defendants allege that I-Flow has violated Section 43 of the of the Lanham Act by

14  disseminating a technical bulletin for the ON-Q Pump entitled Latex Sensitivity (the

15  "Technical Bulletin") and a leaflet entitled On-Q Pump Directions for Use (the "Leaflet") that

16  are false and misleading.   However, I-Flow has not made any false statements of fact in a

17  commercial advertisement about its infusion pumps.   Defendants have not provided any

18  evidence that these statements actually deceived or had the tendency to deceive a substantial

19  segment of its audience.  Additionally, Defendants have not provided evidence that the alleged

20  deception is material, in that it is likely to influence the purchasing decisions.

21          Moreover, Defendants have not provided evidence that they have been or are likely to

22  be injured as a result of the statements, either by direct diversion of sales from itself to I-Flow

23  or by a lessening of the goodwill associated with the products.   In addition, I-Flow's

24  statements do not compare I-Flow's product to Defendants' product, and Defendants have

25  failed to show any actual injury to Defendants causally related to I-Flow's statements.

26          Further, Defendants' unfair competition counterclaim under Section 43 of the Lanham

27  Act is a "fraud-on-the-FDA" claim.  Such fraud-on-the-FDA claims conflict with, and are

28  / / /

1  therefore preempted by the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq*,

2  as amended by the Medical Device Amendments of 1976 ("MDA").

3      Additionally, to resolve Defendants' allegation that I-Flow's Technical Bulletin and

4  Leaflet contain false statements, the Court must interpret the term "likely contact" and

5  determine its meaning in the context of 21 C.F.R. § 801.437.  Only in the context of the FDA

6  regulations in which the statements were made can the alleged false statements be analyzed.

7  Because the FDCA provides no private right of action, and the Court cannot adjudicate this

8  matter without interpreting and applying FDA regulations, Defendants have no standing to

9  bring their unfair competition counterclaim under Section 43 of the Lanham Act.

10  **J.**    **I-Flow Has Not Engaged In Statutory or Common Law Unfair Competition**

11      Defendants have also asserted unfair competition counterclaims under Section 17200 of

12  the California Business and Professions Code and California common law.  However, I-Flow

13  has not engaged in any unlawful, unfair, or fraudulent business practices.  I-Flow has asserted

14  its rights in the validly issued '481 Patent, which does not violate Section 17200.  I-Flow is

15  additionally protected by federal patent laws barring the imposition of liability for publicizing

16  the '481 Patent in the marketplace and notifying infringers that, upon a good faith belief, they

17  are infringing the '481 Patent.  Furthermore, as discussed above, I-Flow has not engaged in

18  inequitable conduct or false advertising which might arguably serve as the basis for an unfair

19  competition violation.   Moreover, as discussed above, Defendants have not provided evidence

20  that they have been or are likely to be injured by I-Flow's statements.

21      Additionally, Defendants' unfair competition counterclaims under statutory and

22  common law are "fraud-on-the-FDA" claims.  Such state-law fraud-on-the-FDA claims conflict

23  with, and are therefore preempted by the FDCA, as amended by the MDA.

24      In addition, to resolve Defendants' allegation that I-Flow's Technical Bulletin and

25  Leaflet contain false statements, the Court must interpret the term "likely contact" and

26  determine its meaning in the context of 21 C.F.R. § 801.437.  Only in the context of the FDA

27  regulations in which the statements were made can the alleged false statements be analyzed.

28  Because the FDCA provides no private right of action, and the Court cannot adjudicate this

1  matter without interpreting and applying FDA regulations, Defendants have no standing to

2  bring their statutory and common law unfair competition counterclaim.

3        Therefore, Defendants' unfair competition counterclaims are both preempted and

4  unsupported.  Moreover, Defendants lack standing to assert such claims.

5  **V.  <u>ISSUES OF LAW</u>**

6  **A.**     **<u>Claim Construction</u>**

7        Claim Construction is an issue of law for the Court to decide.  *Markman v. Westview*

8  *Instruments*, 116 S. Ct. 1384, 1395 (1996); *see also Phillips v. AWH Corp.*, 415 F.3d 1303

9  (Fed. Cir. 2005) (*en banc*); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576 (Fed. Cir.

