1  Steven J. Nataupsky (State Bar No. 155,913)
   snataupsky@kmob.com
2  Michael Friedland (State Bar No. 157,217)
   mfriedland@kmob.com
3  Boris Zelkind (State Bar No. 214,014)
   boris.zelkind@kmob.com
4  Ali S. Razai (State Bar No. 246,922)
   ali.razai@kmob.com
5  Ian Jaquette (State Bar No. 253,887)
   ian.jaquette@kmob.com
6  KNOBBE, MARTENS, OLSON & BEAR, LLP
   550 West C Street, Suite 1200
7  San Diego, CA 92101
   Telephone: (619) 235-8550
8  Facsimile:  (619) 235-0176

9  Attorneys for Plaintiff and Counter-Defendant
   I-FLOW CORPORATION

10

11              IN THE UNITED STATES DISTRICT COURT

12          FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14  I-FLOW CORPORATION, a Delaware          ) Case No. 07-cv-1200 DMS (NLS)
    corporation,                            )
15                                          ) **PLAINTIFF I-FLOW'S TRIAL BRIEF**
                  Plaintiff/Counter-Defendant. ) **PURSUANT TO LOCAL RULE**
16                                          ) **16.1(f)(9)(a)**
         v.                                 )
17                                          )
    APEX MEDICAL TECHNOLOGIES, INC., a      )
18  California corporation, MARK            ) Trial Date:   October 5, 2009
    MCGLOTHLIN, an Individual,              ) Time:         8:30 a.m.
19                                          ) Courtroom 10, 2nd Floor
                  Defendants/Counter-Claimants. ) Honorable Dana M. Sabraw
20                                          )
    I-FLOW CORPORATION, a Delaware          )
21  corporation,                            )
                                            )
22                Plaintiff/Counter-Defendant )
                                            )
23       v.                                 )
                                            )
24  ZONE MEDICAL LLC, a California limited  )
    liability company,                      )
25                                          )
                  Defendant/Counter-Claimant. )
26                                          )

27      <u>**CONTAINS CONFIDENTIAL INFORMATION – FILED UNDER SEAL**</u>

28

**TABLE OF CONTENTS**

**Page No.**

I.   INTRODUCTION ................................................................1

II.  DISPUTED ISSUES ...........................................................1

A.   Defendants Are Liable For Trade Secret Misappropriation ...................1

1.   I-Flow Owns Protectable Trade Secrets .................................2

a.   I-Flow Takes Reasonable Measures To Protect Its Trade Secrets ................................................................2

b.   I-Flow's Trade Secrets Have Independent Economic Value Because They Are Not Generally Known .....................2

2.   Defendants Misappropriated I-Flow's Protectable Trade Secrets ............3

a.   Defendants Misappropriated I-Flow's Business Trade Secrets By Improper Acquisition ................................3

b.   Defendants Misappropriated I-Flow's Business Trade Secrets By Improper Use .....................................3

c.   Defendants Misappropriated I-Flow's Technical Trade Secrets By Improper Acquisition ................................4

d.   Defendants Misappropriated I-Flow's Technical Trade Secrets By Improper Use .....................................4

3.   I-Flow Has Been Damaged By Defendants' Misappropriation of I-Flow's Protectable Trade Secrets .............................5

a.   I-Flow Is Entitled To Damages For Its Lost Profits Resulting from Defendants' Misappropriation ..................5

b.   Alternatively, I-Flow Is Entitled To A Reasonable Royalty For Defendants' Misappropriation .....................6

c.   I-Flow Is Entitled To Punitive Damages For Defendants' Willful And Malicious Misappropriation ...................6

B.   Defendants Should Be Permanently Enjoined From Continuing To Use I-Flow's Protectable Trade Secrets ...............................7

C.   Defendants Are Liable For Breach Of Confidence .........................8

D.   I-Flow Is Entitled To Damages For Defendants' Breach Of Confidence ........9

E.   Infringement Of The '481 Patent ..........................................9

# TABLE OF CONTENTS
## (*cont'd*)

Page No.

    1.    Literal Infringement Of The '481 Patent ................................................. 9

    2.    Infringement Of The '481 Patent Under The Doctrine Of Equivalents .......................................................................................... 10

    3.    Defendants' Infringement Is Willful ....................................................... 10

    4.    Defendants Are Not Entitled To Absolute Or Equitable Intervening Rights ................................................................................ 11

F.    Patent Validity .............................................................................................. 12

    1.    Anticipation .......................................................................................... 12

    2.    Obviousness .......................................................................................... 12

        a.    Obviousness References ............................................................. 13

            i.    The Scope And Content Of Prior Art Taught Away From The Claimed Invention ............................. 13

            ii.    The Asserted Combinations Do Not Disclose Or Suggest A Collapsible Housing ........................................ 13

        b.    Objective Indicia Of Nonobviousness Demonstrate Claims 1, 2 And 15 Are Not Obvious ......................................... 14

            i.    The Infusion Pump With A Collapsible Shell Achieved Unexpected Results ........................................ 14

            ii.    The Commercial Success Enjoyed By Soft-Shell Pumps Support Nonobviousness ..................................... 14

            iii.    Customer Complaints About Prior Pumps Demonstrates A Long-Felt Unmet Need In The Marketplace For The Claimed Invention ........................ 15

    3.    Additional Invalidity Defenses ............................................................. 15

G.    The '481 Patent Is Enforceable .................................................................... 16

    1.    Defendants Cannot Identify Any Specific Individual Who Made Alleged Material Omissions Or Misrepresentations ................................ 17

    2.    Allegations Regarding The Sancoff Patents And The EPO Publication ........................................................................................... 17

    3.    Allegations Regarding The Hessel And The Liebensohn Patents ............ 18

**TABLE OF CONTENTS**
(*cont'd*)

Page No.

H.  I-Flow Is Entitled To Damages For Defendants' Willful Infringement ...............19

    1.  I-Flow Is Entitled To Damages For Its Lost Profits On The Infringing Sales ........................................................................................19

    2.  Alternatively, I-Flow Is Entitled To A Reasonable Royalty For Defendants' Infringement Of The '481 Patent..........................................19

    3.  Enhancement Of Damages .......................................................................20

    4.  Defendants Should Pay I-Flow's Attorneys' Fees ..................................20

I.  Defendants Should Be Permanently Enjoined From Continuing To Infringe The '481 Patent.......................................................................................20

J.  Defendants Are Liable For Unfair Competition Under California Common Law.............................................................................................................21

K.  I-Flow Is Entitled To Damages And A Permanent Injunction For Defendants' Unfair Competition Under California Common Law.....................22

L.  Defendants Are Liable For Unfair Competition Under California Business And Professions Code §17200, Et Seq. ................................................22

M.  I-Flow Has Not Engaged In Unfair Competition Under Section 43 Of The Lanham Act................................................................................................23

N.  I-Flow Has Not Engaged In Statutory Or Common Law Unfair Competition .......................................................................................................24

III.  PROCEDURAL ISSUES ...........................................................................................25

IV.  EVIDENTIARY ISSUES............................................................................................25

1

## TABLE OF AUTHORITIES

2

**Page Nos.**

3

4

*Ajaxo Inc. v. E\*Trade Group, Inc.,*
    135 Cal. App. 4th 21 (Ct. App. 2005)..................................................6

5

*Allied Tube & Conduit Corp. v. John Maneely Co.,*
6
    125 F. Supp. 2d 987 (D. Ariz. 2000) .................................................11

7

*Bank of the West v. Superior Court,*
    2 Cal. 4th 1254 (Cal. 1992).............................................................22

8

*Beatrice Foods Co. v. New England Printing & Lithographing Co.,*
9
    923 F.2d 1576 (Fed. Cir. 1991) .......................................................20

10

*City Solutions Inc. v. Clear Channel Commc'ns, Inc.,*
    365 F.3d 835 (9th Cir. 2004) ...........................................................21

11

*Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.,*
12
    868 F.2d 1251 (Fed. Cir. 1989) .......................................................10

13

*Davies v. Krasna,*
    14 Cal. 3d 502 (Cal. 1975).................................................................9

14

*Digital Control Inc. v. Charles Mach. Works,*
15
    437 F.3d 1309 (Fed. Cir. 2006) .......................................................16

16

*Duncan v. Stuetzle,*
    76 F.3d 1480 (9th Cir. 1996) ...........................................................22

17

*eBay Inc. v. MercExchange, L.L.C.,*
18
    547 U.S. 388 (2006)..................................................................... 7, 20

19

*Engineered Data Products v. GBS Corp.,*
    506 F. Supp. 2d 461 (D.Colo. 2007)................................................11

20

*Exergen Corp. v. Wal-Mart Stores, Inc.,*
21
    2009 WL 2366535 at \*13 (Fed. Cir. Aug. 4, 2009).....................16, 17

