**FILED**

NOV − 3 2009

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA
BY                                    DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| I-FLOW CORPORATION, )<br>)<br>    Plaintiffs, )<br>)<br>  v. )<br>)<br>)<br>APEX MEDICAL )<br>TECHNOLOGIES, INC., ET AL., )<br>)<br>    Defendants. )<br>_____)<br>)<br>AND RELATED )<br>COUNTER-CLAIM. )<br>_____) | No. 07CV1200 |

**JURY INSTRUCTIONS**

DATED:  10-22-09

DANA M. SABRAW
UNITED STATES DISTRICT JUDGE

INSTRUCTION NO: 1.0

CLAIMS AND DEFENSES

Plaintiff, I-Flow Corporation ("I-Flow"), claims that Defendants Mark McGlothlin, Apex Medical Technologies, Inc., and Zone Medical, LLC (collectively "Defendants") have infringed I-Flow's patent, misappropriated I-Flow's protectable trade secrets, engaged in actions constituting breach of confidence, and engaged in unfair competition.  I-Flow has the burden of proving these claims.

Defendants deny those claims.

Defendants contend that the '481 patent is not infringed and that the '481 patent is invalid and unenforceable due to inequitable conduct.  Defendants contend that they have not misappropriated trade secret information of Plaintiff.

Defendants contend that I-Flow has engaged in false advertising under the Lanham Act. Defendants have the burden of proving this counterclaim.  I-Flow denies this counterclaim.

INSTRUCTION NO.  1.1

The evidence you are to consider in deciding what the facts are consists of:

1.    the sworn testimony of any witness;

2.    the exhibits which are received into evidence; and

3.    any facts to which the lawyers have agreed.

INSTRUCTION NO. _1.2_

In reaching your verdict, you may consider only the testimony and exhibits received into evidence. Certain things are not evidence, and you may not consider them in deciding what the facts are. I will list them for you:

(1) Arguments and statements by lawyers are not evidence. The lawyers are not witnesses. What they have said in their opening statements, will say in their closing arguments, and at other times is intended to help you interpret the evidence, but it is not evidence. If the facts as you remember them differ from the way the lawyers have stated them, your memory of them controls.

(2) Questions and objections by lawyers are not evidence. Attorneys have a duty to their clients to object when they believe a question is improper under the rules of evidence. You should not be influenced by the objection or by the court's ruling on it.

(3) Testimony that has been excluded or stricken, or that you have been instructed to disregard, is not evidence and must not be considered. In addition sometimes testimony and exhibits are received only for a limited purpose; when I have given a limiting instruction, you must follow it.

(4) Anything you may have seen or heard when the court was not in session is not evidence. You are to decide the case solely on the evidence received at the trial.

INSTRUCTION NO. __1.3__

Evidence may be direct or circumstantial.  Direct evidence is direct proof of a fact, such as testimony by a witness about what that witness personally saw or heard or did.  Circumstantial evidence is proof of one or more facts from which you could find another fact.  You should consider both kinds of evidence.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.  It is for you to decide how much weight to give to any evidence.

INSTRUCTION NO. __1.4__

There are rules of evidence that control what can be received into evidence. When a lawyer asks a question or offers an exhibit into evidence and a lawyer on the other side thinks that it is not permitted by the rules of evidence, that lawyer may object. If I overrule the objection, the question may be answered or the exhibit received. If I sustain the objection, the question cannot be answered, and the exhibit cannot be received. Whenever I sustain an objection to a question, you must ignore the question and must not guess what the answer might have been.

Sometimes I may order that evidence be stricken from the record and that you disregard or ignore the evidence. That means that when you are deciding the case, you must not consider the evidence that I told you to disregard.

INSTRUCTION NO. __1.5__

In deciding the facts in this case, you may have to decide which testimony to believe and which testimony not to believe. You may believe everything a witness says, or part of it, or none of it. Proof of a fact does not necessarily depend on the number of witnesses who testify about it.

In considering the testimony of any witness, you may take into account:

(1) the opportunity and ability of the witness to see or hear or know the things testified to;

(2) the witness's memory;

(3) the witness's manner while testifying;

(4) the witness's interest in the outcome of the case and any bias or prejudice;

(5) whether other evidence contradicted the witness's testimony;

(6) the reasonableness of the witness's testimony in light of all the evidence; and

(7) any other factors that bear on believability.

The weight of the evidence as to a fact does not necessarily depend on the number of witnesses who testify about it.

INSTRUCTION NO. __*1.6*__

A deposition is the sworn testimony of a witness taken before trial.  The witness is placed under oath to tell the truth and lawyers for each party may ask questions.  The questions and answers are recorded.

You should consider deposition testimony, presented to you in court in lieu of live testimony, insofar as possible, in the same way as if the witness had been present to testify.

INSTRUCTION NO. *1.7*

Some witnesses, because of education or experience, are permitted to state opinions and the reasons for those opinions.

Opinion testimony from expert witnesses should be judged just like any other testimony. You may accept it or reject it, and give it as much weight as you think it deserves, considering the witness's education and experience, the reasons given for the opinion, and all the other evidence in the case.

INSTRUCTION NO. **1·8**

Certain charts and summaries not received in evidence have been shown to you in order to help explain the contents of books, records, documents, or other evidence in the case. They are not themselves evidence or proof of any facts. If they do not correctly reflect the facts or figures shown by the evidence in the case, you should disregard these charts and summaries and determine the facts from the underlying evidence.

INSTRUCTION NO. ___1.4.1___

Certain charts and summaries have been received into evidence to illustrate information brought out in the trial. Charts and summaries are only as good as the underlying evidence that supports them. You should, therefore, give them only such weight as you think the underlying evidence deserves.

INSTRUCTION NO. __1.9__

When a party has the burden of proof on any claim or affirmative defense by a preponderance of the evidence, it means you must be persuaded by the evidence that the claim or affirmative defense is more probably true than not true.

You should base your decision on all of the evidence, regardless of which party presented it.

INSTRUCTION NO. __1·10__

When a party has the burden of proving any claim or defense by clear and convincing evidence, it means you must be persuaded by the evidence that the claim or defense is highly probable. This is a higher standard of proof than proof by a preponderance of the evidence.

You should base your decision on all of the evidence, regardless of which party presented it.

INSTRUCTION NO. ___1.11___

When you begin your deliberations, you should elect one member of the jury as your presiding juror. That person will preside over the deliberations and speak for you here in court.