10  1996). The claim construction in this case has already been decided by the Court after

11  extensive briefing on this issue and oral argument before the Court.  The Court issued its Claim

12  Construction Order on January 4, 2007.

13  **B.**     **<u>Infringement</u>**

14        In a patent case, the infringement analysis is a two-step process.  *Wenger Mfg., Inc. v.*

15  *Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1231 (Fed. Cir. 2001).  First, the asserted claim of the

16  patent must be properly construed as a matter of law to determine its scope and meaning.  *Id.*

17  Claim construction is a question of law for the Court.  *Id.*  Once the court determines, as a

18  matter of law, the correct claim scope, a jury may then compare the properly construed claim to

19  the accused product to determine, as a matter of fact, whether all of the claim limitations are

20  present.  *Johnson Worldwide Assocs. v. Zebco Corp.*, 175 F.3d 985, 988 (Fed. Cir. 1999).

21  Determination of infringement, whether literal or under the doctrine of equivalents, is a

22  question of fact.  *Wenger*, 239 F.3d at 1231.  In this case, the Court has already construed

23  Claims 1, 2 and 15.

24       **1.**     **<u>Literal Infringement</u>**

25        A finding of literal infringement requires that every limitation of the patent claim be

26  found in the accused device.  *Wenger*, 239 F.3d at 1231.  Whether the accused product contains

27  an element corresponding to each claim limitation is a question of fact.  *TechSearch, L.L.C. v.*

28  *Intel Corp.*, 286 F.3d 1360, 1369-70 (Fed. Cir. 2002).

2.      **Infringement Under the Doctrine of Equivalents**

An accused device that does not literally infringe a claim may still infringe under the doctrine of equivalents if it includes a substantial equivalent for any claim limitation that is literally missing. *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1358–59 (Fed. Cir. 2002). Equivalents may be established by evidence that the accused product contains an element that is not "substantially different" from any literally missing claim limitation. *Id.* (citing *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 40 (1997)). One common method of determining equivalents is to analyze whether the accused device includes an element that performs substantially the same function, in substantially the same way, and achieves substantially the same result as the literally missing claim limitation. *Kraft Foods, Inc. v. Int'l Trading Co.*, 203 F.3d 1362, 1371 (Fed. Cir. 2000). Among the factors that may be considered, the Federal Circuit has stressed known interchangeability as evidence of equivalents. *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1261 (Fed. Cir. 1989); *Thomas & Betts Corp. v. Litton Sys., Inc.*, 720 F.2d 1572, 1579 (Fed. Cir. 1983).

3.      **Willful Infringement**

To establish willful infringement, a patentee must first show it is highly probable that the alleged infringer's conduct was reckless. *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). The alleged infringer acted recklessly if it proceeded with the allegedly infringing conduct with knowledge of the patent, and in the face of an unjustifiably high risk that it was infringing the claims of a valid and enforceable patent. The accused infringer's state of mind is not relevant to this objective inquiry. *Id.*

The patentee must also demonstrate that it is highly probable that the unjustifiably high risk of infringement was "known or so obvious that it should have been known" to the accused infringer. *Id.* In determining whether the state-of-mind test is satisfied, the trier of fact can consider whether, (1) the alleged infringer acted in a manner consistent with the standards of commerce for its industry and (2) whether the alleged infringer deliberately copied a product of patentee covered by one or more claims of the patent, as distinguished from trying to "design

1   around" the patent by designing a product that the alleged infringer believed did not infringe

2   those claims.  *Id.* at 1371 n.5; *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1225

3   (Fed. Cir. 2006).

4   **C.      Damages**

5        The patent statute provides: "Upon finding for the claimant the court shall award the

6   claimant damages adequate to compensate for the infringement, but in no event less than a

7   reasonable royalty for the use made of the invention by the infringer, together with interest and

8   costs as fixed by the court."   35 U.S.C. § 284.   "In patent law, the fact of infringement

9   establishes the fact of damage because the patentee's right to exclude has been violated."

10  *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, 895 F.2d 1403, 1406

11  (Fed. Cir. 1990) (citation omitted).

12       **1.      Lost Profits**

13       A patentee may be awarded its profits lost on the sales made by the infringer if the

14  patentee can show that there was a reasonable probability that it would have made those sales

15  but for the infringement.  *Micro Chemical, Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir.

16  2003).  The factors to be considered in determining whether lost profits are appropriate were

17  established in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978).

18  These factors are (1) demand for the patented product; (2) absence of non-infringing

19  substitutes; (3) manufacturing and marketing capability of the patentee to provide the product;

20  and (4) the amount of profit that the patentee would have made.