22

*Faris v. Enberg,*
    97 Cal. App. 3d 309 (Ct. App. 1979)..................................................8

23

*Georgia-Pacific Corp. v. U.S. Plywood Corp.,*
24
    318 F. Supp. 1116 (S.D.N.Y. 1970) ................................................19

25

*In re Seagate Tech., LLC,*
    497 F.3d 1360 (Fed. Cir. 2007) .......................................................10

26

*Kraft Foods, Inc. v. Int'l Trading Co.,*
27
    203 F.3d 1362 (Fed. Cir. 2000) .......................................................10

28

# TABLE OF AUTHORITIES
### (*cont'd*)

**Page Nos.**

*KSR Int'l Co. v. Teleflex Inc.*,
     550 U.S. 398 (2007)...........................................................................................12

*Laitram Corp. v. NEC Corp.*,
     952 F.2d 1357 (Fed. Cir. 1991) .......................................................................11

*Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*,
     285 F.3d 1353 (Fed. Cir. 2002) .......................................................................10

*M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.*,
     439 F.3d 1335 (Fed Cir. 2006) .......................................................................16

*McNeil-PPC, Inc. v. L. Perrigo Co.*,
     337 F.3d 1362 (Fed. Cir. 2003) .......................................................................12

*Monolith Portland Midwest Co. v. Kaiser Aluminum & Chem. Corp.*,
     267 F. Supp. 726 (S.D. Cal. 1966)...................................................................9

*Morlife, Inc. v. Lloyd Perry*,
     56 Cal. App. 4th 1514 (Cal. Ct. App. 1997).....................................................7

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
     575 F.2d 1152 (6th Cir. 1978) .........................................................................19

*Perricone v. Medicis Pharm. Corp.*,
     432 F.3d 1368 (Fed. Cir. 2005) .......................................................................12

*PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*,
     225 F.3d 1315 (Fed. Cir. 2000) .......................................................................25

*Purdue Pharma L.P. v. Endo Pharms., Inc.*,
     438 F.3d 1123 (Fed. Cir. 2006) .......................................................................16

*Sargent Fletcher, Inc. v. Able Corp.*,
     110 Cal. App. 4th 1658 (Ct. App. 2003)............................................................2

*Schumer v. Lab Computer Sys. Inc.*,
     308 F.3d 1304 (Fed. Cir. 2002) .......................................................................12

*Shockley v. Arcan, Inc.*,
     248 F.3d 1349 (Fed. Cir. 2001) .......................................................................11

*Southland Sod Farms v. Stover Seed Co.*,
     108 F.3d 1134 (9th Cir. 1997) .........................................................................23

*Stratoflex, Inc. v. Aeroquip Corp.*,
     713 F.2d 1530 (Fed. Cir. 1983) .......................................................................13

# TABLE OF AUTHORITIES
### (*cont'd*)

Page Nos.

*Takeda Chem. Indus. v. Alphapharm Pty., Ltd.*,
    492 F.3d 1350 (Fed. Cir. 2007) ............................................................. 12

*Tate Access Floors, Inc. v. Maxcess Techs.*,
    222 F.3d 958 (Fed. Cir. 2000) ............................................................. 20

*TechSearch, L.L.C. v. Intel Corp.*,
    286 F.3d 1360 (Fed. Cir. 2002) ............................................................. 9

*Vacco Indus., Inc. v. Van Den Berg*,
    5 Cal. App. 4th 34 (Cal. Ct. App. 1992) ............................................................. 7

*Vess v. Ciba-Geigy Corp.*,
    317 F.3d 1097 (9th Cir. 2003) ............................................................. 22

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001) ............................................................. 9

# OTHER AUTHORITIES

21 C.F.R. § 801 ............................................................. 28

21 U.S.C. § 301 ............................................................. 27

35 U.S.C. § 103 ............................................................. 14, 21

35 U.S.C. § 252 ............................................................. 12, 13

35 U.S.C. § 282 ............................................................. 13

35 U.S.C. § 284 ............................................................. 1, 23

35 U.S.C. § 285 ............................................................. 1, 23

35 U.S.C. § 307 ............................................................. 12

Cal. Bus. & Prof. Code § 17200 ............................................................. 26

Cal. Bus. & Prof. Code § 17203 ............................................................. 26

Cal. Civ. Code § 3294 ............................................................. 10, 26

Cal. Civ. Code § 3426 ............................................................. 2, 6, 7

1    Pursuant to Local Rule 16.1(f)(9)(a), Plaintiff I-Flow Corporation ("I-Flow") hereby

2    submits this Trial Brief.

## I. <u>INTRODUCTION</u>

4    In this trial, I-Flow intends to show that Defendants Apex Medical Technologies, Inc.

5    ("Apex"), Zone Medical, LLC ("Zone"), and Mark McGlothlin ("McGlothlin") (collectively

6    "Defendants") improperly acquired, disclosed, and used I-Flow's trade secrets and confidential

7    information in order to market and sell the Solace™ Post-Operative Pain Relief Infusion System

8    ("Accused Solace Pump").  I-Flow will establish that Defendants are liable for misappropriation

9    of I-Flow's valuable and protectable trade secrets, breach of confidence, and unfair competition

10   under California common law and California Business and Professions Code §17200, et seq.

11   I-Flow is entitled to actual and punitive damages for Defendants' trade secret misappropriation,

12   breach of confidence, and unfair competition, and a permanent injunction enjoining Defendants'

13   continued use of I-Flow's trade secret and confidential information.

14   I-Flow will also demonstrate that Defendants have willfully infringed Claims 1, 2 and 15

15   of U.S. Patent No. 5,284,481 ("the '481 Patent") by making, using, selling, and offering for sale

16   the Accused Solace Pump.  The '481 Patent is directed to an improved collapsible elastomeric

17   infusion pump.  An elastomeric infusion pump is a drug delivery system that uses an elastomeric

18   bladder to drive drugs into a patient's body.

19   As a result of Defendants' infringement, I-Flow will establish it is entitled to damages in

20   the amount of profits I-Flow has lost due to Defendants' infringement.  If lost profits are not

21   awarded, I-Flow is entitled to damages in the amount of no less than a reasonable royalty.  I-Flow

22   is also entitled to a permanent injunction to prevent further infringement.  Because Defendants'

23   infringement was and continues to be willful, the Court should award I-Flow up to three times the

24   damages awarded at trial, as well as I-Flow's reasonable attorneys' fees.

## II. <u>DISPUTED ISSUES</u>

26   A.    <u>Defendants Are Liable For Trade Secret Misappropriation</u>

27   A plaintiff asserting misappropriation of trade secrets must show: (1) the plaintiff owned a

28   trade secret; (2) the defendant acquired, disclosed, or used the plaintiff's trade secret through

-1-                                I-Flow's Trial Brief
                                                      07cv1200 DMS (NLS)

1  improper means; and (3) the defendant's actions damaged the plaintiff.  Cal. Civ. Code § 3426.1

2  *et seq.*; *Sargent Fletcher, Inc. v. Able Corp.*, 110 Cal. App. 4th 1658, 1665 (Ct. App. 2003).

3        At trial, I-Flow will establish that Defendants are liable for trade secret misappropriation

4  because they acquired, disclosed, and used, through a series of misrepresentations and under false

5  pretenses, I-Flow's trade secret confidential business information ("Business Trade Secrets") and

6  trade secret confidential technical information ("Technical Trade Secrets").

7        **1.      I-Flow Owns Protectable Trade Secrets**

8        I-Flow will demonstrate at trial that it owns protectable trade secrets.    For nearly two

9  decades, I-Flow has collected, developed, and synthesized vast amounts of proprietary

10  information regarding the market for infusion pumps and their technical design.  I-Flow employs

11  numerous methods to maintain the confidentiality of its Business and Technical Trade Secrets to

12  ensure that they are not publicly available and not generally known by I-Flow's competitors and

13  others involved in the infusion pump industry.

14        **a.      I-Flow Takes Reasonable Measures To Protect Its Trade Secrets**

15        At trial, I-Flow will demonstrate that it uses a variety of methods to maintain the

16  confidentiality of its information.  I-Flow will also demonstrate that its principal, Don Earhart,

17  took measures to maintain the confidentiality of I-Flow's trade secrets during his participation in

18  the Adaptive Business Leaders Organization ("ABL").

19        **b.      I-Flow's Trade Secrets Have Independent Economic Value Because**

20            **They Are Not Generally Known**

21        I-Flow will establish that the Business and Technical Trade Secrets have great value to

22  I-Flow because they are not publicly available and not generally known by I-Flow's competitors

23  and others involved in the infusion pump industry.  I-Flow's Business Trade Secrets have great

24  value because this knowledge allows I-Flow to focus its resources on profitable markets and

25  effective distribution models, whereas a competitor without access to I-Flow's Business Trade

26  Secrets would squander its resources through the lengthy process of trial and error in an uncertain

27  attempt to develop its own methods to become profitable.  I-Flow's Technical Trade Secrets are

28  valuable because I-Flow's technical specifications are critical for establishing a design that is

capable of safe operation while meeting customer requirements.  I-Flow's competitors do not know this information, and a potential competitor would be forced to spend vast sums of money over many years to recreate this wealth of knowledge from experience.