You will then discuss the case with your fellow jurors to reach agreement if you can do so. Your verdict must be unanimous.

Each of you must decide the case for yourself, but you should do so only after you have considered all of the evidence, discussed it fully with the other jurors, and listened to the views of your fellow jurors.

Do not hesitate to change your opinion if the discussion persuades you that you should. Do not come to a decision simply because other jurors think it is right.

It is important that you attempt to reach a unanimous verdict but, of course, only if each of you can do so after having made your own conscientious decision. Do not change an honest belief about the weight and effect of the evidence simply to reach a verdict.



INSTRUCTION NO. **1.12**

      If it becomes necessary during your deliberations to communicate with me, you may send a note through my law clerk, signed by your presiding juror or by one or more members of the jury. No member of the jury should ever attempt to communicate with me except by a signed writing; I will communicate with any member of the jury on anything concerning the case only in writing, or here in open court. If you send out a question, I will consult with the parties before answering it, which may take some time. You may continue your deliberations while waiting for the answer to any question. Remember that you are not to tell anyone—including me—how the jury stands, numerically or otherwise, until after you have reached a unanimous verdict or have been discharged. Do not disclose any vote count in any note to the court.

INSTRUCTION NO. __1.13__

A verdict form has been prepared for you.  After you have reached unanimous agreement on a verdict, your presiding juror will fill in the form that has been given to you, sign and date it, and advise the court that you are ready to return to the courtroom.

INSTRUCTION NO:  **2.0**

## SUMMARY OF PATENT CONTENTIONS

As I did at the start of the case, I will first give you a summary of each side's patent contentions in this case. I will then provide you with detailed instructions on what each side must prove to win on each of its contentions.

As I previously told you, I-Flow seeks money damages from Defendants for allegedly infringing the '481 patent by making, using, selling and offering for sale products that I-Flow argues are covered by claims 1, 2, and 15 of the '481 patent. These are the asserted claims of the '481 patent. The product that is alleged to infringe is the Solace Pump.

Defendants deny that they have infringed the asserted claims of the patent and argue that, in addition, claims 1, 2, and 15 are invalid and unenforceable.

Your job is to decide whether Defendants have infringed the asserted claims of the '481 patent and whether any of the asserted claims of the '481 patent are invalid. If you decide that any claim of the patent has been infringed and is not invalid, you will then need to decide any money damages to be awarded to I-Flow to compensate it for the infringement. You will also need to make a finding as to whether the infringement was willful. If you decide that any infringement was willful, that decision should not affect any damage award you make. I will take willfulness into account later.

INSTRUCTION NO:__2.0.1

## THE ROLE OF THE CLAIMS OF A PATENT

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims." The patent claims are the numbered sentences at the end of each patent. The claims are important because it is the words of the claims that define what a patent covers. The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims but it is the claims that define how broad or narrow the patent's coverage is. Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than another claim. Therefore, what a patent covers depends, in turn, on what each of its claims cover.

You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid. The law says that it is my role to define the terms of the claims and it is your role to apply my definitions to the issues that you are asked to decide in this case. Therefore, as I explained to you at the start of the case, I have determined the meaning of the claims and I will provide to you my definitions of certain claim terms. You must accept my definitions of these words in the claims as being correct. It is your job to take these definitions and apply them to the issues that you are deciding, including the issues of infringement and validity.

INSTRUCTION NO: 2.1

## HOW A CLAIM DEFINES WHAT IT COVERS

I will now explain how a claim defines what it covers.

A claim sets forth, in words, a set of requirements. Each claim sets forth its requirements in a single sentence. If a device or a method satisfies each of these requirements, then it is covered by the claim.

There can be several claims in a patent. Each claim may be narrower or broader than another claim by setting forth more or less requirements. The coverage of a patent is assessed claim-by-claim.

In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations." When a thing (such as a product or a process) meets all of the requirements of a claim, the claim is said to "cover" that thing, and that thing is said to "fall within the scope of" that claim. In other words, a claim covers a product or process where each of the claim elements or limitations is present in that product or process.

Sometimes the words in a patent claim are difficult to understand, and therefore it is difficult to understand what requirements these words impose. It is my job to explain to you the meaning of the words in the claims and the requirements these words impose.

As I just instructed you, there are certain specific terms that I have defined and you are to apply the definitions that I provide to you. Some terms used in a claim may have a specific meaning in patent law. For example, a claim that reads: "A product comprising a seat and legs" covers all products that have both a seat and legs. The word "comprising" in this claim is a special word in patent law meaning that the claim covers all products that have a seat and legs, regardless of whether or not they also have additional features. For example, this claim would cover several different kinds of chairs, stools, and sofas, because there are several different kinds of chairs, stools, and sofas that have at least a seat and legs.

By understanding the meaning of the words in the claims and by understanding that the words in a claim set forth the requirements that must be met in order to be covered by that claim, you will

be able to understand the scope of coverage for each claim.  Once you understand what each claim covers, then you are prepared to decide the issues that you are asked to decide, such as infringement and invalidity.

INSTRUCTION NO: **2.2**

**INDEPENDENT AND DEPENDENT CLAIMS**

This case involves two types of patent claims: independent claims and dependent claims. An "independent claim" sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. In this case, claims 1 and 15 of the '481 patent are each independent claims.

Claim 2 of the '481 patent is a "dependent claim." A dependent claim does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements. In this way the claim "depends" on another claim. The law considers a dependent claim to incorporate all of the requirements of the claim(s) to which it refers. The dependent claim then adds its own, additional, requirements. To determine what a dependent claim covers, it is necessary to look at both the dependent claim and any other claim to which it refers. A product that meets all of the requirements of both the dependent claim and the claim to which it refers is covered by that dependent claim. Here, claim 2 depends on claim 1 and thus incorporates all of the requirements of claim 1. Claim 2 then adds its own, additional requirements. A product that meets all of the requirements of both claim 2 and claim 1 is covered by both claims 1 and 2.

INSTRUCTION NO: **2.3**

**INFRINGEMENT**

I will now instruct you how to decide whether or not Defendants have infringed the patent. Infringement is assessed on a claim-by-claim basis. Therefore, there may be infringement as to one claim but not infringement as to another.