21       **2.      Reasonable Royalty**

22       A reasonable royalty is the amount to which a "willing" licensor and licensee would

23  agree at a hypothetical negotiation occurring at the time infringement began.  *Georgia-Pacific*

24  *Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  The *Georgia-Pacific*

25  case, since adopted by the Federal Circuit, lists the following 15 factors that may be relevant to

26  determine a reasonable royalty:

27       1. The royalties received by the patentee for the licensing of the patent
             in suit, proving or tending to prove an established royalty.

28

2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.

4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.

5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.

6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.

7. The duration of the patent and the term of the license.

8. The established profitability of the product made under the patent; its commercial success; and its current popularity.

9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.

10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.

12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.

14. The opinion testimony of qualified experts.

15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee- who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented

1  invention- would have been willing to pay as a royalty and yet be able
2  to make a reasonable profit and which amount would have been
   acceptable by a prudent patentee who was willing to grant a license.

3  *Id.*; *see also Monsanto Co. v. Ralph*, 382 F.3d 1374, 1383 (Fed. Cir. 2004).

4  ### 3.  **Treble Damages**

5  The patent statute also states that "the court may increase the damages up to three times

6  the amount found or assessed."  35 U.S.C. § 284.  The decision to award such enhanced

7  damages may be based on willful infringement or bad faith.  *Beatrice Foods Co. v. New*

8  *England Printing & Lithographing Co.*, 923 F.2d 1576, 1578 (Fed. Cir. 1991).  Courts consider

9  several factors such as:

10  (1)  whether the infringer deliberately copied the ideas or design of another;

11  (2) whether the infringer, when he knew of the other's patent protection, investigated

12  the scope of the patent and formed a good-faith belief that it was invalid or that it was

13  not infringed;

14  (3) the infringer's behavior as a party to the litigation;

15  (4) the defendant's size and financial condition;

16  (5) closeness of the case;

17  (6) duration of the defendant's misconduct;

18  (7) remedial action by the defendant;

19  (8) the defendant's motivation for harm; and

20  (9) whether the defendant attempted to conceal its misconduct.

21  *Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1225 (Fed. Cir. 2006) (quoting *Read*

22  *Corp. v. Portec, Inc.*, 970 F.2d 816, 826-27 (Fed. Cir. 1992) (superseded on other grounds as

23  recognized in *Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir.

24  1996))).

25  ## D.  **Injunctive Relief**

26  The decision to grant or deny permanent injunctive relief is in the discretion of the

27  Court.  *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006).  That discretion must be

28  exercised consistent with traditional principals of equity, applying the four factor framework

1  that governs the award of injunctive relief.  *Id.* at 394.  A plaintiff seeking a permanent

2  injunction must demonstrate; (1) that it has suffered irreparable injury; (2) that remedies

3  available at law, such as monetary damages, are inadequate to compensate for that injury; (3)

4  that, considering the balance of hardships between the plaintiff and defendant, a remedy in

5  equity is warranted; and (4) that the public interest would not be disserved by a permanent

6  injunction. *Id.* at 391.

7  **E.**      **Intervening Rights**

8          The doctrine of absolute intervening rights relieves an infringer of liability during the

9  period before the claims of a reexamined patent are validated if a claim is amended to introduce

10  a substantive change.  *See* 35 U.S.C. §§ 252, 307(b).  A claim amendment is not substantive if

11  it "make[s] specific what was always implicit or inherent," or "makes [the claim] more definite

12  without affecting its scope." *Engineered Data Products v. GBS Corp.*, 506 F.Supp.2d 461, 467

13  (D.Colo. 2007) (quoting *Laitram Corp. v. NEC Corp.*, 952 F.2d 1357, 1361 (Fed. Cir. 1991);

14  *Bloom Eng'g Co. v. North American Mfg. Co.*, 129 F.3d 1247, 1250 (Fed. Cir. 1997)); *see*

15  *Kaufman Co. v. Lantech, Inc.*, 807 F.2d 970, 977 (Fed. Cir. 1986).

16          When claims are amended during reexamination following a rejection based on prior

17  art, the claims are not deemed substantively changed as a matter of law.  *Laitran Corp.*, 952

18  F.2d at 1362 ("In harmony with the court's clear rejection of the proposition that any

19  amendment to a claim acts as a *per se* estoppel when the issue is the doctrine of equivalents, we

20  conclude that the proposition of *per se* estoppel, when the issue is substantive change on

21  reexamination, must also be rejected.").  "Determination of whether a claim change during

22  reexamination is substantive requires analysis of the scope of the original and reexamined

23  claims in light of the specification, with attention to the references that occasioned the

24  reexamination, as well as the prosecution history and any other relevant information." *Bloom*

25  *Eng'g Co.*, 129 F.3d at 1250 (citing *Laitram Corp.*, 952 F.2d at 1363).  Further, when

26  analyzing the original claims to determine whether an amendment merely clarified a claim, the

27  original claim must be considered as a whole.  *Engineered Data Products*, 506 F.Supp.2d at

28  471.