   **2.   Defendants Misappropriated I-Flow's Protectable Trade Secrets**

   At trial, I-Flow will establish that Defendants improperly acquired, disclosed, and used I-Flow's Business and Technical Trade Secrets in order to market and sell the Accused Solace Pump.

   **a.   Defendants Misappropriated I-Flow's Business Trade Secrets By Improper Acquisition**

   I-Flow will prove that Defendants improperly acquired I-Flow's Business Trade Secrets in the course of Defendant McGlothlin's participation in ABL.  McGlothlin agreed to maintain the confidentiality of all proprietary and confidential information disclosed at ABL.  During his participation, McGlothlin gained access to I-Flow's Business Trade Secrets regarding the infusion pump and drug delivery markets.  While at ABL, McGlothlin represented himself as a component supplier and materials expert; he never disclosed that he was secretly developing or manufacturing infusion pumps to compete with I-Flow. ████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████  Until his resignation from ABL one year later in January of 2004, McGlothlin continued to attend ABL meetings and obtain, through misrepresentations and under false pretenses, I-Flow's confidential and trade secret business information.

   **b.   Defendants Misappropriated I-Flow's Business Trade Secrets By Improper Use**

   At trial, I-Flow will establish that, after McGlothlin improperly acquired I-Flow's Business Trade Secrets under obligations of confidentiality, Defendants used this information to enter the pain management market at a significant advantage.  Defendants have tailored their marketing and sales strategy to take advantage of I-Flow's proprietary sales methods misappropriated from I-Flow. ██████████████████████████████████

1 ███████████████████████████████████ ██████████████████

2 ████████████████████████████████████████████████████████

3 Defendants have also used I-Flow trade secret pricing strategies to undercut I-Flow and offer their

4 pump below the cost of I-Flow's products.

        **c.**     **Defendants Misappropriated I-Flow's Technical Trade Secrets By**

                  **Improper Acquisition**

7      I-Flow will establish at trial that Defendants improperly acquired I-Flow's Technical Trade

8 Secrets through a series of misrepresentations and under false pretenses.  I-Flow retained Apex

9 from approximately May 2005 until December 2005 to help develop an improved infusion pump

10 system.  At that time, Defendants represented themselves as a component supplier and contract

11 manufacturer, and never disclosed that they were developing their own product to compete with I-

12 Flow.  The parties discussed confidentiality and the confidential nature of the information

13 provided by I-Flow to facilitate Defendants' work on I-Flow's behalf.  I-Flow provided

14 Defendants confidential drawings and design specifications, which were marked with

15 confidentiality designations.  I-Flow's work orders to Defendants included express confidentiality

16 provisions.  Moreover, Defendants received admonishments about the obligations of

17 confidentiality they had undertaken.  Thus, Defendants acquired I-Flow's Technical Trade Secrets

18 through improper means.

        **d.**     **Defendants Misappropriated I-Flow's Technical Trade Secrets By**

                  **Improper Use**

21      I-Flow will also demonstrate that Defendants improperly used I-Flow's Technical Trade

22 Secrets despite their obligations of confidentiality.  Defendants' access to I-Flow's proven design

23 criteria enabled Defendants to quickly verify their product design and avoid pitfalls in their own

24 product development effort.  The Accused Solace Pump also incorporates I-Flow's Technical

25 Trade Secrets. ███████████████████████████████

26 ████████████ █████████████████████████████

27 ████████████████████████████████████████████

28 ████████████████████████████████████████████

1     ████████████████████████████████████████  Additionally, Defendants

2 adopted the proprietary dip molding process that it developed for I-Flow.  Defendants also used

3 I-Flow's Technical Trade Secrets to select bladder materials for their infusion pump.

> ### 3.    I-Flow Has Been Damaged By Defendants' Misappropriation Of I-Flow's Protectable Trade Secrets
>
> #### a.    I-Flow Is Entitled To Damages For Its Lost Profits Resulting from Defendants' Misappropriation

8     At trial, I-Flow will establish that it has been damaged by, among other things, its lost

9 sales resulting from Defendants' misappropriation of I-Flow's Business and Technical Trade

10 Secrets.  Damages to I-Flow include at least lost profits on diverted sales, eroded prices, remedial

11 costs, future lost profits, and royalties.  I-Flow's expert, David Hanson, determined that I-Flow is

12 entitled to between ████████████████  in incremental profits as a result of Defendants'

13 misappropriation of I-Flow's Business and Technical Trade Secrets through October 31, 2009.

14     Mr. Hanson's calculations are based upon sales information provided by Defendants in

15 discovery as of the date of Mr. Hanson's Supplemental Expert Report dated September 11, 2009.

16 Because Defendants refused to produce any documents regarding sales in 2009, Mr. Hanson's

17 calculations are based on projections of Defendants' sales through the end of October 2009.  In

18 granting I-Flow's Motion *in Limine* No. 5 to Exclude Evidence Contradicting I-Flow's Damages

19 Calculations, this Court has precluded Defendants from presenting evidence contradicting Mr.

20 Hanson's calculations of the number of Accused Solace Pumps at issue presented in his expert

21 reports.  *See* Minute Order Granting Motion *in Limine* No. 5 to Exclude Evidence Contradicting

22 I-Flow's Damages Calculations.  To the extent that Defendants actually produce net worth

23 documents for Defendants McGlothlin and Apex, the grant of I-Flow's Motion *in Limine* No. 5

24 will not preclude evidence contradicting Mr. Hanson's punitive damages calculations presented in

25 his expert reports.

26 / / /

27 / / /

28 / / /

1             **b.**        <u>**Alternatively, I-Flow Is Entitled To A Reasonable Royalty For**</u>

2                     <u>**Defendants' Misappropriation**</u>

3       I-Flow is entitled to at least a reasonable royalty on the revenue generated by all of

4 Defendants' sales which, but for Defendants' misappropriation of I-Flow's Business and

5 Technical Trade secrets, would not have occurred.  Mr. Hanson determined the appropriate proxy

6 royalty rate to be ▮▮▮ of sales.  Based on projections for 2009 sales, Mr. Hanson determined

7 I-Flow is entitled to a reasonable royalty of ▮▮▮▮▮▮ assuming no lost profits, or ▮▮▮▮▮

8 assuming lost profits for a ▮▮▮ market share.

9             **c.**        <u>**I-Flow Is Entitled To Punitive Damages For Defendants' Willful And**</u>

10                     <u>**Malicious Misappropriation**</u>

11       I-Flow will also demonstrate it is entitled to punitive damages for Defendants' willful and

12 malicious misappropriation of I-Flow's Business and Technical Trade Secrets.  *Ajaxo Inc. v.*

13 *E*Trade Group, Inc.*, 135 Cal. App. 4th 21, 61 (Ct. App. 2005) (discussing Cal. Civ. Code §

14 3426.3(c)).  With a willful and conscious disregard for I-Flow's rights, Defendants intentionally

15 copied I-Flow's sales and marketing strategies.  Defendants developed a competing product using

16 I-Flow's trade secrets acquired while working for I-Flow.   Courts have approved punitive

17 damages in excess of 10 times actual damages.   In light of Defendants' repeated outrageous

18 willful and malicious conduct, I-Flow is entitled to punitive damages of at least ▮▮▮▮▮▮▮

19       Under the Uniform Trade Secrets Act ("UTSA"), a complainant can recover damages for

20 the unjust enrichment caused by misappropriation that is not taken into account in computing

21 damages for actual loss.  *See* Cal. Civ. Code § 3426.3(a).  In addition to I-Flow's lost sales,

22 Defendants' have been unjustly enriched by acquiring, disclosing, and using I-Flow's trade

23 secrets both to develop their competing product and to significantly reduce barriers to entry into

24 the infusion pump market by capitalizing on I-Flow's knowledge acquired through years of

25 market participation and product development.   Access to I-Flow's trade secrets has enabled

26 Defendants to avoid having to spend the time and money necessary to generate information

27 internally and eliminate the risk of error.  Defendants' gain has resulted in I-Flow's loss of

28 customers, sales and, ultimately, profits.