In this case, I-Flow has alleged that Defendants directly infringe the '481 patent. In order to prove infringement, I-Flow must prove the requirements for direct infringement are met by a preponderance of the evidence, i.e., that it is more likely than not that all of the requirements of one or more of each of these types of infringement have been proved.

INSTRUCTION NO: **2.3.1**

## DIRECT INFRINGEMENT BY "LITERAL INFRINGEMENT"

There are two types of "direct infringement": (1) "literal infringement" and (2) "infringement under the doctrine of equivalents."  I will first explain the circumstances under which you may find "literal infringement."

A person or company directly infringes a claim by "literal infringement" if, during the time the patent is in force, the person or company makes, uses, sells, or offers to sell within the United States a product that meets all of the requirements of the claim and does so without the permission of the patent holder.  To determine whether a particular product meets all of the requirements of a claim, you must understand the meaning of the words in the claim and the requirements that these words impose. I have already explained to you the meaning of some of the words of the claims in this case.  I have also explained to you that other words in the claims should be given their plain English meaning.  You must compare the product with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met. When the product meets all of the requirements of a claim, the product is said to "literally infringe" that claim.  If a product that literally infringes a claim is made, used, sold, or offered for sale within the United States during the time the patent is in force, without I-Flow's authorization, it directly infringes the claim.

In order to prove direct infringement by literal infringement, I-Flow must prove that the above requirements are met by a preponderance of the evidence, i.e., that it is more likely than not that Defendants made, used, sold, or offered for sale within the United States, without I-Flow's authorization, during the time the patent is in force, a product that meets all of the requirements of a claim.

INSTRUCTION NO: 2.3.2

## DIRECT INFRINGEMENT "UNDER THE DOCTRINE OF EQUIVALENTS"

If a person or company makes, uses, sells, or offers to sell within the United States a product that does not meet all the requirements of the claim, there can still be direct infringement if that product satisfies that claim "under the doctrine of equivalents."

I will now explain the circumstances under which you may find that a product satisfies a claim under the doctrine of equivalents.

Under the doctrine of equivalents, a product satisfies a claim if, for each and every requirement of the claim that is not literally present in the accused product, the accused product has some corresponding alternative feature that is "equivalent" to the unmet claim requirement. I will explain to you shortly what "equivalent" means. Depending on the nature of the requirement that is not met literally, the alternative feature of the product may be an alternative component or a relationship between components.

In making your decision as to whether or not a product is equivalent under the doctrine of equivalents, you must look at each and every requirement of that claim and decide whether or not the product either meets that requirement or has some alternative feature that is "equivalent" to the unmet requirement. If it does, the product satisfies the claim under the doctrine of equivalents. If instead, (1) the product has an alternative to the unmet requirement but the alternative is not "equivalent" to the unmet requirement; or (2) the product has no corresponding alternative feature to the unmet requirement, you must find that the requirement is not satisfied under the doctrine of equivalents and there is no infringement under the doctrine of equivalents.

I will now explain how to determine whether an alternative feature of the product at issue is "equivalent" to a requirement of the claim. An alternative is considered to be "equivalent" to an unmet requirement of a claim if a person having ordinary skill in the field of technology of the patent would have considered the differences between them to be "insubstantial" at the time of the alleged infringement. In deciding whether an alternative feature of the product is equivalent to an unmet requirement of the claim, you may consider whether the alternative feature and the unmet claim

requirement: (1) perform substantially the same function; and (2) work in substantially the same way; (3) to achieve substantially the same result. You may also consider whether, at the time of the alleged infringement, a person having ordinary skill in the field of technology of the patent would have known of the interchangeability of the alternative feature and the unmet requirement of the claim. Interchangeability at the present time is not sufficient; in order for the structures to be considered to be interchangeable, rather, the interchangeability of the two structures must have been known to persons of ordinary skill in the field of technology of the invention at the time the infringement began.

In order to prove infringement by "equivalents," I-Flow must prove by a preponderance of the evidence that any differences between the unmet requirement and the alternative are insubstantial. This means that I-Flow must prove that it is more likely than not the Solace Pump has an alternative feature that is "equivalent" to the unmet claim requirement.

INSTRUCTION NO: **2.3.2.1**

**DIRECT INFRINGEMENT: MULTIPLE ALLEGED INFRINGERS**

You must make a determination of infringement separately for each of the alleged infringers. Therefore, if you find that a claim is not infringed by any one alleged infringer, you must go on to consider whether that claim is infringed by the others.

It is not necessary for the acts that constitute infringement to be performed by one person or entity. When infringement results from the participation and combined action(s) of more than one person or entity, they are all joint infringers and jointly liable for patent infringement. Where the infringement is the result of the participation and combined action(s) of one or more persons or entities, they are joint infringers and are jointly liable for the infringement.

**INSTRUCTION NO:** 2.3.3

**WILLFUL INFRINGEMENT**

In this case, I-Flow argues both that Defendants infringed and, further, that Defendants infringed willfully. Even if you have decided that Defendants have infringed, you must go on and address the additional issue of whether or not this infringement was willful. Willfulness requires you to determine three things: first, that Defendants were aware of the '481 patent; second whether the alleged infringer acted despite an objectively high likelihood that its actions infringed a valid patent; and, third, that this objectively high risk was either known or so obvious that it should have been known to Defendants. To prove willful infringement, I-Flow must establish that Defendants willfully infringed by clear and convincing evidence. That is I-Flow must prove willfulness in such a way that you have been left with a clear conviction that the infringement was willful.

In deciding whether or not Defendants committed willful infringement, you must consider all of the facts and the totality of the circumstances, which include but are not limited to:

(1)     Whether or not Defendants intentionally copied a product of I-Flow that is covered by the '481 patent;

(2)     Whether or not Defendants possessed a reasonable basis to believe that it had a substantial defense to infringement and reasonably believed that the defense would be successful if litigated;

(3)     Whether or not Defendants made a good faith effort to avoid infringing the patent, for example Defendants took remedial action upon learning of the patent by ceasing infringing activity or attempting to design around the patent;

(4)     Whether or not Defendants tried to cover up its infringement; and

(5)     Whether or not Defendants relied on a legal opinion that appeared to it to be

well-supported and believable and that advised Defendants (1) that the Solace Pump did not infringe the '481 patent or (2) that the '481 patent was invalid or unenforceable.