1    With respect to reexamination claims that are not substantially identical to the original

2    claims, a court has discretion under the doctrine of equitable intervening rights to allow an

3    infringer to "continue to manufacture, use, offer to sell, or sell articles for which substantial

4    preparations for manufacture or use was made" before the claims were validated.  35 U.S.C. §

5    252; *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1361 (Fed. Cir. 2001).  However, "courts only

6    grant equitable intervening rights to parties acting in 'good faith' who 'innocently' develop and

7    manufacture the infringing good."  *Allied Tube & Conduit Corp. v. John Maneely Co.*, 125 F.

8    Supp.2d 987, 1004 (D. Ariz. 2000).  A court granting equitable intervening rights may impose

9    a mandatory royalty payment; allow an infringer to use up raw materials; or allow the infringer

10   to "recoup its investment and to offset, against any infringement damages, the reasonable cost

11   of converting or replacing its present equipment in order to produce noninfringing goods."

12   *Mine Safety Appliances Co. v. Dickinson & Co.*, 744 F. Supp. 578 (S.D.N.Y.1990); *Seattle Box

13   Co. v. Indus. Crating & Packing, Inc.*, 731 F.2d 818, 827 (Fed. Cir. 1984) (allowing infringer

14   to use up supply of raw materials where infringer knew of patent, manufactured under advice

15   of counsel, had existing orders at the date of reissuance, and there was no evidence materials

16   had an alternate non-infringing use); *Plastic Container Corp. v. Cont'l Plastics of Oklahoma,

17   Inc.*, 607 F.2d 855 (10th Cir. 1979).

18   **F.**    **Patent Validity**

19   Patent claims are presumed to be valid.  35 U.S.C. § 282.  The party challenging a

20   patent must prove facts supporting a determination of invalidity by clear and convincing

21   evidence.  *Schumer v. Lab Computer Sys. Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002).

22   **1.**    **Anticipation**

23   Anticipation is determined on a claim-by-claim basis. *SRI Int'l v. Matsushita Elec.

24   Corp. of Am.*, 775 F.2d 1107, 116 (Fed. Cir. 1985). The party alleging invalidity has the burden

25   of demonstrating anticipation by clear and convincing evidence. 35 U.S.C. § 282; *Typeright

26   Keyboard Corp. v. Microsoft Corp.*, 374 F. 3d 1151, 1157 (Fed. Cir. 2004).

27   / / /

28   / / /

### a.   **Printed Publication**

A printed publication published more than one year before the application for a patent claim may anticipate the claimed invention.  35 U.S.C. § 102(b).  To anticipate the claimed invention, each and every limitation in the claim must be found in a single prior art reference, either explicitly or inherently. *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375 (Fed. Cir. 2005).  Additionally, the "prior art reference must be enabling so that the claimed subject matter may be made or used by one skilled in the art." *Impax Labs, Inc. v. Aventis Pharms., Inc.*, 468 F.3d 1366, 1381 (Fed. Cir. 2006); *see also Elan Pharms., Inc. v. Mayo Found.*, 346 F.3d 1051, 1052 (Fed. Cir. 2003) ("[I]nvalidity based on anticipation requires that the assertedly anticipating disclosure enabled the subject matter of the reference and thus of the patented invention without undue experimentation.")  Furthermore, extrinsic evidence may not be used to supply missing claim limitations in the printed publication. *Teleflex, Inc. v. Ficosa N Am. Corp.*, 299 F.3d 1313, 1335 (Fed. Cir. 2002) ("[A]nticipation does not permit an additional reference to supply a missing claim limitation."); *see also Studiengesellschaft Kohle m. H. v. Dart Indus., Inc.*, 726 F.2d 724, 726-27 (Fed. Cir. 1984) ("It is hornbook law that anticipation must be found in a single reference, device, or process.")

### 2.   **Obviousness**

A patent may also be found invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).