**B.** **Defendants Should Be Permanently Enjoined From Continuing To Use I-Flow's**
**Protectable Trade Secrets**

"Actual or threatened misappropriation may be enjoined" under the UTSA.  Cal. Civ.
Code § 3426.2(a); *Morlife, Inc. v. Lloyd Perry*, 56 Cal. App. 4th 1514, 1527-28 (Cal. Ct. App.
1997) (affirming permanent injunction enjoining defendants who misappropriated plaintiff's trade
secrets from doing business with entities who switched their business after being unlawfully
solicited); *Vacco Indus., Inc. v. Van Den Berg*, 5 Cal. App. 4th 34, 53-54 (Cal. Ct. App. 1992)
(affirming permanent injunction and finding "the court's act of enjoining defendants' further use
and enjoyment of [plaintiff's] trade secrets was entirely appropriate" where "jury expressly found
that defendants had misappropriated plaintiffs' trade secrets").  I-Flow will demonstrate at trial
that Defendants actually misappropriated I-Flow's trade secrets, and that I-Flow is entitled to a
permanent injunction enjoining Defendants from "further use and enjoyment" of I-Flow's trade
secrets.  *Vacco*, 5 Cal. App. 4th at 54.

I-Flow will also demonstrate (1) that it has suffered irreparable injury; (2) that remedies
available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that,
considering the balance of hardships between the plaintiff and defendant, a remedy in equity is
warranted; and (4) that the public interest would be served by a permanent injunction.  *eBay Inc.
v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

Since at least 2006, I-Flow has lost the invaluable competitive advantage that trade secret
protection was meant to bestow.  This loss of the benefits of trade secret protection and
concomitant degradation of the worth of those trade secrets is irreparable harm suffered by
I-Flow.

Defendants have been unjustly enriched by acquiring, disclosing, and using I-Flow's
Business and Technical Trade Secrets both to develop their competing product and to
significantly reduce barriers to entry into the infusion pump market.  Any damages for lost profits
awarded in this case are thus inadequate to compensate I-Flow for Defendants' continued
misappropriation of its trade secrets.

/ / /

The balance of hardships also weighs in favor of I-Flow.  The only disadvantage to Defendants is that they must cease manufacturing and using products that use I-Flow's Technical Trade Secrets, and cease selling such products using I-Flow's Business Trade Secrets.  I-Flow, on the other hand, if Defendants are not enjoined, will lose the benefit of the advantage it acquired through years of market participation and product development.

There are no public interests in this case weighing against awarding I-Flow a permanent injunction.   The public has an interest in honoring reasonable efforts to maintain the confidentiality of valuable trade secrets and in encouraging businesses to share confidential information in order to improve efficiency and improve products, which can only be done if businesses can be certain that confidentiality obligations will be enforced.  Allowing Defendants to continue competing against I-Flow, using its own Business and Technical Trade Secrets against it, undercuts the public interest principles underlying trade secret protection.

## C.    Defendants Are Liable For Breach Of Confidence

A claim for breach of confidence arises "when an idea, whether or not protectable, is offered to another in confidence, and is voluntarily received by the offeree in confidence with the understanding that it is not to be disclosed to others, and is not to be used by the offeree for purposes beyond the limits of the confidence without the offeror's permission." *Faris v. Enberg*, 97 Cal. App. 3d. 309, 323 (Ct. App. 1979).

At trial, I-Flow will establish that Defendants have committed an unlawful breach of confidence because I-Flow offered Business Trade Secrets, Technical Trade Secrets, and non-trade secret confidential information (collectively, "Confidential Information") to Defendants in confidence, with the understanding that they were not to be disclosed to others, and Defendants used that Confidential Information for purposes beyond the limits of the confidence without I-Flow's permission.  I-Flow's non-trade secret confidential information includes vast amounts of business and technical proprietary information regarding the infusion pump market and infusion pumps,

1 ███████████████████████████████████   I-Flow's Non-Trade Secret Confidential

2 Information is not publicly available and not generally known by I-Flow's competitors and others

3 involved in the infusion pump industry, and thus has great value to the company.  As described

4 above, Defendants acquired I-Flow's Non-Trade Secret Confidential Information under

5 confidentiality obligations and used such information without I-Flow's permission.  I-Flow will

6 therefore establish at trial that Defendants have committed an unlawful breach of confidence.

7 **D.**     **I-Flow Is Entitled To Damages For Defendants' Breach Of Confidence**

8       I-Flow will demonstrate at trial that it is entitled to damages for Defendants' breach of

9 confidence under California common law.  *See Monolith Portland Midwest Co. v. Kaiser*

10 *Aluminum & Chem. Corp.*, 267 F. Supp. 726, 731 (S.D. Cal. 1966); *Davies v. Krasna*, 14 Cal. 3d

11 502, 514 (Cal. 1975).  I-Flow has been damaged by, among other things, its lost sales resulting

12 from Defendants' breach of confidence in using I-Flow's Confidential Information without

13 permission.  Damages to I-Flow include at least lost profits on diverted sales, eroded prices,

14 remedial costs, future lost profits, and royalties, as set forth above.  I-Flow may also be entitled to

15 punitive damages for Defendants' fraudulent and malicious breach of confidence.  *See* Cal. Civ.

16 Code § 3294(a) ("In an action for the breach of an obligation not arising from contract, where it is

17 proven by clear and convincing evidence that the defendant has been guilty of oppression, fraud,

18 or malice, the plaintiff, in addition to the actual damages, may recover [punitive] damages . . . .").

19 **E.**     **Infringement Of The '481 Patent**

20     **1.**     **Literal Infringement Of The '481 Patent**

21       A finding of literal infringement requires that every limitation of the patent claim be found

22 in the accused device.  *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1231 (Fed.

23 Cir. 2001).  Whether the accused product contains an element corresponding to each claim

24 limitation is a question of fact.  *TechSearch, L.L.C. v. Intel Corp.*, 286 F.3d 1360, 1369-70 (Fed.

25 Cir. 2002).

26       At trial, I-Flow will demonstrate by a preponderance of evidence that the Accused Solace

27 Pump, a compact, portable, collapsible infusion pump manufactured, sold, and offered for sale by

28 Defendants, infringes Claims 1, 2 and 15 of the '481 Patent.

2.      **Infringement Of The '481 Patent Under The Doctrine Of Equivalents**

An accused device that does not literally infringe a claim may still infringe under the doctrine of equivalents if it includes a substantial equivalent for any claim limitation that is literally missing.  *Leggett & Platt, Inc. v. Hickory Springs Mfg. Co.*, 285 F.3d 1353, 1358 59 (Fed. Cir. 2002).   Equivalence can be determined by analyzing whether the accused device includes an element that performs substantially the same function, in substantially the same way, and achieves substantially the same result as the literally missing claim limitation.  *Kraft Foods, Inc. v. Int'l Trading Co*., 203 F.3d 1362, 1371 (Fed. Cir. 2000)*.*  Among the factors that may be considered, the Federal Circuit has stressed known interchangeability as evidence of equivalents. *See Corning Glass Works v. Sumitomo Elec. U.S.A., Inc.*, 868 F.2d 1251, 1261 (Fed. Cir. 1989).

To the extent that the Accused Solace Pump is found not to literally contain any element of Claims 1, 2 or 15, the Accused Solace Pump contains structures that are equivalent to each missing element recited in the claims.  These structures are known to be interchangeable with the corresponding elements in the claims.  Further, these structures perform substantially the same function, in substantially the same way, and achieve substantially the same result as the corresponding limitations in Claims 1, 2 and 15 of the '481 Patent.

3.      **Defendants' Infringement Is Willful**

To establish willful infringement, a patentee must show that it is highly probable that the alleged infringer's conduct was reckless.  *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).  The patentee must also demonstrate that it is highly probable that the unjustifiably high risk of infringement was "known or so obvious that it should have been known" to the accused infringer. *Id.*

I-Flow will demonstrate that Defendants' infringement of the '481 Patent has been willful. Defendants acted with reckless disregard of the claims of the '481 Patent, and Defendants knew of the unjustifiably high risk that their conduct infringed the claims of the '481 Patent. Defendants had full knowledge of I-Flow and the '481 Patent as Defendants were secretly developing their product.  Defendants deliberately copied I-Flow's product and did not obtain a written opinion until well after receiving I-Flow's cease-and-desist letter.  Moreover, this opinion

1  was not competent in that it ignored basic principles of patent law, and Defendants knew that it

2  was not independent.

3  **4.      Defendants Are Not Entitled To Absolute Or Equitable Intervening Rights**

4          The doctrine of absolute intervening rights relieves an infringer of liability during the

5  period before the claims of a reexamined patent are validated if a claim is amended to introduce a

6  substantive change.  *See* 35 U.S.C. §§ 252, 307(b).  A claim amendment is not substantive if it

7  "make[s] specific what was always implicit or inherent," or "makes [the claim] more definite

8  without affecting its scope."  *Engineered Data Prods. v. GBS Corp.*, 506 F. Supp. 2d 461, 467 (D.