INSTRUCTION NO:__2.4__

**INVALIDITY – BURDEN OF PROOF**

I will now instruct you on the rules you must follow in deciding whether or not Defendants have proven that claims 1, 2 and 15 of the '481 patent are invalid.  To prove that any claim of a patent is invalid, Defendants must persuade you by clear and convincing evidence.  That is, in order to find a claim invalid you must be left with a clear conviction that the claim is invalid.

I will now instruct you on the invalidity issues that you have to decide in this case.

INSTRUCTION NO: 2.4.1

## INVALIDITY – BEST MODE

Defendants may establish that a patent claim is invalid by showing, by clear and convincing evidence, that the patent does not disclose what any of the inventors believed to be the best way to carry out the claimed invention at the time the patent application was filed. This is known as the "best mode" requirement. It ensures that the public obtains a full disclosure of the best way to carry out the claimed invention that was known to the inventor at the time the original patent application was first filed. The best mode requirement is designed to prohibit any of the inventors from concealing a better mode of practicing the invention than the mode he or she disclosed in the patent application.

The best mode requirement focuses on what the inventor believed at the time the original patent application was first filed. It does not matter whether the best mode contemplated by any of the inventors was considered by others to have been the best way to carry out the claimed invention. Nor does it matter that the inventors failed to disclose a better way to carry out the claimed invention if the inventors did not believe it to be better at the time they filed the original application.

If any of the inventors believed there was a best way to carry out the claimed invention and the patent does not adequately disclose it, the patent is invalid. In deciding whether or not the best mode has been included in the patent, you must consider two questions.

First, you must decide whether or not any of the inventors believed there to be a best way to practice the claimed invention at the time that application was filed. If none of the inventors believed there to be a best way to carry out the claimed invention, there is no requirement that the patent describe a best mode.

Second, you must decide whether or not the patent describes what any of the inventors believed to be the best mode at the time the original patent application was filed. The disclosure of the best mode must be detailed enough to enable persons of ordinary skill in the field of technology relevant to this case to carry out that best mode without excessive experimentation. The patent specification need not disclose routine details concerning the quality and nature of the invention if

such details would be readily apparent to a person of ordinary skill in the field. Although a patent specification must disclose at least the best mode, it may also disclose other modes as well, and it need not state which of the modes disclosed is considered by the inventors to be the best.

**INSTRUCTION NO:** **2.5**

**INEQUITABLE CONDUCT**

Every applicant for a patent has a duty of candor and good faith in its dealing with the United States Patent and Trademark Office and with the Examiner handling the application. This duty of candor is important because the examiner has limited resources. The examiner may have less information available to them than an applicant may have from which to determine whether an invention is sufficiently different from that which already exists to warrant a patent. The examiner also has a limited amount of time to spend determining whether the invention claimed in any particular application meets the requirements for a patent. To prevent patents from issuing on inventions that are not sufficiently different from that which already exists, anyone involved in a substantial way in the examination of an application is required to be truthful and honest in all of their dealings with the Patent and Trademark Office and to disclose all information in their possession which a reasonable examiner may consider to be material to the examination of the application.

When a person involved in the prosecution of an application fails to comply with the duty of candor and good faith, and does so with an intent to deceive the Patent and Trademark Office, he or she may commit what is called "inequitable conduct." When inequitable conduct occurs during the examination of an application, any patent that issues from that application may be rendered unenforceable as a matter of fairness. This means that despite the existence of the patent, the patent holder may not prevent others from using the invention covered by the patent and may not collect damages from those who use the invention that is covered by the patent.

Because a finding of inequitable conduct completely extinguishes a patent holder's right to prevent others from using an invention, the burden of proving inequitable conduct is high. An alleged infringer must establish that inequitable conduct occurred during the examination of a patent with evidence by clear and convincing evidence. That is, based on the evidence presented to you in this case you must have a clear conviction that inequitable conduct occurred in connection with the '481 patent in order for it to be considered unenforceable.

In this case, the Defendants contends that Block Medical, the original owner of the '481 patent, failed to disclose material information or made materially false and misleading statements to the Patent and Trademark Office during the examination of the '481 patent, and did so with an intent to deceive the examiner into issuing the '481 patent.

I will now explain to you what "materiality" and "intent to mislead" mean. I will then explain to you how any materiality and intent that you may find must be balanced in order to determine whether, given all the facts and circumstances, inequitable conduct occurred in this case as Defendants contend.

**Materiality**

In considering materiality, you first must determine whether or not information was withheld from or false or misleading statements were made to the Patent and Trademark Office during the examination of the '481 patent. If you find that the applicant, the applicant's representatives, or others involved in a substantial way with the examination of the application withheld information from or made false or misleading statements to the Patent Trademark Office during the examination of the '481 patent, you must then determine whether or not the withheld information or false or misleading statements were material.

Information or statements are material if there is a substantial likelihood that a reasonable examiner would have considered it important in deciding whether to allow an application to issue as a patent.

Information that is cumulative of, or in other words, adds little to or has no more bearing on the examination of an application than information the examiner already had, is not material. Information that discloses a more complete combination of the relevant features of the invention sought to be patented may be highly material. This is true even if those features were before the examiner in other, less complete references.

I will now discuss the concept of "intent to mislead."

**Intent to Mislead**

In order for inequitable conduct to have occurred Defendants must establish that any failure to disclose material information or false or misleading statements were done with an intent to deceive the examiner. If the failure to disclose material information or false or misleading statements occurred through negligence, oversight, carelessness, or an error in judgment, even if it was grossly negligent, then there was no intent to deceive and there is no inequitable conduct.

Intent may be shown through direct evidence, such as documents or testimony about one's intent to deceive. Intent also may be shown through indirect evidence, or in other words, it may be inferred from conduct. For example, you may infer an intent to mislead from acts substantially certain to accomplish a result, or a combination of conduct and statements. However, you are not required to infer intent. Any inference of intent will necessarily depend upon the totality of the circumstances as you find them to have been, including the nature and level of any culpable conduct you may find and the absence or presence of affirmative evidence of good faith on the Applicant's part.

**Balancing of Materiality and Intent**

If you find that Defendants have proved that material information was withheld or materially misleading statements were made and, further, that these acts or omissions were done with an intent to mislead the examiner, you must then weigh the degree of materiality and the degree of intent to determine whether, on balance, the evidence clearly and convincingly establishes that the Applicant committed inequitable conduct and the patent should in fairness be declared unenforceable. When performing this balancing, the higher the level of materiality of the withheld information or the false and misleading statements, the lower the level of intent that is required to establish inequitable conduct, and vice versa. Materiality and intent to deceive are separate issues: proof of materiality does not give rise to an inference of intent to deceive, and proof of an intent to deceive does not give rise to an inference of materiality. There must be evidence that establishes materiality and there must be evidence that establishes an intent to deceive. If evidence of either, or both, is missing, there can be no inequitable conduct.