The issue of obviousness is a legal conclusion based upon underlying questions of fact. *See McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1368 (Fed. Cir. 2003).  The Supreme Court has recognized that "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does" when determining obviousness.  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418 (2007); *see also Takeda Chem. Indus. v. Alphapharm Pty., Ltd.*, No. 06-1329, 2007 U.S. App. LEXIS 15349, at *13 (Fed. Cir. June 28, 2007) ("[I]t remains necessary to identify

1    some reason that would have led a chemist to modify a known compound in a particular

2    manner to establish *prima facie* obviousness of a new claimed compound.")  Additionally, in

3    determining whether a patent claim is obvious in view of the prior art, the Court must also

4    evaluate and assess any objective indicia of nonobviousness, including commercial success of

5    the invention, unexpected results, teaching away, initial skepticism, and copying by others.

6    *See, e.g.*, *KSR*, 550 U.S. at 406–07 (reiterating that such objective indicia of nonobviousness,

7    also referred to as "secondary considerations," continue to define the inquiry that controls the

8    obviousness analysis); *see also Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed.

9    Cir. 1983) (explaining that objective evidence may often be the most probative and cogent

10   evidence in the record).

11   **G.    Inequitable Conduct**

12        A patent may be rendered unenforceable for inequitable conduct if an applicant makes a

13   material omission or misrepresentation with intent to deceive the PTO.  *Digital Control Inc. v.*

14   *Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006).  To demonstrate inequitable

15   conduct sufficient to render an issued patent unenforceable, the party asserting this defense

16   must establish both elements of materiality and intent by clear and convincing evidence.

17   *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1128 (Fed. Cir. 2006).  Materiality

18   requires a showing that a "reasonable examiner" would have considered the undisclosed

19   information important in deciding whether to allow a patent.  *Digital*, 437 F.3d at 1314 (Fed.

20   Cir. 2006).  Materiality is not satisfied if the withheld information is "merely cumulative to that

21   information considered by the examiner."  *Id.* at 1319.

22        For intent, a party must establish that "the involved conduct, viewed in light of all the

23   evidence, including evidence indicative of good faith . . . indicate[s] sufficient culpability to

24   require a finding of intent to deceive."  *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.,*

25   *Inc.*, 439 F.3d 1335, 1341 (Fed Cir. 2006).  Although direct evidence is rare, "[i]ntent to

26   deceive cannot be inferred solely from the fact that information was not disclosed; there must

27   be a factual basis for finding of intent."  *Id.* at 1340 (citing *Hebert v. Lisle Corp.*, 99 F.3d 1109,

28   1116 (Fed. Cir. 1996)).  Where nondisclosure is the only evidence of intent, a lack of good faith

1    explanation for nondisclosure of prior art is insufficient to constitute clear and convincing

2    evidence to support an inference of intent.  *M. Eagles*, 439 F.3d at 1341.

3    **H.    Patent Misuse**

4          Improper expansion of the scope or term of a patent constitutes patent misuse.

5    However, a patent owner shall not be denied relief for infringement or deemed guilty of misuse

6    of the patent by reason of the patent owner seeking "to enforce his patent rights against

7    infringement."  35 U.S.C. § 271(d)(4).

8    **I.     Waiver**

9          Waiver is the intentional relinquishment of a known right with knowledge of its

10   existence and the intent to relinquish it.  *A&M Records v. Napster, Inc.*, 239 F.3d 1004, 1026

11   (9th Cir. 2001) (quoting *United States v. King Features Entm't, Inc.*, 843 F.2d 394, 399 (9th

12   Cir. 1988)).

13   **J.     Equitable Estoppel**

14         The doctrine of equitable estoppel bars a patentee's claim if, (1) the patentee's

15   misleading conduct leads an alleged infringer to reasonably infer that the patentee does not

16   intend to enforce its patent, (2) the alleged infringer relies on that conduct, and (3) "due to its

17   reliance, the alleged infringer will be materially prejudiced if the patentee is allowed to proceed

18   with its claim."  *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028 (Fed.

19   Cir. 1992).

20   **K.    Laches**

21         A defense of laches requires two elements: (1) the patentee's delay in bringing suit was

22   unreasonable and inexcusable, and (2) the alleged infringer suffered material prejudice

23   attributable to the delay.  *A.C. Aukerman Co. v. R.L. Chaides Constr. Co.*, 960 F.2d 1020, 1028

24   (Fed. Cir. 1992).  A presumption of laches arises where a patentee delays bringing suit for more

25   than six years after the date the patentee knew or should have known of the alleged infringer's

26   activity.  *Id.*

27   / / /

28   / / /

**L.     Collateral Estoppel**

Under the doctrine of collateral estoppel, a decision on an issue of fact or law necessary to a court's judgment may preclude relitigation of the issue in a later suit on a different cause of action involving a party to the first case.  *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 435 F.3d 1356, 1360 (Fed. Cir. 2006).  A party asserting collateral estoppel must establish: "(1) the issue to be decided is identical to one decided in the first action; (2) the issue was actually litigated in the first action; (3) resolution of the issue was essential to a final judgment in the first action; and (4) the parties had a full and fair opportunity to litigate the issue in the first action." *Id.* at 1361.