9  Colo. 2007) (quoting *Laitram Corp. v. NEC Corp.*, 952 F.2d 1357, 1361 (Fed. Cir. 1991)).  With

10  respect to reexamined claims that are not substantially identical to the original claims, a court has

11  discretion under the doctrine of equitable intervening rights to allow an infringer to "continue to

12  manufacture, use, offer to sell, or sell articles for which substantial preparations for manufacture

13  or use was made" before the claims were validated.  35 U.S.C. § 252; *Shockley v. Arcan, Inc.*, 248

14  F.3d 1349, 1361 (Fed. Cir. 2001).  However, "courts only grant equitable intervening rights to

15  parties acting in 'good faith' who 'innocently' develop and manufacture the infringing good."

16  *Allied Tube & Conduit Corp. v. John Maneely Co.*, 125 F. Supp. 2d 987, 1004 (D. Ariz. 2000).

17          Defendants allege that they are entitled to intervening rights as a result of clarifying claim

18  amendments made during the reexamination of the '481 Patent.  However, the limitation added

19  during reexamination merely clarifies an inherent limitation within the claims and does not

20  constitute a substantive change.  Thus, Defendants are not entitled to either absolute or equitable

21  intervening rights because Defendants cannot meet their burden of establishing that Claims 1, 2

22  and 15 of the '481 Patent, after reexamination, are substantively different from the claims as

23  originally issued.  Defendants are not entitled to equitable intervening rights for the additional

24  reason that Defendants did not innocently act in good faith when they developed and

25  manufactured the Accused Solace Pump.

26  / / /

27  / / /

28  / / /

**F.**   **Patent Validity**

Patent claims are presumed to be valid.  35 U.S.C. § 282.  The party challenging a patent must prove facts supporting a determination of invalidity by clear and convincing evidence. *Schumer v. Lab. Computer Sys. Inc.*, 308 F.3d 1304, 1315 (Fed. Cir. 2002).  At trial, I-Flow will demonstrate that Defendants have failed to meet their burden to demonstrate invalidity by clear and convincing evidence.

**1.**   **Anticipation**

Anticipation requires that a single prior art reference contain each and every element of the claimed invention.  *Perricone v. Medicis Pharm. Corp.*, 432 F.3d 1368, 1375 (Fed. Cir. 2005). Defendants cannot demonstrate that either European Application No. 90311152.4 ("the EPO Publication") or United States Patent No. 5,105,983 ("the '983 Patent") fully disclose or enable Claims 1, 2 or 15 of the '481 Patent.

**2.**   **Obviousness**

A patent may also be found invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  35 U.S.C. § 103(a).   The issue of obviousness is a legal conclusion based upon underlying questions of fact.  *See McNeil-PPC, Inc. v. L. Perrigo Co.*, 337 F.3d 1362, 1368 (Fed. Cir. 2003).  The Supreme Court has recognized that, "it can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does" when determining obviousness.  *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 418 (2007); *see also Takeda Chem. Indus. v. Alphapharm Pty., Ltd.,* 492 F.3d 1350, 1357 (Fed. Cir. 2007) ("[I]t remains necessary to identify some reason that would have led a chemist to modify a known compound in a particular manner to establish  prima facie obviousness of a new claimed compound.").  Additionally, in determining whether a patent claim is obvious in view of the prior art, the Court must also evaluate and assess any objective indicia of nonobviousness, including commercial success of the invention, unexpected results, teaching away, initial skepticism, and copying by others.  *See, e.g.*, *KSR*, 550 U.S. at 406 07

1   (reiterating that such objective indicia of nonobviousness, also referred to as "secondary

2   considerations," continue to define the inquiry that controls the obviousness analysis); *see also*

3   *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1538 (Fed. Cir. 1983) (explaining that objective

4   evidence may often be the most probative and cogent evidence in the record).

5           **a.     Obviousness References**

6           Defendants allege that Claims 1, 2 and 15 are obvious over the EPO Publication in view of

7   seven intravenous bag technology patents ("the IV bag patents").  Defendants also allege that

8   Claims 1, 2 and 15 are obvious over the '983 Patent in view of the IV bag patents, and obvious

9   over U.S. Patent No. 5,080,652 ("the '652 Patent") in view of the IV bag patents.  Defendants

10  cannot demonstrate that Claims 1, 2 and 15 are rendered obvious by any of these combinations of

11  references.

12          **i.     The Scope And Content Of Prior Art Taught Away From The**

13                   **Claimed Invention**

14          At the time of invention, the prior art taught away from replacing the rigid cover of the

15  hard-shell infusion pump with a "collapsible shell" or "collapsible non-stretchable housing."

16  Infusion pumps, such as those disclosed in the EPO publication and the '983 patent, taught a rigid

17  housing that contained an elastic bladder or reservoir.  The widely held belief by persons of skill

18  in the art was that the absence of a hard shell would leave the pump vulnerable to overfilling,

19  external pressure, and flow rate variability.   The conception of the non-rigid "collapsible"

20  housing, as recited in Claims 1, 2 and 15 of the '481 Patent, was therefore contrary to the strongly

21  held understanding of those skilled in the art.  Successfully replacing the rigid hard-shell housing

22  of predecessor pumps with a non-rigid "collapsible" housing, despite prior art teachings,

23  demonstrates Claims 1, 2 and 15 are not obvious.

24          **ii.    The Asserted Combinations Do Not Disclose Or Suggest A**

25                   **Collapsible Housing**

26          In addition, the IV bag patents do not cure the deficient disclosure of the EPO Publication,

27  the '983 Patent, or any other reference disclosing a pump with a hard-shell housing.   The

28  combination of a hard-shell housing reference and the IV bag patents fails to teach or suggest a

1  "collapsible non-stretchable housing," as recited in Claims 1 and 2 and a "collapsible shell" of

2  Claim 15 of the '481 Patent.  As the prior art fails to teach all limitations of Claims 1, 2 and 15,

3  Defendants cannot establish by clear and convincing evidence that Claims 1, 2 and 15 of the '481

4  Patent are obvious.

5       **b.**      **Objective Indicia Of Nonobviousness Demonstrate Claims 1, 2 And 15**

6                   **Are Not Obvious**

7       In view of substantial evidence of objective indicia of nonobviousness, Defendants cannot

8  demonstrate by clear and convincing evidence that Claims 1, 2 and 15 of the '481 Patent are

9  obvious.

10      **i.**      **The Infusion Pump With A Collapsible Shell Achieved**

11                  **Unexpected Results**

12      The unexpected results demonstrated by the commercial embodiment of the claimed

13  invention of the '481 Patent evidences the nonobviousness of Claims 1, 2 and 15.  Contrary to

14  expectations, the Homepump Eclipse® and other soft-shell elastomeric infusion pumps in

15  I-Flow's family of soft-shell pumps proved to be more durable and dependable than hard shell

16  infusion pumps.  Upon testing, the soft collapsible PVC shell proved to provide adequate

17  protection against bursting and accidental puncture of the bladder assembly.   Contrary to

18  expectations, soft-shell pumps did not experience the anticipated flow rate problems caused by

19  patients' squeezing, sitting, laying or otherwise putting additional external pressure on the pumps.

20  Also contrary to expectations, I-Flow's soft-shell pumps were not prone to being overfilled.

21  Thus, the unexpected results achieved by commercial embodiments of the claimed invention

22  establish the nonobviousness of Claims 1, 2 and 15 of the '481 Patent.

23      **ii.**     **The Commercial Success Enjoyed By Soft-Shell Pumps Support**

24                  **Nonobviousness**

25      Commercial embodiments of the claimed invention enjoyed, and continue to enjoy,

26  unparalleled success in the marketplace.  The soft-shell Eclipse pump was first introduced in the

27  third quarter of 1993.  By 1998, millions of Eclipse pumps had been manufactured and sold.  To

28  / / /

1  date, Block Medical and I-Flow have sold over 30 million soft-shell pumps.  I-Flow's collapsible

2  shell pump is the number one elastomeric infusion product sold today.

3        The success of I-Flow's soft-shell pumps is directly attributable to the development of the

4  collapsible shell.  The commercial success enjoyed by infusion pumps containing a non-rigid

5  "collapsible" housing constitutes further evidence of the nonobviousness of Claims 1, 2 and 15 of

6  the '481 Patent.

7                  iii.       **Customer Complaints About Prior Pumps Demonstrates A**

8                            **Long-Felt Unmet Need In The Marketplace For The Claimed**

9                            **Invention**

10        I-Flow's collapsible shell pump satisfied a long-felt unmet need in the marketplace,

11  further demonstrating the nonobviousness of Claims 1, 2 and 15.  Customer complaints by

12  pharmacies regarding the amount of space occupied by earlier infusion pumps evidence the long-

13  felt need in the market.  The increased cost associated with sterilization of the rigid housing

14  presented yet another drawback to the hard-shell pumps.  The widely-held belief in the field that a

15  rigid housing was essential to the proper function of the infusion pump did not allow

16  manufacturers to meet this long-felt need for a space-saving infusion pump.  The improvements

17  introduced in the '481 Patent, a pump that required one-fourth the space occupied by predecessor

18  pumps and addressed costs associated with sterilizing a rigid housing, finally placed a product on

19  the market that would address these needs.  This evidence of long-felt unmet need supports a

20  finding of nonobviousness of Claims 1, 2 and 15.