Although the question of whether there has been inequitable conduct is one that I will decide, I will ask for your findings so that I can consider them in making my decision. You should make determinations on this issue as you would for any other issue in this case because I will consider them seriously in making my determination.

INSTRUCTION NO: 2.6

**PATENT DAMAGES – BURDEN OF PROOF**

I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case, on any issue. If you find that Defendants infringed any valid claim of the '481 patent, you must then determine the amount of money damages to be awarded to I-Flow to compensate it for the infringement.

The amount of those damages must be adequate to compensate I-Flow for the infringement. The damages you award are meant to compensate the patent holder and not to punish an infringer. Your damages award, if you reach this issue, should put the patent holder in approximately the same financial position that it would have been in had the infringement not occurred, but in no event may the damages award be less than a reasonable royalty. I will give you more detailed instructions on the calculation of a reasonable royalty shortly.

In this case, I-Flow seeks to recover lost profits on Defendants' sales of the Solace Pump, and a reasonable royalty on the rest of Defendants' sales. To recover lost profits for infringing sales, I-Flow must show that but for the infringement there is a reasonable probability that it would have made sales that Defendants made of the infringing product. If you find that I-Flow has not proved its claim for lost profits, or has proved its claim for lost profits for only a portion of the infringing sales, then I-Flow should be awarded a reasonable royalty for those infringing sales for which it has not been awarded lost profits damages. I will give you more detailed instructions on lost profits damages shortly.

I-Flow has the burden to establish the amount of its damages. You should award only those damages that I-Flow establishes that it more likely than not suffered. I-Flow is not entitled to damages that are remote or speculative. While I-Flow is not required to prove its damages with mathematical precision, it must prove them with reasonable certainty. To the extent Defendants contend that the amount of damages should be reduced or offset, Defendants must prove the amount of such reduction or offset. When the amount of damages cannot be ascertained with precision, any doubts regarding the amount must be resolved against the infringer. Any adverse consequences must

rest on the alleged infringer when the inability to ascertain lost profits is due to the infringer's own failure to keep accurate records.

INSTRUCTION NO: 2.6.1

## LOST PROFITS

In this case, I-Flow seeks to recover lost profits for Defendants' sales of the Solace Pump.

To recover lost profits for infringing sales, I-Flow must show that, but for the infringement, there is a reasonable probability that it would have made sales that Defendants made of the infringing product. In proving that it would have made those sales if not for the infringement, I-Flow must establish the share of Defendants' sales that it would have made had the infringing product not been on the market.

I-Flow is entitled to lost profits if it establishes each of the following, by a preponderance of the evidence:

1) that there was a demand for the patented product;

2) that there were no non-infringing substitutes, or, if there were, the patent holder's market share of the number of the sales made by Defendants that I-Flow would have made despite the availability of other acceptable noninfringing substitutes. An alternative may be considered available as a potential substitute even if it was not actually on sale during the infringement period. Factors suggesting that the alternative was available include whether the material, experience, and know-how for the alleged substitute were readily available. Factors suggesting that the alternative was not available include whether the material was of such high cost as to render the alternative unavailable and whether Defendants had to design or invent around the patented technology to develop an alleged substitute;

3) that I-Flow had the manufacturing and marketing capacity to make any infringing sales actually made by the infringer and for which I-Flow seeks an award of lost profits; and

4) the amount of profit that I-Flow would have made if Defendants had not infringed.

INSTRUCTION NO: __2.6.2__

## LOST PROFITS - MARKET SHARE

If you find that I-Flow has established that it would have made sales but for the infringement, you must decide the amount of sales that I-Flow lost as a result of the infringement. One way I-Flow may prove the sales it would have made if the infringement had not happened is to prove its share of the relevant market, excluding infringing products. You may award I-Flow a share of profits equal to that market share even if you find that there were available, noninfringing substitutes for the patented product.

In deciding I-Flow's market share, you must decide which products are in I-Flow's market. Products are in the same market if they are sufficiently similar to compete against each other. Two products are sufficiently similar if one does not have a significantly higher price than or possess characteristics significantly different than the other.

**INSTRUCTION NO:** 2.6.3

**REASONABLE ROYALTY - ENTITLEMENT**

If you find that I-Flow has established infringement, I-Flow is entitled to at least a reasonable royalty to compensate it for that infringement. If you find that I-Flow has not proved its claim for lost profits, or has proved its claim for lost profits for only a portion of the infringing sales, then you must award I-Flow a reasonable royalty for all infringing sales for which it has not been awarded lost profits damages.

INSTRUCTION NO: 2.6.4

## REASONABLE ROYALTY - DEFINITION

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is the amount of royalty payment that a patent holder and the infringer would have agreed to in a hypothetical negotiation taking place at the time when the infringing sales first began. In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations. You must also assume that both parties believed the patent was valid and infringed. In addition, you must assume that patent holder and infringer were willing to enter into an agreement. Your role is to determine what that agreement would have been. The measure of damages is what royalty would have resulted from the hypothetical negotiation, and not simply what royalty either party would have preferred.

In this trial, you have heard evidence of things that happened after the infringing sales first began. That evidence can be considered only to the extent that that evidence aids in you assessing what royalty would have resulted from a hypothetical negotiation. Although evidence of the actual profits Defendants made may aid you in determining the anticipated profits at the time of the hypothetical negotiation, you may not limit or increase the royalty based on the actual profits Defendants made.