**M.     Unclean Hands**

The doctrine of unclean hands requires that "he who comes into equity must come with clean hands."  *Precision Inst. Mfr. Co. v. Automotive Maintenance Machinery Co.*, 324 U.S. 806, 814 (1945).  In the context of a patent suit, unclean hands based on misconduct in the procurement of a patent will not render a patent unenforceable absent showing of inequitable conduct.  *See Regents of the Univ. of California v. Eli Lilly & Co.*, 119 F.3d 1559, 1571 (Fed. Cir. 1997) (stating that unclean hands cannot "render a patent unenforceable without proof of materiality because such a 'categorization is inconsistent with this court's view that materiality is a necessary ingredient of any inequitable conduct'"); *Consolidated Aluminum Corp. v. Foseco Int'l, Ltd.*, 910 F.2d 804, 812 (Fed. Cir. 1990) ("[W]hat we have termed inequitable conduct is no more than the unclean hands doctrine applied to particular conduct before the PTO.").

**N.     Res Judicata**

A claim for patent infringement can be barred by res judicata, or claim preclusion, if that claim arises from the same transactional facts as a prior action.  *Acumed, LLC v. Stryker Corp.*, 525 F.3d 1319, 1323 (Fed. Cir. 2008).  In the Ninth Circuit, a party asserting res judicata must show: (1) the same parties, or those in privity, were involved in the prior litigation; (2) the prior litigation involved the same claim or cause of action as the later suit; and (3) the prior litigation was terminated by a final judgment on the merits. *Id.*

**O.**      **Preemption as a Defense to a State Law Unfair Competition Claim**

A party responding to an allegation of, for example, an unfair competition under state law, may allege the affirmative defense of preemption. A state law "that offers 'patent-like protection' to discoveries unprotected under federal patent law" is preempted by federal patent statutes. *Ultra-Precision Mfg., LTD v. Ford Motor Co.*, 411 F.3d 1369, 1377–78 (Fed. Cir. 2005).

**P.**      **Trade Secret Misappropriation**

In order to prevail on a misappropriation of trade secrets claim, the plaintiff must demonstrate that it has protectable trade secrets and that the defendant misappropriated them. *See* Cal. Civ. Code § 3426.1 *et seq.* Stated differently, a prima facie claim for misappropriation of trade secrets requires the plaintiff to show: (1) the plaintiff owned a trade secret; (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through improper means; and (3) the defendant's actions damaged the plaintiff. *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (Ct. App. 2003).

The Uniform Trade Secrets Act ("UTSA") defines a trade secret as:

information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and

(2)  Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Cal. Civ. Code § 3426.1(d). "The lack of confidentiality agreements is not dispositive on the issue of secrecy. [The plaintiff] may have taken other precautions to keep its information secret, such as verbally telling its clients and employees that the information was confidential or limiting access to information on a 'need to know' basis." *Hilderman v. Enea Teksci, Inc.*, 551 F.Supp.2d. 1183, 1201 (S.D. Cal. 2008).

/ / /

/ / /

The UTSA defines "misappropriation" as:

(1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) Disclosure or use of a trade secret of another without express or implied consent by a person who:

    (A) Used improper means to acquire knowledge of the trade secret; or

    (B) At the time of disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

        (i) Derived from or through a person who had utilized improper means to acquire it;

        (ii) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (iii) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (C) Before a material change of his or her position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Cal. Civ. Code § 3426.1(b).  The UTSA defines improper means to include, among other things, acquisition by misrepresentation:

"Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.  Reverse engineering or independent derivation alone shall not be considered improper means.

Cal. Civ. Code § 3426.1(a).  Thus, under the UTSA, "misappropriation" can occur through improper acquisition of a trade secret.  *See* Cal. Civ. Code § 3426.1(b)(1); *San Jose Construction, Inc. v. S.B.C.C., Inc.*, 155 Cal. App. 4th 1528, 1544 (Ct. App. 2007).  Under the UTSA, "misappropriation" can also occur through improper use of a trade secret.  *See* Cal. Civ. Code § 3426.1(b)(2).