21        **3.**       **Additional Invalidity Defenses**

22        The defenses of indefiniteness, lack of enablement, and lack of written description have

23  been waived by Defendants and resolved by the Court's claim construction rulings.  Moreover,

24  this Court has precluded Defendants from presenting expert testimony regarding enablement,

25  written description, and indefiniteness.  *See* Minute Order Granting Motion *in Limine* No. 8 To

26  Exclude Expert Testimony Regarding Enablement, Written Description, or Indefiniteness.

27  Defendants cannot show by clear and convincing evidence that the '481 Patent is invalid for

28  indefiniteness, lack of enablement, or lack of written description.

**G.     The '481 Patent Is Enforceable**

A patent may be rendered unenforceable for inequitable conduct if an applicant makes a material omission or misrepresentation with intent to deceive the United States Patent and Trademark Office ("PTO").  *Digital Control Inc. v. Charles Mach. Works*, 437 F.3d 1309, 1313 (Fed. Cir. 2006).   To demonstrate inequitable conduct sufficient to render an issued patent unenforceable, the party asserting this defense "must identify the specific who, what, when, where, and how of the material misrepresentation or omission committed before the PTO." *Exergen Corp. v. Wal-Mart Stores, Inc.*, 2009 WL 2366535 at *13 (Fed. Cir. Aug. 4, 2009). Thus, a defendant seeking to prove inequitable conduct must specifically identify by name the individual who allegedly intended to deceive the PTO.  *Id.*  The defendant must also specifically identify the portions of any allegedly withheld reference that are material to patentability and the specific claims to which the reference is material.   *Id.*   Additionally, the defendant must specifically identify facts from which it can reasonably be inferred that a specific individual knew of the materiality of the withheld reference and intended to deceive the PTO by withholding the reference. *Id.*

The party asserting inequitable conduct must establish both elements of materiality and intent by clear and convincing evidence.  *Purdue Pharma L.P. v. Endo Pharms., Inc.*, 438 F.3d 1123, 1128 (Fed. Cir. 2006).  Materiality requires a showing that a "reasonable examiner" would have considered the undisclosed information important in deciding whether to allow a patent. *Digital*, 437 F.3d at 1314.   Materiality is not satisfied if the withheld information is "merely cumulative to that information considered by the examiner."  *Id.* at 1319.   For intent, a party must establish that "the involved conduct, viewed in light of all the evidence, including evidence of good faith . . . indicate[s] sufficient culpability to require a finding of intent to deceive." *M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co.*, 439 F.3d 1335, 1341 (Fed. Cir. 2006).

Defendants allege that the '481 Patent is unenforceable because of alleged inequitable conduct before the PTO.   However, Defendants cannot meet their burden under *Exergen* to identify any specific individual who knew of a prior art reference, knew of its materiality, and intended to deceive the PTO by withholding that reference.   2009 WL 2366535 at *13.

Defendants also cannot identify "what" in any allegedly withheld reference is material and "how" or "why" it is material to a claim of an asserted patent. *Id.* Thus, Defendants cannot show by clear and convincing evidence that any undisclosed information was material and withheld with intent to deceive the PTO.

1.   **Defendants Cannot Identify Any Specific Individual Who Made Alleged Material Omissions Or Misrepresentations**

Defendants' cannot identify with any particularity "who" was responsible for alleged material omissions and misrepresentations before the PTO. Defendants' allege that "[t]he persons listed as inventors on the '481 patent ('inventors'), by themselves and/or by and through their attorneys and agents, committed acts constituting inequitable conduct and fraud." Zone Answer, ¶22, Apex Answer, ¶62. Defendants further allege that "the inventors through their attorneys and agents took a position which they knew to be inconsistent with a prior art reference the inventors and/or their attorneys and agents were aware of at the time they took the position," and that "the inventors, their attorneys and/or agents failed to disclose prior art to the Patent Office they were aware of." Zone Answer, ¶¶23-24, Apex Answer, ¶¶63-64. However, Defendants have not and cannot "name the specific individual associated with the filing who both knew of the material information and deliberately withheld or misrepresented it." *Exergen*, 2009 WL 2366535 at *13. Defendants therefore cannot meet their burden of showing the '481 Patent is unenforceable.

2.   **Allegations Regarding The Sancoff Patents And The EPO Publication**

Defendants cannot meet their burden of showing that failure to disclose the EPO Publication during prosecution of Application Serial No. 07/984,899 ("the '899 Application"), which eventually issued as the '481 Patent, constitutes inequitable conduct. Defendants argue that as the EPO Publication was published 19 months before the filing date of the '899 Application, it constituted prior art and should have been disclosed to the Examiner. However, the disclosure of the EPO Publication is the same as the disclosure of the Sancoff '652 Patent. The '652 Patent and the EPO Publication provide the same teaching, and as such have the same prior art effect. Thus, the EPO Publication was cumulative to the information unquestionably before the Examiner, and there was no need or requirement under PTO Rule 56 for the EPO

1  Publication to be cited to the Examiner.

2      Nor can Defendants meet their burden of showing that Applicants took inconsistent

3  positions during prosecution of the '899 Application. The Applicants' attorney apparently

4  misunderstood the disqualification paragraph of 35 U.S.C. § 103 and argued that the '652 Patent

5  and the '983 Patent (collectively "the Sancoff patents") did not qualify as prior art in an

6  obviousness rejection because the Sancoff Patents and the '899 Application were co-owned.  The

7  Examiner did not accept the attorney's argument, and specifically pointed out in his Notice of

8  Allowability for the '899 Application that the attorney's statement was incorrect.  The attorney's

9  mistaken argument that the Sancoff Patents did not constitute prior art did not affect the

10  Examiner's decision to issue the '481 Patent.  This is made clear by the Examiner's express

11  statement in the Notice of Allowability.  Accordingly, Applicants did not withhold material

12  information from the PTO or take inconsistent positions before the PTO.

13      With regard to intent, there is nothing in the record to indicate that the attorney recognized

14  that his argument regarding the Sancoff Patents was incorrect.  The argument was the result of an

15  honest mistake, and not improper intent.  Accordingly, Defendants cannot meet their burden of

16  proving an intent to mislead the PTO.

17      **3.      Allegations Regarding The Hessel And The Liebensohn Patents**

18      Defendants have also asserted that, during the prosecution of the '899 Application,

19  Applicants failed to cite various prior art references which were cited in the prosecution of related

20  applications.  Defendants specifically identify the Hessel Patent and the Liebensohn Patent as

21  prior art references not disclosed by Applicants during prosecution of the '899 Application.

22  However, the Examiner considered the Hessel Patent and the Liebensohn Patent in his decisions

23  on patentability. Thus, Defendants cannot meet their burden to identify information material to

24  patentability that was not before the Examiner.

25      With regard to intent, Defendants cannot demonstrate that Applicants or their attorneys

26  intentionally withheld information material to patentability from the PTO.   Thus, Defendants

27  cannot demonstrate proof of intent to mislead the PTO.

28  / / /

**H.      I-Flow Is Entitled To Damages For Defendants' Willful Infringement**

      **1.      I-Flow Is Entitled To Damages For Its Lost Profits On The Infringing Sales**

Defendants' infringement of the '481 Patent entitles I-Flow to damages adequate to compensate I-Flow for Defendants' infringement.  Based upon a consideration of the factors established in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978), as well as evidence that Defendants specifically targeted I-Flow's customers, I-Flow's expert, David Hanson, determined that I-Flow is entitled to between ███████████████████ in incremental profits for Defendants' infringement through October 31, 2009.

Mr. Hanson's calculations are based upon sales information provided by Defendants in discovery as of the date of Mr. Hanson's Supplemental Expert Report dated September 11, 2009. Because Defendants refused to produce any documents regarding sales in 2009, Mr. Hanson's calculations are based on projections of Defendants' sales through the end of October 2009.  In granting I-Flow's Motion *in Limine* No. 5 to Exclude Evidence Contradicting I-Flow's Damages Calculations, this Court has precluded Defendants from presenting evidence contradicting Mr. Hanson's calculations of the number of Accused Solace Pumps at issue presented in his expert reports.  *See* Minute Order Granting Motion *in Limine* No. 5 to Exclude Evidence Contradicting I-Flow's Damages Calculations.   To the extent that Defendants actually produce net worth documents for Defendants McGlothlin and Apex, the grant of I-Flow's Motion *in Limine* No. 5 will not preclude evidence contradicting Mr. Hanson's punitive damages calculations presented in his expert reports.