In determining the reasonably royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors that you may consider in making your determination are:

1) whether the patent holder had an established royalty for the invention; whether, in the absence of an established royalty, there is evidence that tends to prove an established royalty; whether, in the absence of such a licensing history, there are any royalty arrangements that were generally used and recognized in the particular industry at that time;

2) the nature of the commercial relationship between the patent holder and the licensee such as whether they were competitors or whether their relationship was that of an inventor and a promoter;

3) the established profitability of the patented product, its commercial success and its popularity at the time;

4) whether the patent holder had an established policy of granting licenses or retaining the patented invention as its exclusive right, or whether the patent holder had a policy of granting licenses under special conditions designed to preserve his monopoly;

5) the size of the anticipated market for the invention at the time the infringement began;

6) the duration of the patent and of the license, as well as the terms and scope of the license, such as whether it is exclusive or nonexclusive or subject to territorial restrictions;

7) the rates paid by the licensee for the use of other patents comparable to the plaintiffs patent;

8) whether the licensee's sales of the patented invention promote sales of its other products and whether the invention generates sales to the inventor of his nonpatented items;

9) the utility and advantages of the patented property over the old modes or devices, if any, that had been used for working out similar results;

10) the extent to which the infringer used the invention and any evidence probative of the value of such use;

11) the portion of the profits in the particular business that is customarily attributable to the use of the invention or analogous inventions;

12) the portion of the profits that should be credited to the invention as distinguished from nonpatented elements, the manufacturing process, business risks or significant features or improvements added by the infringer;

13) the opinion and testimony of qualified experts and of the patent holder; and

14)        any other factors which in your mind would have increased or decreased the royalty the infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. The final factor establishes the framework which you should use in determining a reasonable royalty, *i.e.*, the payment that would have resulted from a negotiation between a patent holder and the infringer taking place at the time when the infringing sales first began.

**INSTRUCTION NO:  3.0**

## MISAPPROPRIATION OF TRADE SECRETS - INTRODUCTION

I-Flow claims that it is the owner of valuable confidential and proprietary information regarding preferences / material characteristics for an elastomeric bladder component of an ambulatory infusion pump device and certain business information in the infusion pump industry. I-Flow claims that this technical and business information are trade secrets and that Defendants "misappropriated" them. "Misappropriation" means the improper acquisition, use, or disclosure of the trade secrets.

I-Flow also claims that Defendants' misappropriation caused it harm or Defendants to be unjustly enriched. Defendants deny I-Flow's claims and contend that I-Flow's alleged technical and business information is not trade secret information.

**JURY INSTRUCTION NO:** 3.1

## MISAPPROPRIATION OF TRADE SECRETS -ESSENTIAL FACTUAL ELEMENTS

I-Flow claims that Defendants have misappropriated a trade secret. To succeed on this claim, I-Flow must prove the following:

1) That I-Flow owned one or more of the following:

    a.    Preferred range of modulus values for an elastomeric bladder material,

        i.    at 100% elongation is between approximately 75-190 psi,

        ii.    at 300% elongation is between approximately 140-300 psi

    b.    Range of acceptable tensile strengths: for an elastomer bladder material to have the minimum acceptable tensile range from approximately 1800 psi at the materials breaking point

    c.    Elongation of the bladder not to exceed 400 -500 % at maximum fill volume

    d.    Ultimate elongation of the bladder material at break no less than 675%

    e.    Acceptable burst rates from 0.1% to 0.0001%

    f.    Method of molding the bladder material whereby a first layer is dipped, dried and partially cured, a second layer is then dipped dried and partially cured, and finally a third layer is dipped, dried and fully cured for approximately 9 minutes

    g.    Average fill and crack pressures do not exceed 35 psi

    h.    I-Flow's marketing strategy of selling pumps by approaching doctors, hospital units, and hospital floor nurses

      i.       I-Flow's sales personnel selection criterion, choosing only sales personnel with experience selling medical devices to surgeons

      j.       I-Flow's cost of manufacture

      k.       I-Flow's pricing strategies

      l.       I-Flow's trade secret hospital sales strategy

2) That this technical and business information was trade secret at the time of the misappropriation;

3) That Defendants improperly used one or more of the trade secrets;

4) That I-Flow was harmed or Defendants were unjustly enriched by Defendants use of the trade secrets; and

5) That Defendants' use was a substantial factor in causing I-Flow's harm.

**INSTRUCTION NO:** __3.2__

**"TRADE SECRET" DEFINED**

  To prove that the technical and business information was a trade secret, I-Flow must prove all of the following:

1) That the technical and business information was secret;

2) That the technical and business information had actual or potential independent economic value because it was secret; and

3) That I-Flow made reasonable efforts to keep the technical and business information secret.

**INSTRUCTION NO: 3.3**

**SECRECY REQUIREMENT**

The secrecy required to prove that something is a trade secret does not have to be absolute in the sense that no one else in the world possesses the information. It may be disclosed to employees involved in I-Flow's use of the trade secret as long as they are instructed to keep the information secret. It may also be disclosed to nonemployees if they are obligated to keep the information secret. However, it must not have been generally known to the public or to people who could obtain value from knowing it.

**INSTRUCTION NO: 3.4**

**REASONABLE EFFORTS TO PROTECT SECRECY**

To establish that the technical and business information is a trade secret, I-Flow must prove that it made reasonable efforts under the circumstances to keep it secret. "Reasonable efforts" are the efforts that would be made by a reasonable business in the same situation and having the same knowledge and resources as I-Flow, exercising due care to protect important information of the same kind.

In determining whether or not I-Flow made reasonable efforts to keep the technical and business information secret, you should consider all of the facts and circumstances. Among the factors you may consider are the following:

1) Whether documents or computer files containing the technical and business information was marked with confidentiality warnings;

2) Whether I-Flow instructed its employees to treat the technical and business information as confidential;

3) Whether I-Flow restricted access to the technical and business information to persons who had a business reason to know the information;

4) Whether I-Flow kept the technical and business information in a restricted or secured area;

5) Whether I-Flow required employees or others with access to the technical and business information to sign confidentiality or nondisclosure agreements;

6) Whether I-Flow took any action to protect the specific technical and business information, or whether it relied on general measures taken to protect its technical and business information or assets;

7) The extent to which any general measures taken by I-Flow would prevent the unauthorized disclosure of the technical and business information;

8) Whether there were other reasonable measures available to I-Flow that it did not take;

The presence or absence of any one or more of these factors is not necessarily determinative.

# INSTRUCTION NO: 3.5

## MISAPPROPRIATION BY USE

Defendants misappropriated I-Flow's trade secrets by use if Defendants:

1) Used them without I-Flow's consent; and

2) Acquired knowledge of the trade secrets by improper means; or at the time of use, knew or had reason to  know that their knowledge of I-Flow's trade secrets was acquired under circumstances creating a legal obligation to limit use of the business and technical information.