Under the UTSA, a complainant can recover damages for the actual loss caused by misappropriation and for the unjust enrichment caused by misappropriation that is not taken into account in computing damages for actual loss.  *See* Cal. Civ. Code § 3426.3(a).  Punitive

1   damages are also available. *Ajaxo Inc. v. E\*Trade Group, Inc.*, 135 Cal.App.4th 21, 61 (Ct.

2   App. 2005) (discussing Cal. Civ. Code § 3426.3(c)).

3   **Q.     Breach of Confidence**

4           A claim for breach of confidence arises "when an idea, whether or not protectable, is

5   offered to another in confidence, and is voluntarily received by the offeree in confidence with

6   the understanding that it is not to be disclosed to others, and is not to be used by the offeree for

7   purposes beyond the limits of the confidence without the offeror's permission." *Faris v.*

8   *Enberg*, 97 Cal.App.3d. 309, 323 (Ct. App. 1979). Damages and injunctive relief are available

9   for a breach of confidence. *Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem.*

10  *Corp.*, 267 F.Supp. 726, 731 (S.D. Cal. 1966); *Davies v. Krasna*, 14 Cal.3d 502, 514 (Cal.

11  1975). Punitive damages may also be available. Cal. Civ. Code § 3294(a) ("In an action for

12  the breach of an obligation not arising from contract, where it is proven by clear and

13  convincing evidence that the defendant has been guilty of oppression, fraud, or malice, the

14  plaintiff, in addition to the actual damages, may recover [punitive] damages . . . .").

15  **R.     Unfair Competition Under California Common Law**

16          The elements of a cause of action for common law unfair competition under California

17  law are: "(1) that [plaintiff] had invested substantial time, skill, or money in developing its

18  property; (2) that [defendant] had appropriated and used [plaintiff's] property at little or no

19  cost; (3) that [defendant's] appropriation and use of [plaintiff's] property was without

20  authorization or consent of [plaintiff]; and (4) the [plaintiff] could establish that it has been

21  injured by [defendant's] conduct." *See City Solutions Inc. v. Clear Channel Commc'ns, Inc.*,

22  365 F.3d 835, 842 (9th Cir. 2004). Damages may be recovered for common law unfair

23  competition. *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1265 (Cal. 1992). Punitive

24  damages are also available. *See* Cal. Civ. Code § 3294(a); *Duncan v. Stuetzle*, 76 F.3d 1480,

25  1490 (9th Cir. 1996).

26  **S.     Unfair Competition Under Cal. Bus. And Prof. Code 17200, et seq.**

27          Statutory unfair competition includes any "unlawful, unfair, or fraudulent business act

28  or practice." Cal. Bus. and Prof. Code § 17200; *Vess v.  Ciba-Geigy Corp.*, 317 F.3d 1097,

1102 (9th Cir. 2003).  This law "embraces anything that can be called a business practice and that at the same time is forbidden by law."  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1135 (Cal. 2003).  That is, this section borrows violations from other laws and makes them independently actionable as unfair business practices.  *Id.*

Section 17203 of the California Business and Professions Code allows injunctive relief and monetary relief to "restore to any person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."  Cal. Bus. and Prof. Code § 17203.  Statutory unfair competition under the Business and Professions Code is an equitable action, and damages cannot be recovered.  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal.4th 1134, 1144 (Cal. 2003).  Thus, the only monetary remedy available for statutory unfair competition is restitution.  *Id.* at 1148.  Disgorgement of the defendant's profits is only available to the extent that it is restitutionary disgorgement to "recover profits unfairly obtained to the extent that these profits represent monies given to the defendant or benefits in which the plaintiff has an ownership interest."  *Id.*  Furthermore, "[c]ompensation for a lost business opportunity is a measure of damages and not restitution to the alleged victims."  *Id.* at 1151 (quoting *MAI Systems Corp. v. UIPS*, 856 F.Supp. 538, 542 (N.D. Cal. 1994)).

**T.   False Advertising Under the Lanham Act 43(a)(1)(B)**

A Lanham Act 43(a)(1)(B) false advertising claim requires:

(1) a false statement of fact by the defendant in a commercial advertisement about its own or another's product; (2) the statement actually deceived or has the tendency to deceive a substantial segment of its audience; (3) the deception is material, in that it is likely to influence the purchasing decision; (4) the defendant caused its false statement to enter interstate commerce; and (5) the plaintiff has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to defendant or by a lessening of the goodwill associated with its products.

*Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

The Ninth Circuit has drawn a distinction between comparative and non-comparative advertising.  "When advertising does not directly compare defendant's and plaintiffs products, [] injury to a particular competitor may be a small fraction of the defendant's sales, profits, or advertising expenses."  *Harper House, Inc. v. Thomas Nelson, Inc.*, 889

1    F.2d 197, 209 n.8 (9th Cir. 1989).   "Where an advertisement does not draw a direct

2    comparison, however, the plaintiff must present evidence of an injury 'causally related to the

3    defendant's deception.'"   *Healthport Corp. v. Tanita Corp. of Am.*, 563 F.Supp.2d 1169, 1181

4    (D. Or. 2008) (quoting *Harper*, 889 F.2d at 209–10).

5    **U.      Preemption as a Defense to Fraud-on-the-FDA Claims**

6          A state law unfair competition claim whose sole basis is an allegation that a party made

7    fraudulent representations to the FDA is a state-law fraud-on-the-FDA claim.   Such fraud-on-

8    the-FDA claims conflict with, and are therefore preempted by the FDCA, as amended by the

9    MDA.   *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341 (2001).   The conflict

10   between federal law and state-law fraud-on-the-FDA claims "stems from the fact that the

11   federal regulatory scheme amply empowers the FDA to punish and deter fraud against the

12   [FDA], and that this authority is used by the [FDA] to achieve a somewhat delicate balance of

13   statutory objectives."   *Id.* at 348.   When the existence of FDA regulations is the critical element

14   of a party's claims and fraud in complying with those regulations is alleged, the fraud claims

15   are preempted.   *See Buckman*, 531 U.S. at 353.   Thus, like the state-law fraud-on-the-FDA

16   claims in *Buckman*, an unfair competition claim under Section 43 of the Lanham Act whose

17   sole basis is alleged fraud in complying with FDA regulations is preempted.

18   **V.      Lack of Standing to Assert a Private Right of Action under the Food, Drug, and**

19   **       Cosmetic Act**

20         Section 337(a) of the FDCA provides that "all proceedings for the enforcement, or to

21   restrain violations of [the Act] shall be by and in the name of the United States."   21 U.S.C. §

22   337(a).   Thus, there is no private right of action to address violations of the FDCA; the right to

23   enforce the Act's provisions lies exclusively with the federal government.   *See Buckman*, 531

24   U.S. at 349, n.4; *Gile v. Optical Radiation Corp.*, 22 F.3d 540, 544 (3rd Cir. 1994), *cert.*

25   *denied*, 513 U.S. 965 (1994) (*citing Pacific Trading Co. v. Wilson & Co.*, 547 F.2d 367, 370

26   (7th Cir. 1976) (stating that "violations of the FDCA do not create private rights of action")).

27   / / /

28   / / /

# VI.  ATTORNEYS' FEES

The Court in exceptional cases may award reasonable attorneys' fees to the prevailing party. 35 U.S.C. § 285.   At least Defendants' willful infringement of the '481 Patent justifies an award of I-Flow's reasonable attorneys' fees.  *Tate Access Floors, Inc. v. Maxcess Techs.*, 222 F.3d 958, 972 (Fed. Cir. 2000).


                                    Respectfully submitted,

                                    KNOBBE, MARTENS, OLSON & BEAR, LLP


Dated:_July 7, 2009_____     By:_ s/Boris Zelkind_____
                                        Steven J. Nataupsky
                                        Boris Zelkind
                                        Ali S. Razai

                                    Attorneys for Plaintiff and Counter-Defendant
                                    I-FLOW CORPORATION

**CERTIFICATE OF SERVICE**

I hereby certify that on July 7, 2009, I caused the **PLAINTIFF'S MEMORANDUM OF CONTENTIONS OF FACT AND LAW** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the following person(s):

Ralph B. Kalfayan, Esq.
KRAUSE, KALFAYAN, BENINK & SLAVENS LLP
rkalfayan@kkbs-law.com

Norbert Stahl, Esq.
STAHL LAW FIRM
nstahl@patentlawservice.com

I certify and declare under penalty of perjury under the laws of the State of California that I am employed in the office of a member of the bar of this Court at whose direction the service was made, and that the forgoing is true and correct.

Executed on July 7, 2009, at San Diego, California.

Megan Placin

IFLOWL.241L/IFLOWL.261L
7049621
042809

-1-