      **2.      Alternatively, I-Flow Is Entitled To A Reasonable Royalty For Defendants'**
              **Infringement Of The '481 Patent**

I-Flow is entitled to at least a reasonable royalty on the revenue generated by all of Defendants' infringing sales occurring after February 8, 1994, the issue date of the '481 Patent.  A determination of the reasonable royalty is based upon a hypothetical negotiation between a willing licensor and a willing licensee.

The evaluation of I-Flow's reasonable royalty is based on the guidelines established by the court in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

1  Upon evaluation of the 15 factors outlined in *Georgia Pacific*, Mr. Hanson determined the

2  appropriate proxy royalty rate to be ███ of sales.  Based on projections for 2009 sales, Mr.

3  Hanson determined I-Flow is entitled to a reasonable royalty of ███ assuming no lost

4  profits, or ███ assuming lost profits for a ███ market share.

5      **3.**    **Enhancement Of Damages**

6        The patent statute states that "the court may increase the damages up to three times the

7  amount found or assessed."  35 U.S.C. § 284.  The decision to award such enhanced damages

8  may be based on willful infringement or bad faith.  *Beatrice Foods Co. v. New England Printing*

9  *& Lithographing Co.*, 923 F.2d 1576, 1578 (Fed. Cir. 1991).  Based on Defendants' willful

10  infringement of the '481 Patent, I-Flow is entitled to up to three times the amount of damages

11  awarded.  Thus, the damages award should be trebled and I-Flow awarded ███ (based on

12  an award of lost profits including projected 2009 infringement and 100% market share).

13  Alternatively, if I-Flow is awarded a reasonable royalty, the reasonably royalty should be trebled

14  and I-Flow awarded ███ (assuming no lost profits).

15      **4.**    **Defendants Should Pay I-Flow's Attorneys' Fees**

16        In exceptional cases, the Court may award reasonable attorneys' fees to the prevailing

17  party.  35 U.S.C. § 285.  Defendants' willful infringement of I-Flow's patent justifies an award of

18  reasonable attorneys' fees.  *Tate Access Floors, Inc. v. Maxcess Techs.*, 222 F.3d 958, 972 (Fed.

19  Cir. 2000).

20  **I.**    **Defendants Should Be Permanently Enjoined From Continuing To Infringe The '481**

21      **Patent**

22        At trial, I-Flow will demonstrate, (1) that it has suffered irreparable injury; (2) that

23  remedies available at law, such as monetary damages, are inadequate to compensate for that

24  injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a

25  remedy in equity is warranted; and (4) that the public interest would not be disserved by a

26  permanent injunction.  *eBay Inc.*, 547 U.S. at 391.

27        Since at least 2006, I-Flow has lost the right of exclusivity that the '481 Patent was meant

28  to bestow.  The loss of the benefit and concomitant degradation of the worth of a valid patent is

1  irreparable harm suffered by I-Flow.

2        Any reasonable royalty awarded in this case is inadequate to compensate I-Flow for the

3  loss of the right to exclusively practice the patented technology.  By infringing the '481 Patent,

4  Defendants have gained an advantage through a compulsory license that they would not have

5  received if they had not infringed I-Flow's patent rights.  The mere payment of royalties in the

6  future is inadequate to compensate I-Flow for the loss of the legitimate commercial advantage

7  that would have come with the exclusive right to practice the patented technology and for the

8  forced sharing of that right with Defendants, I-Flow's competitor.

9        The balance of hardships also weighs in favor of I-Flow.  The only disadvantage to

10  Defendants is that they must cease manufacturing, selling, and using infringing products that

11  Defendants never had a right to manufacture, sell, or use in the first place.  Defendants are also

12  free to design around the '481 Patent to avoid infringing I-Flow's patent rights.  I-Flow, on the

13  other hand, if Defendants are not enjoined, will lose the benefit of having patented its technology

14  and will be forced to treat its competitors as its licensees, competing in the market against its own

15  patented technology.

16        There are no public interests in this case weighing against awarding I-Flow a permanent

17  injunction.  The public has an interest in honoring the exclusive patent rights bestowed on the

18  inventors in exchange for the inventors' disclosure of the '481 Patent invention to the public and

19  to encourage investment in medical device innovation.   Allowing Defendants, competing

20  infringers, to extract an involuntary license from I-Flow, thereby allowing Defendants to continue

21  infringement, undercuts the public interest principles underlying the patent system and

22  discourages others from making the substantial investment necessary to develop new medical

23  devices.

24  **J.**     **Defendants Are Liable For Unfair Competition Under California Common Law**

25        The elements of a cause of action for common law unfair competition under California

26  law are: "(1) that [plaintiff] had invested substantial time, skill, or money in developing its

27  property; (2) that [defendant] had appropriated and used [plaintiff's] property at little or no cost;

28  (3) that [defendant's] appropriation and use of [plaintiff's] property was without authorization or

1   the consent of [plaintiff]; and (4) that the [plaintiff] could establish that it has been injured by

2   [defendant's] conduct." *City Solutions Inc. v. Clear Channel Commc'ns, Inc.*, 365 F.3d 835, 842

3   (9th Cir. 2004).

4        At trial, I-Flow will show that Defendants are liable for unfair competition under

5   California common law because (1) I-Flow invested substantial time, skill, and money in

6   developing its Confidential Information; (2) Defendants appropriated and used I-Flow's

7   Confidential Information at little or no cost; (3) Defendants' appropriation and use of I-Flow's

8   Confidential Information was without authorization or consent of I-Flow; and (4) I-Flow has

9   established it has been injured by Defendants' conduct.

10  **K.    I-Flow Is Entitled To Damages And A Permanent Injunction For Defendants' Unfair**

11  **Competition Under California Common Law**

12       I-Flow will establish at trial that it is entitled to damages and injunctive relief for

13  Defendants' past and continuing acts of unfair competition under California common law.  *See*

14  *Bank of the West v. Superior Court*, 2 Cal. 4th 1254, 1265 (Cal. 1992).  I-Flow will demonstrate

15  that it has been damaged by, among other things, its lost sales resulting from Defendants' acts

16  constituting unfair competition under California common law.   Damages to I-Flow include at

17  least lost profits on diverted sales, eroded prices, remedial costs, future lost profits, and royalties,

18  as set forth above.   I-Flow will also demonstrate that it is entitled to punitive damages for

19  Defendants' fraudulent and malicious unfair competition under California common law.  *See* Cal.

20  Civ. Code § 3294(a); *Duncan v. Stuetzle*, 76 F.3d 1480, 1490 (9th Cir. 1996).

21  **L.    Defendants Are Liable For Unfair Competition Under California Business And**

22  **Professions Code §17200, Et Seq.**

23       Statutory unfair competition includes any "unlawful, unfair, or fraudulent business act or

24  practice."  Cal. Bus. and Prof. Code § 17200; *Vess v.  Ciba-Geigy Corp.*, 317 F.3d 1097, 1102

25  (9th Cir. 2003).  At trial, I-Flow will establish that Defendants are liable for unfair competition

26  under California Business and Professions Code §17200, et seq. because Defendants' acquisition,

27  disclosure, and use of I-Flow's Confidential Information, as described in detail above, constitutes

28  an unlawful, unfair, and fraudulent business act or practice.  I-Flow will also demonstrate that it is

1  entitled to a permanent injunction enjoining Defendants' conduct constituting unfair competition.

2  *See* Cal. Bus. and Prof. Code § 17203.

3  **M.      I-Flow Has Not Engaged In Unfair Competition Under Section 43 Of The Lanham**

4  **Act**

5      A Lanham Act 43(a)(1)(B) false advertising claim requires:

6      (1) a false statement of fact by the defendant in a commercial advertisement about
       its own or another's product; (2) the statement actually deceived or has the
7      tendency to deceive a substantial segment of its audience; (3) the deception is
       material, in that it is likely to influence the purchasing decision; (4) the defendant
8      caused its false statement to enter interstate commerce; and (5) the plaintiff has
9      been or is likely to be injured as a result of the false statement, either by direct
       diversion of sales from itself to defendant or by a lessening of the goodwill
10     associated with its products.

11 *Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1139 (9th Cir. 1997).

12     Defendants allege that I-Flow has violated Section 43 of the of the Lanham Act by

13 publishing a technical bulletin for the ON-Q Pump entitled Latex Sensitivity (the "Technical

14 Bulletin") and a leaflet entitled On-Q Pump Directions for Use (the "Leaflet") that are false and

15 misleading.  However, Defendants cannot establish that I-Flow has made any false or misleading

16 statements of fact in these publications.  Defendants cannot prove that any statement actually

17 deceived or had the tendency to deceive a substantial segment of its audience.  Additionally,

18 Defendants cannot establish that the alleged deception is material, in that it is likely to influence

19 the purchasing decisions.