**INSTRUCTION NO:**  **3.6**

**IMPROPER MEANS OF ACQUIRING A TRADE SECRET**

Improper means of acquiring a trade secret or knowledge of a trade secret include, but are not limited to theft, misrepresentation, breach or inducing a breach of a duty to maintain secrecy, unauthorized copying or spying, false pretenses, or other means of espionage.

However, it is not improper to acquire a trade secret or knowledge of the trade secret by any of the following:

1. Independent efforts to invent or discover the information;

2. Reverse engineering; that is, examining or testing a product to determine how it works, by a person who has a right to possess the product;

3. Obtaining the information as a result of a license agreement with the owner of the information;

4. Observing the information in public use or on public display; or

5. Obtaining the information from published literature, such as trade journals, reference books, the Internet, or other publicly available sources.

INSTRUCTION NO:  **3·7**

**"INDEPENDENT ECONOMIC VALUE" EXPLAINED**

Information has independent economic value if it gives the owner an actual or potential business advantage over others who do not know the information and who could obtain economic value from its disclosure, or use.

In determining whether information had actual or potential independent economic value because it was secret, you may consider the following:

1. The extent to which I-Flow obtained or could obtain economic value from the information in keeping it secret;

2. The extent to which others could obtain economic value from the information if it were not secret;

3. The amount of time, money, or labor that I-Flow expended in developing the information; and

4. The amount of time, money, or labor that was saved by a competitor who used the information.

The presence or absence of any one or more of these factors is not necessarily determinative.

INSTRUCTION NO.: *3.7.1*

**REMEDIES FOR MISAPPROPRIATION OF TRADE SECRET**

If I-Flow proves that Defendants misappropriated its trade secrets, then I-Flow is entitled to recover damages if the misappropriation caused I-Flow to suffer an actual loss or Defendants to be unjustly enriched.

If Defendants' misappropriation did not cause I-Flow to suffer an actual loss or Defendants to be unjustly enriched, I-Flow may still be entitled to a reasonable royalty for no longer than the period of time the use could have been prohibited.

**INSTRUCTION NO: 3.7.2**

**PUNITIVE DAMAGES FOR WILLFUL AND MALICIOUS MISAPPROPRIATION**

If you decide that Defendants' misappropriation caused I-Flow's harm, you must decide whether that conduct justifies an award of punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed I-Flow and to discourage similar conduct in the future.

In order to recover punitive damages, I-Flow must prove by clear and convincing evidence that Defendants acted willfully and maliciously. You must determine whether Defendants acted willfully and maliciously, but you will not be asked to determine the amount of any punitive damages. You will calculate the amount later.

"Willfully" means that Defendants acted with a purpose or willingness to commit the act or engage in the conduct in question, and the conduct was not reasonable under the circumstances at the time and was not undertaken in good faith.

"Maliciously" means that Defendants acted with an intent to cause injury, or that Defendants' conduct was despicable and was done with a willful and knowing disregard for the rights of others. "Despicable conduct" is conduct so vile, base, or wretched that it would be looked down on and despised by ordinary decent people. Defendants acted with knowing disregard if they were aware of the probable consequences of their conduct and deliberately failed to avoid those consequences.

INSTRUCTION NO: __3.8__

**AFFIRMATIVE DEFENSE – INFORMATION ACQUIRED THROUGH PROPER MEANS**

Defendants did not misappropriate I-Flow's trade secret information if Defendants prove that the information was readily ascertainable by proper means at the time of the alleged acquisition or use.

There is no fixed standard for determining what is "readily ascertainable by proper means." In general, information is readily ascertainable if it can be obtained, discovered, developed, or compiled without significant difficulty, effort or expense. For example, information is readily ascertainable if it is available in trade journals, reference books, or published materials.

On the other hand, the more difficult information is to obtain, and the more time and resources that must be expended in gathering it, the less likely it is that the information is readily ascertainable by proper means.

INSTRUCTION NO: **4.0**

BREACH OF CONFIDENCE-INTRODUCTION

I-Flow also claims that it has lost sales resulting from Defendants' acts constituting breach of confidence.  I-Flow claims that it offered non-trade secret confidential business and technical information (collectively, "Confidential Information") to Defendants in confidence, with the understanding that it was not to be disclosed to others, and Defendants used that Confidential Information for purposes beyond the limits of the confidence without I-Flow's permission.

I-Flow also claims that Defendants' unfair competition caused it harm.  Defendants deny I-Flow's claims.

INSTRUCTION NO: _4.0.1_

**BREACH OF CONFIDENCE – ESSENTIAL ELEMENTS**

I-Flow is seeking to recover damages from Defendants for breach of confidence. To recover on this claim, I-Flow must prove all of the following:

1. That I-Flow conveyed new and novel information to Defendants in confidence;

2. That Defendants knew that the information was confidential before it was disclosed to them by I-Flow;

3. That before I-Flow gave the information to Defendants, Defendants had a chance to reject receipt of the information on a confidential basis;

4. That Defendants accepted the information on the understanding that they would keep the information confidential;

5. That Defendants used or disclosed the information in breach of confidence;

6.. That Defendants' use or disclosure of the information caused damage to I-Flow; and

7. The nature and extent of I-Flow's damages.

INSTRUCTION NO: __4.1__

**REMEDIES FOR BREACH OF CONFIDENCE**

If I-Flow proves that Defendants engaged in acts constituting a breach of confidence, then I-Flow is entitled to recover damages if the breach of confidence caused I-Flow to suffer an actual loss.

INSTRUCTION NO: 4.2

**PUNITIVE DAMAGES FOR WILLFUL AND MALICIOUS UNFAIR COMPETITION**

If you decide that Defendants' acts constituted a breach of confidence and caused I-Flow's harm, you must decide whether that conduct justifies an award of punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed I-Flow and to discourage similar conduct in the future.

In order to recover punitive damages, I-Flow must prove that Defendants acted willfully and maliciously.

"Willfully" means that Defendants acted with a purpose or willingness to commit the act or engage in the conduct in question, and the conduct was not reasonable under the circumstances at the time and was not undertaken in good faith.

"Maliciously" means that Defendants acted with an intent to cause injury, or that Defendants' conduct was despicable and was done with a willful and knowing disregard for the rights of others. "Despicable conduct" is conduct so vile, base, or wretched that it would be looked down on and despised by ordinary decent people. Defendants acted with knowing disregard if they were aware of the probable consequences of their conduct and deliberately failed to avoid those consequences.