20     Moreover, Defendants cannot show that they have been, or are likely to be, injured as a

21 result of the statements.  In addition, I-Flow's statements do not compare I-Flow's product to

22 Defendants' product, and Defendants cannot demonstrate any actual injury to them caused by

23 I-Flow's statements.

24     Further, Defendants' unfair competition counterclaim under Section 43 of the Lanham Act

25 is a "fraud-on-the-FDA" claim.  Such fraud-on-the-FDA claims conflict with, and are therefore

26 preempted by the Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq*, as amended

27 by the Medical Device Amendments of 1976 ("MDA").

28     Additionally, to resolve Defendants' allegation that I-Flow's Technical Bulletin and

-23-                                    I-Flow's Trial Brief

1   Leaflet contain false statements, the Court must interpret the term "likely contact" and determine

2   its meaning in the context of 21 C.F.R. § 801.437.  Only in the context of the FDA regulations in

3   which the statements were made can the alleged false statements be analyzed.  Because the FDCA

4   provides  no  private  right  of  action,  and  the  Court  cannot  adjudicate  this  matter  without

5   interpreting and applying FDA regulations, Defendants have no standing to bring their unfair

6   competition counterclaim under Section 43 of the Lanham Act.

7        Therefore, Defendants' cannot establish that I-Flow is liable for unfair competition under

8   Section 43 of the Lanham Act.

9   **N.       I-Flow Has Not Engaged In Statutory Or Common Law Unfair Competition**

10       Defendants have also asserted unfair competition counterclaims under Section 17200 of

11  the California Business and Professions Code and California common law.  However, I-Flow will

12  demonstrate  at  trial  that  it  has  not  engaged  in  any  unlawful,  unfair,  or  fraudulent  business

13  practices.  I-Flow has asserted its rights in the validly issued '481 Patent, which does not violate

14  Section 17200.  I-Flow is additionally protected by federal patent laws barring the imposition of

15  liability for publicizing the '481 Patent in the marketplace and notifying infringers that, upon a

16  good faith belief, they are infringing the '481 Patent.  Furthermore, as discussed above, I-Flow

17  has not engaged in inequitable conduct or false advertising which might arguably serve as the

18  basis  for  an  unfair  competition  violation.    Moreover,  as  discussed  above,  Defendants  cannot

19  demonstrate that they have been or are likely to be injured by I-Flow's statements.

20       Additionally, Defendants' unfair competition counterclaims under statutory and common

21  law are "fraud-on-the-FDA" claims.  Such state-law fraud-on-the-FDA claims conflict with, and

22  are therefore preempted by the FDCA, as amended by the MDA.

23       In addition, to resolve Defendants' allegation that I-Flow's Technical Bulletin and Leaflet

24  contain false statements, the Court must interpret the term "likely contact" and determine its

25  meaning in the context of 21 C.F.R. § 801.437.  Only in the context of the FDA regulations in

26  which the statements were made can the alleged false statements be analyzed.  Because the FDCA

27  provides  no  private  right  of  action,  and  the  Court  cannot  adjudicate  this  matter  without

28  interpreting and applying FDA regulations, Defendants have no standing to bring their statutory

1  and common law unfair competition counterclaim.

2       Therefore, Defendants' cannot establish that I-Flow is liable for unfair competition under

3  Section 17200 of the California Business and Professions Code and California common law.

4                          III.  **PROCEDURAL ISSUES**

5       I-Flow, pursuant to *PerSeptive Biosystems, Inc. v. Pharmacia Biotech, Inc.*, 225 F.3d

6  1315, 1318 (Fed. Cir. 2000), requests that the issue of inequitable conduct be tried separately to

7  the Court following trial of I-Flow's patent infringement, trade secret misappropriation, breach of

8  confidence, and unfair competition claims, and after Defendants' counterclaims and defenses.

9                          IV.  **EVIDENTIARY ISSUES**

10      This Court granted I-Flow's Motions *in Limine* Nos. 5, 6, and 8 in a hearing held on

11 September 25, 2009, ruling the following evidence is excluded and cannot be introduced at trial:

12      • any evidence, argument, or testimony contradicting Mr. Hanson's calculations of

13         the number of Accused Solace Pumps at issue presented in his expert reports;

14      • to the extent that Defendants do not produce documentation of the net worth of

15         Defendants McGlothlin and Apex, any evidence, argument, or testimony

16         contradicting Mr. Hanson's punitive damages calculations presented in his expert

17         reports;

18      • expert testimony of Ronald Simon and Giorgio di Palma regarding the meaning of

19         the phrases "eliminate" and  "not in contact" contained in the Technical Bulletin

20         and the Leaflet; and

21      • any expert testimony regarding lack of enablement, lack of written description, or

22         indefiniteness of the '481 Patent.

23      The Court also granted I-Flow's Motion *in Limine* No. 12, ruling that the following

24 exhibits are admissible at trial: Plaintiff's Exhibit Nos. PX-4, 5, 18, 33, 40, 45, 46, 47, 53, 55, 62,

25 64, 66, 67, 69, 70, 71, 72, 110, 136, 143, 147, 159, 409, 411, 412, 426, 453, and 485.

26      The Court reserved ruling on I-Flow's Motions *in Limine* Nos. 1, 2, and 3.  I-Flow will

27 object at trial to preclude introduction of the following:

28 / / /

1    • any evidence, testimony, or argument regarding allegedly false representations
2        made by I-Flow to the Federal Food and Drug Administration ("FDA") or I-Flow's
3        alleged failure to comply with FDA regulations;
4    • any evidence, testimony, or argument regarding "Adverse Event Reports"
5        regarding I-Flow products (specifically Defendants' Trial Exhibit No. QB); and
6    • any evidence, argument, or testimony regarding chondrolysis, or any lawsuit
7        alleging patients developed chondrolysis as a result of using a disposable pain
8        pump, such as I-Flow's ON-Q® Post-Op Pain Relief System.

9    I-Flow requested in its Motion *in Limine* No. 11 that the issue of inequitable conduct be
10   tried separately to the Court.  To the extent that the Court does not rule on this motion prior to
11   trial, I-Flow will object to preclude introduction of any evidence, argument, or testimony relating
12   to inequitable conduct during the jury trial.

13   The Court denied I-Flow's Motions *in Limine* Nos. 4, 7, 9, and 10 to exclude the
14   following:

15   • any evidence, testimony, or argument regarding monetary damages stemming from
16       Defendants' Unfair Competition Counterclaims;
17   • any evidence, argument, or testimony that statements contained in I-Flow's
18       Technical Bulletin and Leaflet are deceptive or misleading;
19   • any expert testimony from G. Marshall Abbey, Esq.; and
20   • any expert testimony from Perry De Fazio.

21   / / /
22   / / /
23   / / /
24   / / /
25   / / /
26   / / /
27   / / /
28   / / /

1    I-Flow expects these specific issues, as well as other evidentiary issues, will arise at trial.  I-Flow

2    will object at trial to preclude the introduction of irrelevant, prejudicial, or untimely evidence to

3    the jury.

4

5

6                                    Respectfully submitted,

7                                    KNOBBE, MARTENS, OLSON & BEAR, LLP

8

9    Dated:  September 28, 2009        By: *s/Ali S. Razai*

10                                         Steven J. Nataupsky
                                           Michael Friedland
11                                         Boris Zelkind
                                           Ali S. Razai
12                                         Ian Jaquette

13                                         Attorneys for Plaintiff and Counter-Defendant
                                           I-FLOW CORPORATION

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**

I hereby certify that on September 28, 2009, I caused the **PLAINTIFF I-FLOW CORPORATION'S TRIAL BRIEF PURSUANT TO LOCAL RULE 16.1(f)(9)(a)** to be electronically filed with the Clerk of the Court using the CM/ECF system which will send electronic notification of such filing to the following person(s):

Robert C. Matz
THE LAW OFFICE OF ROBERT C. MATZ, LLP
rcmatz@matzlaw.com

Norbert Stahl, Esq.
STAHL LAW FIRM
nstahl@patentlawservice.com

Trevor Q. Coddington, Ph.D., Esq.
SAN DIEGO IP LAW GROUP, LLP
trevorcoddington@sandiegoiplaw.com

James V. Fazio, III
SAN DIEGO IP LAW GROUP, LLP
jamesfazio@sandiegoiplaw.com

Douglas Olson
SAN DIEGO IP LAW GROUP, LLP
dougolson@sandiegoiplaw.com

I certify and declare under penalty of perjury under the laws of the State of California that I am employed in the office of a member of the bar of this Court at whose direction the service was made, and that the forgoing is true and correct.

Executed on September 28, 2009, at San Diego, California.

Megan Placin
Megan Placin

IFLOWL.241L/IFLOWL.261L
7488942
072009

-1-                                                    Certificate of Service