INSTRUCTION NO: **5.0**

## COMMON LAW UNFAIR COMPETITION - INTRODUCTION

I-Flow also claims that it has lost sales resulting from Defendants' acts constituting unfair competition under California common law. I-Flow claims that Defendants appropriated and used property that I-Flow had invested substantial time, skill, or money in developing without authorization or consent. I-Flow also claims that Defendants' unfair competition caused it harm or Defendants to be unjustly enriched. Defendants deny I-Flow's claims.

INSTRUCTION NO: __5.1__

**COMMON LAW UNFAIR COMPETITION – ESSENTIAL ELEMENTS**

I-Flow claims that Defendants have engaged in common law unfair competition. To succeed on this claim, I-Flow must prove the following:

1) That I-Flow had invested substantial time, skill, or money in developing its property;

2) That Defendants had appropriated and used I-Flow's property at little or no cost;

3) That Defendants' appropriation and use of I-Flow's property was without authorization or consent of I-Flow; and

4) That I-Flow could establish that it has been injured by Defendants' conduct.

INSTRUCTION NO:_**5.2**_

**REMEDIES FOR COMMON LAW UNFAIR COMPETITION**

If I-Flow proves that Defendants engaged in common law unfair competition, then I-Flow is entitled to recover damages if the unfair competition caused I-Flow to suffer an actual loss or Defendants to be unjustly enriched.

INSTRUCTION NO: 5.3

**UNJUST ENRICHMENT**

Defendants were unjustly enriched if their unfair competition caused Defendants to receive a benefit that they otherwise would not have achieved.

To decide the amount of any unjust enrichment, first determine the value of Defendants' benefit that would not have been achieved except for its misappropriation.  Then subtract from that amount Defendants' reasonable expenses.  In calculating the amount of any unjust enrichment, do not take into account any amount that you included in determining any amount of damages for I-Flow's actual loss.

INSTRUCTION NO: **5·4**

## PUNITIVE DAMAGES FOR WILLFUL AND MALICIOUS MISAPPROPRIATION

If you decide that Defendants' misappropriation caused I-Flow's harm, you must decide whether that conduct justifies an award of punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed I-Flow and to discourage similar conduct in the future.

In order to recover punitive damages, I-Flow must prove that Defendants acted willfully and maliciously.

"Willfully" means that Defendants acted with a purpose or willingness to commit the act or engage in the conduct in question, and the conduct was not reasonable under the circumstances at the time and was not undertaken in good faith.

"Maliciously" means that Defendants acted with an intent to cause injury, or that Defendants' conduct was despicable and was done with a willful and knowing disregard for the rights of others. "Despicable conduct" is conduct so vile, base, or wretched that it would be looked down on and despised by ordinary decent people. Defendants acted with knowing disregard they were aware of the probable consequences of their conduct and deliberately failed to avoid those consequences.

**INSTRUCTION NO: 6.0**

**FALSE ADVERTISING UNDER LANHAM ACT – INTRODUCTION**

Defendants have alleged that I-Flow has engaged in false advertising in violation of section 43(a) of the Lanham Act.  The Lanham Act imposes liability upon any person or entity who, in connection with any goods or services, uses in commerce any word, term, name, symbol or device or any combination thereof, or false or misleading description of fact, or false or misleading representation of fact which in commercial advertising or promotion, misrepresents the nature, characteristics, or qualities of their goods or services.

**INSTRUCTION NO:** _6.1_

**FALSE ADVERTISING UNDER THE LANHAM ACT**

Defendants claim that I-Flow has engaged in false advertising in violation of section 43(a) of the Lanham Act. To prevail on its claim for false advertising, Defendants have the burden of proving, by a preponderance of the evidence, each of the following elements:

(1)   A false description of fact or representation of fact by I-Flow in a commercial advertisement about its own or another's product;

(2)   The statement actually deceives or has the tendency to deceive a substantial segment of its audience;

(3)   The deception is material, in that it is likely to influence the purchasing decision;

(4)   I-Flow placed the false statement in interstate commerce; and

(5)   Apex has been or is likely to be injured as a result of the false statement, either by direct diversion of sales from itself to I-Flow or by a lessening of goodwill associated with the Solace pump.

INSTRUCTION NO: **6.2**

A statement may be considered literally false if it is false on its face or by necessary implication. When evaluating whether an advertising claim is literally false, the claim must be analyzed in its full context.

INSTRUCTION NO: **6.3**

**LANHAM ACT DAMAGES**

  To be entitled to damages, Defendants must prove that they suffered actual injury resulting from I-Flow's advertising.  If you find that Defendants have suffered actual injury as a result of I-Flow's advertisement, then you may award to Defendants: (1) I-Flow's profits, or (2)  any other damages sustained by Defendants.

INSTRUCTION NO:____7____

A corporate officer or director may be liable for tortuous acts committed on behalf of a corporation. Liability, if any, stems from the officer's or director's own conduct, not from their status as a director or officer of the corporation. An individual officer or director may be liable if he or she authorizes, directs, or actively participates in the wrongful conduct.

INSTRUCTION NO: ___8___

**Punitive Damages**

You must now decide the amount, if any, that you should award Plaintiff in punitive damages. The purposes of punitive damages are to punish a wrongdoer for the conduct that harmed the Plaintiff and to discourage similar conduct in the future.

There is no fixed formula for determining the amount of punitive damages, and you are not required to award any punitive damages. If you decide to award punitive damages, you should consider all of the following factors in determining the amount:

(a)    How reprehensible was defendant's conduct?

In deciding how reprehensible defendant's conduct

was, you may consider, among other factors:

1. Whether the conduct caused physical harm;

2. Whether defendant disregarded the health or safety of others;

3. Whether defendant was financially weak or

vulnerable and defendant knew Plaintiff was financially weak

or vulnerable and took advantage of it;

4. Whether defendant's conduct involved a pattern or practice; and

5. Whether defendant's acted with trickery or deceit.

(b)    Is there a reasonable relationship between the amount of

punitive damages and Plaintiff's harm?

(c)    In view of Defendant's financial condition, what

amount is necessary to punish it or him and discourage

future wrongful conduct? You may not increase the

punitive award above an amount that is otherwise

appropriate merely because Defendant has substantial

financial resources. Any award you name may not exceed defendants' ability to pay.